IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 10-41521 |
| DIABETES AMERICA, INC., | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

### EMERGENCY MOTION OF THE DEBTOR FOR INTERIM AND FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL AND GRANTING RELATED RELIEF

**COMES NOW** Diabetes America, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"), and hereby moves the Court pursuant to sections 105(a), 361, 362, and 363(c) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of interim and final orders authorizing the Debtor to use cash collateral on the terms and conditions contained herein and granting adequate protection with respect thereto. The Debtor also requests that the Court schedule a hearing to approve the relief requested herein on a final basis (the "Final Hearing") and grant certain related relief. In support of this Motion, the Debtor incorporates the statements contained in the Declaration of Bonita L. Groesser is Support of First Day Pleadings (the "Groesser Declaration") filed contemporaneously herewith and further respectfully states as follows:

### I.
### BACKGROUND

**Debtor's Business**

1.      On the date hereof (the "Petition Date"), the Debtor commenced the above-captioned case by filing a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code").  The Debtor is continuing in

possession of its properties and is managing its businesses, as a debtor-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     There are 24 million Diabetics in the United States, and the pace at which new patients are being diagnosed with Diabetes is growing faster than the U.S. population, with 44 million expected to be diagnosed by 2034.  The total estimated cost of Diabetes in 2007 was $174 billion, including $116 billion in direct health care costs and $58 billion in reduced national productivity due to absenteeism.  Studies conducted by Aetna have shown that meaningful and comprehensive Diabetic treatment designed and provided by Debtor and its affiliates have significantly improved clinical outcomes for patients and materially reduced overall medical and other costs associated with Diabetes and its co-morbidities.

3.     In Texas, the Debtor works with DCOA – Physicians Associates, PA ("DCOA"), which employs the doctors that provide medical services at the Debtor's clinics. The DCOA is a separate entity that has not filed for bankruptcy relief.  The medical services provided by the DCOA physicians generate revenues that belong to the DCOA. However, pursuant to a management agreement, dated December 10, 2008 (the "Management Agreement"), the Debtor is required to provide certain management services to the DCOA, including providing (a) billing and collection services for the DCOA, (b) cash management services for the DCOA, (c) facilities for the DCOA physicians to provide medical services, (d) medical supplies for the DCOA doctors, and (e) non-medical professional and administrative staff to assist the DCOA's physicians.  In return for these services, the DCOA pays the Debtor a management fee and reimburses the Debtor's expenses that are incurred on behalf of DCOA.

4.     Founded in 2004, the Debtor is a network of centrally managed medical clinics that provide comprehensive outpatient medical care, primarily to patients with Type 1, Type 2

and Gestational Diabetes.  The Debtor initially held clinics in Houston, Texas, but with the help

of investment capital, it subsequently expanded its centers to the Dallas and San Antonio areas.

By 2008, the Debtor had rapidly expanded to 17 clinics in Texas and 1 in Arizona.

5.       The Debtor treated over 18,000 patients as of 2010, and has over 51,000 visits per

year by individuals diagnosed with Diabetes. Unlike other Diabetes medical providers, which are

fragmented, the Debtor's clinics provide a multi-disciplinary treatment to their patients that

include comprehensive medical care, education, diagnostics and lifestyle and nutrition

counseling.  This comprehensive treatment has been shown by independent analytical studies to

substantially improve the long-term well being of patients, reduce the overall medical costs and

reduce other costs, like patient employee absenteeism and turnover, associated with Diabetes.

6.       By the end of 2008, the Debtor was not yet profitable, which caused the Debtor to

streamline its business to include only profitable services.  The Debtor's original business plan

was to generate revenue from 5 sources:  (a) medical services provided by physicians, (b)

educational services by non-physician professionals, (c) screening tests recommended by the

American Diabetes Association, (d) pharmaceutical services/products and (e) interactive real-

time wellness programs.  By the end of 2008, however, the Debtor was compelled to discontinue

non-profitable programs such as the interactive wellness programs and pharmaceutical

services/products.

7.       The Debtor has experienced several financial set-backs, which continue to strain

its cash flow.  First, the Debtor has entered into several long-term lease commitments, which

prevent it from discontinuing underperforming operations at several locations.  Second, in 2008,

Medicare and Medicaid imposed an ambitious payback plan, based on self-reporting functions

undertaken by the Debtor, which resulted in many months in 2009 where there was no revenue in

respect of Medicare or Medicaid patients.  Third, Aetna insurance, which covers a significant portion of the patients treated at Debtor's facilities, determined that some of the Debtor's billings in 2007 and 2008 that had been previously accepted should not be allowed and subsequently imposed a repayment program for the Debtor, despite challenges by the Debtor that many of the contested claims were valid.  This repayment program continues to offset medical claims by the patients treated at the Debtor's facilities who are covered by Aetna.  Fourth, in the Fall of 2008, Hurricane Ike, a Category 4 Hurricane, caused a serious business disruption due to closures of many of the Debtor's clinics and/or inaccessibility to clinics by patients, resulting in nearly a million dollars in lost revenue that could not be recouped by insurance.  Fifth, for a period of time since 2008, when the U.S. economy has been struggling, employers have reduced the scope of insurance benefits, many of which would fall into a non-acute provider program such as that of the Debtor.  Sixth, due to increased unemployment, a decrease in wages (and an increase in basic living expenses) and a shifting of costs from employers to their employees, co-pays have risen.  This has resulted in patient visits at the Debtor's clinics declining in the areas most heavily impacted and well as patients' inability to pay the co-pays for their visits.

8.     During this time period, despite having been presented with valid term sheets from strategic and financial investors, the Debtor was unable to secure investment capital from outside investors, due to the liquidity issues caused by the financial crisis of 2008 and 2009.  All of the aforementioned issues have been exacerbated by an uncertainty in the overall federal regulatory environment and in particular, federal Healthcare Reform, unpredictable changes in the tax code and new financial regulation all of which contributed to a general lack of availability of growth capital from traditional funding sources such as venture capital and commercial, asset-

based lenders.  At this time, the Debtor is seeking other sources of funding, in addition to investment capital.

9.      The Debtor currently has 17 outpatient Diabetic centers, including 8 in the greater Houston area, 4 in the Dallas, Texas area, 3 in the San Antonio, Texas area, 1 in the Corpus Christi, Texas area and 1 in the Phoenix, Arizona, area.  As of December 2010, the Debtor employed approximately 133 non-physician employees.  The Debtor generated, on average, approximately $1.267 million in revenues per month during 2010.  Debtor is diligently working to reduce its operating expenses and to increase revenues.  As of October 31, 2010, the Debtor's total liabilities exceeded $11 million.

**MetroBank Indebtedness**

10.      Pursuant to the terms of a certain Promissory Note dated September 7, 2007, as may have been extended and amended, Debtor obtained a loan in the original principal amount of $600,000.00 from MetroBank, N.A. ("MetroBank").  In connection with the MetroBank loan, Debtor executed a certain Business Loan Agreement, Commercial Security Agreement and other related documents.  MetroBank asserts a lien against property of the Debtor, including accounts, deposit accounts and other collateral more fully set forth in the applicable loan documents.  At this point in time, Debtor does not admit that MetroBank has a valid duly perfected lien and security interest on any assets of Debtor's bankruptcy estate.  The approximate indebtedness owing to MetroBank by Debtor, as of the Petition Date, was $556,112.15.  Debtor has attempted in good faith to negotiate repayment terms that would not place force it into a position where by it cannot repay this obligation.  This would include a potential reduction in the interest rate and an increase in the payback period or change in the amortization schedule.  To date those efforts have not been met with success.

11.     In addition to the other purported collateral allegedly held by MetroBank to secure any indebtedness, Debtor had *de minimus* cash in any account controlled by MetroBank and accounts receivable owing in the approximate amount of $1,000,000 as of the Petition Date. MetroBank will likely assert that it has an interest in "cash collateral" (as defined in Section 363(a) of the Bankruptcy Code, and to the extent such liens are valid, perfected, enforceable and unavoidable (the "Cash Collateral").

12.     Separate and apart from the accounts belonging to the Debtor prepetition, DCOA generates similar types of accounts from healthcare receivables owed by the government and insurance companies. While the Debtor provides cash management and financial services to DCOA, pursuant to their Management Agreement, it does not own the accounts belonging to DCOA. Moreover, MetroBank's loan documents do not include DCOA as a borrower, and DCOA has not pledged accounts to MetroBank in respect of the loan to the Debtor. Thus, MetroBank cannot claim that the accounts belonging to DCOA constitute Cash Collateral.

13.     Furthermore, a portion of the Debtor's cash receipts come from Medicare and Medicaid receivables. Indeed, the Medicare and Medicaid receivables comprise a portion of the cash receipts in which MetroBank claims a security interest. However, the Debtor denies that MetroBank has a security interest in the Medicare and Medicaid receivables. 42 U.S.C. § 1395(c) provides that "[n]o payment which may be made to a provider of services under this subchapter for any service furnished to an individual shall be made to any other person under an assignment or power of attorney." In other words, a lien cannot be granted on Medicare and Medicaid receivables.  As is known by experienced lenders in the healthcare industry, the only method for taking a security interest in Medicare and Medicaid receivables is by taking a security interest in the accounts in which such receivables are deposited by Medicare and Medicaid.  Moreover, to

take a security interest in a deposit account, a purported secured party must have control of that account. MetroBank does not have control of accounts currently maintained by the Debtor. Thus, the Debtor does not believe that MetroBank has a security interest in any Medicare and Medicaid receivables or proceeds thereof. Accordingly, the Debtor only seeks authority to use proceeds from the Medicare or Medicaid receivables to the same constitutes Cash Collateral.

**Certain Other Filed UCCs**

14.     In addition to the asserted secured claim by MetroBank, various other parties have filed UCC financing statements that may arguably create a lien on Debtor's inventory and accounts receivable.  The chart below sets forth the creditors that have filed UCC financing statements against Debtor, which the Debtor has located to date, regarding Debtor's inventory, accounts and/or accounts receivable, as well as the estimated debts owed to those parties, as reflected in the Debtor's current books and records.

| Alleged Creditor | Alleged Claim Amount |
|---|---|
| Denly ACI Partners, Ltd. | $93,500.00 |
| Dennis C. Von Waaden and Sally A. Von Waaden, Co-Trustees of the Von Waaden 2004 Revocable Trust | $450,000.00 |
| Afton Capital, Inc. | $90,000.00 |
| Apelles Investment Management, LLC | $4,900,000.00 |
| Frank and Dina Basile | $150,000.00 |
| Baytree Leasing Company, LLC | Unknown |
| Bonita Lue Groesser | $50,000.00 |
| Kimon J. Angelides | unknown |
| KB Centre, Ltd. | unknown |
| Venue at Hometown, Ltd. | unknown |

15.     It also appears that the Debtor entered into other loan documents purporting to create a security interest in the Debtor's assets. Each of the creditors described above, excluding MetroBank, are collectively referred to herein below as the "Other Secured Creditors".  The

Debtor is still reviewing the security agreements and other loan documents in an attempt to validate all of their claims.

16.     Attached hereto as Exhibit "A" is a proposed combined budget for the twenty (20) day period after the Petition Date for Debtor and DCOA (the "Interim Budget").  Inclusion of any income or expense item on Exhibit "A" attached hereto does not constitute an admission or acknowledgement that any of such items are assets or liabilities of the Debtor or Debtor's bankruptcy estate.  The Debtor contemplates having discussions with MetroBank and certain other secured creditors regarding a final cash budget (the "Final Cash Collateral Budget") of expenses the Debtor anticipates incurring in connection with the administration of these chapter 11 cases. The Debtor will submit the Final Cash Collateral Budget to the Court at or before the final hearing on this Motion. The expenses reflected and to be reflected in the Interim Budget and the Final Cash Collateral Budget represent amounts necessary to administer this bankruptcy estate for the benefit of all creditors and parties-in-interest.

**The Debtor's Urgent Need for Use of Cash Collateral**

17.     It is essential that the Debtor obtain immediate authority to use Cash Collateral, which is encumbered by security interest claimed by MetroBank and the Other Secured Creditors. As described in the Groesser Declaration, the Debtor lacks the liquidity necessary to fund current operating expenses, including rent, payroll and professional fees. While Debtor is seeking a potential DIP Lender that may be willing to provide working capital funding while the Debtor implements its long-term plan, a potential funding service has not been identified.

18.     Without access to the Cash Collateral, the Debtor will be unable to pay the post-petition costs and expenses set forth in the Cash Collateral Budget, including certain expenses necessary to maintain and protect the Debtor's assets and to administer this chapter 11 case.

Denial of this motion would deprive the Debtor of the only source of funds available to pay post-petition expenses.

**The Debtor's Urgent Need for Use of Cash Collateral**

19.     It is essential that the Debtor obtain immediate authority to use Cash Collateral, which is encumbered by security interest claimed by MetroBank and the Other Secured Creditors. As described in the Groesser Declaration, the Debtor lacks the liquidity necessary to fund current operating expenses, including rent, payroll and professional fees. While the Debtor is seeking a potential DIP Lender that may be willing to provide working capital funding while the Debtor implements its long-term plan, a potential funding service has not been identified.

20.     Without access to the Cash Collateral, the Debtor will be unable to pay the post-petition costs and expenses set forth in the Cash Collateral Budget, including certain expenses necessary to maintain and protect the Debtor's assets and to administer this chapter 11 case. Denial of this motion would deprive the Debtor of the only source of funds available to pay post-petition expenses.  Debtor reserves any and all objections to the extent, validity and priority of any liens and claims asserted by MetroBank and the Other Secured Creditors.

**II.**
**REQUEST FOR ENTRY OF ORDER FOR**
**AUTHORITY TO USE CASH COLLATERAL**

21.     Pursuant to Bankruptcy Rule 4001(b)(2), Debtor requests interim and final authorization to use the cash collateral claimed by MetroBank and the Other Secured Creditors.

22.     In connection with its operations, Debtor incurs expenses for payroll, employee benefits, employee expenses, professionals, insurance, rent, utilities, telephone, supplies, taxes and other operational costs.  Debtor's only source of cash from which to operate its business is it's cash on hand as of the Petition Date, any pre-petition accounts receivable collected and any

post-petition revenues that it may generate.  As mentioned above, MetroBank and Other Secured Creditors may claim that a portion of these funds constitute cash collateral.  At the present time, the Debtor needs to use all of its cash receipts and other sources of cash to pay payroll and other ordinary course of business operating expenses and professional fees.

23.     No material diminution in value of Debtor's inventory, accounts receivable and tangible assets is anticipated during the case while Debtor operates as a debtor-in-possession and continues its businesses.

**MetroBank is Adequately Protected**

24.     MetroBank and the Other Secured Creditors are entitled to adequate protection against any diminution in value of the cash collateral pursuant to sections 361 and 363(e) of the Bankruptcy Code. As discussed below, Debtor believes that these secured parties will be adequately protected by replacement liens on the Debtor's post-petition accounts, which should remain constant throughout this case.  Debtor does not believe there will be any diminution in value of any of MetroBank or the Other Secured Creditors collateral by use of the Cash Collateral as requested.

25.     Section 363(e) of the Bankruptcy Code provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest...."  The means by which adequate protection is provided are specified in section 361 of the Bankruptcy Code, which sets forth three non-exclusive forms of adequate protection: (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property; (b) provision of additional or replacement liens to the extent the use of property results in a diminution in value

of an entity's interest in property; and (c) such other relief as will result in an entity realizing the indubitable equivalent of its interest in property.  11 U.S.C. § 361.

26.     By this Motion, Debtor offers adequate protection to MetroBank for the use of Cash Collateral in the form of replacement liens on the Debtor's post-petition accounts receivable and proceeds of collection of accounts receivable, to the extent the use of cash collateral results in a decrease in the value of each such entities interest in such property upon which each such entity holds a validly perfected and unavoidable lien in such collateral.

27.     Debtor seeks authorization pursuant to sections 361, 362 and 363 of the Bankruptcy Code to use the Cash Collateral of MetroBank to pay the ordinary course operating expenses and professional fees of Debtor during the course of Debtor's Chapter 11 bankruptcy case. Debtor expressly reserves a right to file a subsequent pleading seeking to grant a senior priority lien to any potential debtor-in-possession lender pursuant to Section 364(d)(1) of the Bankruptcy Code.

**Request for Entry of Interim Cash Collateral Order**

28.     Bankruptcy Rule 4001(b)(2) authorizes the Court to enter an interim order authorizing the use of cash collateral pending a final hearing. Attached hereto as Exhibit "A" is an interim twenty (20) day budget outlining the categories of expenses which Debtor must pay to operate as a debtor-in-possession during the next twenty days pending a final hearing on the use of cash collateral. Debtor requires the use of cash collateral to fund its post-petition operations and to preserve property of its estate.  This Motion presents an emergency and Debtor requests emergency consideration of the Motion.

29.     To summarize, Debtor has immediate cash needs in the amounts described in Exhibit "A" to fund payroll and other expenses as set forth in the attached proposed budget

pending a final hearing on the usage of cash collateral by this Motion.  As discussed above, the receivables collected by Debtor are one of the single largest assets of Debtor.  Without access to these funds, Debtor cannot continue to employ the personnel necessary to continue operations for the benefit of all creditors and parties-in-interest.  The Debtor's efforts therefore require the emergency use of cash collateral in order to avoid immediate and irreparable harm to the Debtor's estate which will occur if this Motion is not granted and the use of the cash collateral requested herein approved.  Without the use of the cash collateral, the Debtor will be unable to retain or pay employees, to maintain their assets, to provide financial information, or to perform many of the tasks which are necessary to maximize the value of their assets.  Debtor additionally requests that the Court enter a final cash collateral hearing after notice and opportunity for a hearing.

## III.
## NOTICE

30.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Debtor's 20 largest unsecured creditors, as identified in the Debtor's chapter 11 petition; (c) MetroBank; and (d) the Other Secured Creditors.  In light of the nature of the relief requested, the Debtor submits that no other or further notice is required.

**WHEREFORE,** Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as Exhibit "B", authorizing it to use cash collateral pursuant to the terms of the budget attached hereto as Exhibit "A" on an interim basis as requested herein; that the Court set this Motion for a final hearing within fifteen (15) days; that the Court enter a final order granting the use of cash collateral as requested herein.  The Debtor additionally requests such other and further relief to which the Court may deem proper.

Respectfully submitted,

Dated:  December 21, 2010                 By:    _/s/ H. Joseph Acosta_
                                                Micheal W. Bishop, Esq.
                                                State Bar No. 02354860
                                                H. Joseph Acosta, Esq.
                                                State Bar No. 24006731
                                                **LOOPER REED & MCGRAW, P.C.**
                                                1601 Elm Street, Suite 4600
                                                Dallas, Texas 75201
                                                Telephone:  (214) 954-4135
                                                Facsimile:  (214) 953-1332

                                                **PROPOSED COUNSEL FOR
                                                DEBTOR-IN-POSSESSION**