**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 10-41521** |
| **DIABETES AMERICA, INC.,** | § | |
| | § | **CHAPTER 11** |
| **Debtor.** | § | |
| | § | |

### UNSWORN DECLARATION OF BONITA L. GROESSER

I, Bonita L. Groesser, hereby testify, under penalty of perjury, as follows:

1.       I am the Chief Operating Officer ("COO") of Diabetes America, Inc. (the "Debtor"). I have been employed by the Debtor as COO since August/September 2009.  Prior to my appointment as COO, I was the Executive Vice President of Operations of the Debtor.  As a result of my work experience and having reviewed documents and participated in conversations with other officers, directors and/or employees of the Debtor, I am familiar with the Debtor's day-to-day operations, business affairs and books and records. Therefore, I can attest to the truth and accuracy of the relevant facts set forth herein and in the first-day motions and requests submitted contemporaneously herewith (the "First Day Motions").

2.       I submit this Declaration in support of the Debtor's chapter 11 petition and the First-Day Motions filed by the Debtor. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussion with members of the Debtor's Management, my review of relevant documents, and/or my opinion, relying on my experience in the industry and knowledge of the Debtor's operations and financial condition. If called to testify, I could and would testify completely to the facts set for the herein. I am authorized to submit this Declaration.

**Background**

*Commencement of Cases*

3.        On December 21, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United Sates Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

4.        The Debtor continues to operate and manage its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases pursuant to section 1104 of the Bankruptcy Code. No official committee of unsecured creditors has yet been appointed.

*Overview of the Debtor's Business*

5.        There are 24 million people with Diabetes in the United States, and the pace at which new patients are being diagnosed with Diabetes is growing faster than the U.S. population, with 44 million expected to be diagnosed by 2034.  The total estimated cost of Diabetes in 2007 was $174 billion, including $116 billion in direct health care costs and $58 billion in reduced national productivity due to absenteeism.  Studies conducted by Aetna have shown that meaningful and comprehensive Diabetic treatment designed and provided by Debtor and its affiliates have significantly improved clinical outcomes for patients and materially reduced overall medical and other costs associated with Diabetes and its co-morbidities.

6.        Founded in 2004, the Debtor is a network of centrally managed medical clinics that provide comprehensive outpatient medical care, primarily to patients with Type 1, Type 2 and Gestational Diabetes.  The Debtor initially held clinics in Houston, Texas, but with the help of investment capital, it subsequently expanded its centers to the Dallas and San Antonio areas.

By 2008, the Debtor had rapidly expanded to 17 clinics in Texas and 1 in Arizona. Unlike other Diabetes medical providers, which are fragmented, the Debtor's clinics provide a multi-disciplinary treatment to their patients that include comprehensive medical care, education, diagnostics and lifestyle and nutrition counseling. This comprehensive treatment has been shown by independently run, analytical studies to substantially improve the long-term well being of patients, reduce the overall medical costs and reduce other costs, like patient employee absenteeism and turnover, associated with Diabetes. The Debtor has treated over 30,000 patients as of 2010, and has over 51,000 visits per year by individuals diagnosed with Diabetes.

7.     In 2003, Aetna identified a group of the Debtor's patients whose employer had put incentives in place for patients to receive care at the Debtor's clinics without co-payments. Aetna studied these patients over time and compared them with similar or "matched" Aetna patients that had Diabetes but were not seen by the Debtor for their care (the "control group"). In fact, these two groups have been compared a number of times by the Informatics group at Aetna over the last 3 years. The control group patients received "fragmented" care of their Diabetes, given by a primary care doctor or internist with referrals for an endocrinologist, educator and nutritionist.

8.     The Aetna study also has clearly revealed that the Debtor's patients are more engaged with their care, and more compliant with their medication and diet. In addition to their improvement in glucose control, these patients also had lower blood pressures and cholesterol, indicating they were taking more of their prescribed medications and compliant with their diets. At the end of the Year One of the study, there were improvements in all of these clinical indicators, which improved even further in Year Two. The costs for pharmacy initially increases as patients are more compliant with their medications, but those costs are offset by other benefits

in Year Two. Better Diabetes control decreases the impact of adverse events, the impact of which is observed after Year Two.

9.      The difference in total medical costs for the Debtor's patients who were studied, and the control group, diverges substantially after Year Two, being lower in the case of the Debtor's patients. Being able to avoid or reduce the high costs for these serious co-morbid diseases related to Diabetes make up 70% of the observed savings, leading to $262 less in costs for each Debtor patient each month in year 3. All of the clinical indicators remain at a high compliance rate in Year Three, becoming statistically different from the control group Diabetic patients. The co-morbid disease medical costs results for Year Three show a substantial decrease in costs related to kidney disease, renal failure, and cardiovascular disease. As shown in each of the first two years as well, not only were the Debtor's patients better controlled for diabetes, they had fewer cardiovascular events and hospitalizations. This independent study by Aetna provides conclusive evidence that the Debtor's treatment of patients substantially improves patient health and reduces total healthcare costs.

10.      The Debtor's original business plan was to generate revenue from five sources: (a) medical services provided by physicians, (b) educational services by non-physician professionals, (c) screening tests recommended by the American Diabetes Association, (d) pharmaceutical services/products and (e) interactive real-time wellness programs.  As discussed below, this model needed to be changed so that the Debtor could continue providing treatment services only at profitable locations or locations that have a reasonable likelihood to be able to meet the financial requirements of remaining in operation.

11.      The Debtor currently has 17 outpatient Diabetic centers, including 8 in the greater Houston area, 4 in the Dallas, Texas area, 3 in the San Antonio, Texas area, 1 in the Corpus

Christi, Texas area and 1 in the Phoenix, Arizona, area. As of December 2010, the Debtor employed approximately 133 non-physician employees. The Debtor generated, on average, approximately $1.267 million in revenues per month during 2010. Debtor is diligently working to reduce its operating expenses and to increase revenues. As of October 31, 2010, the Debtor's total liabilities exceeded $11 million.

### *Facts Leading Up to This Bankruptcy*

12.     In 2008, the Debtor experienced several financial set-backs, the impact of which still continue to strain the Debtor's cash flow. First, starting in 2008, the Debtor entered into several long-term lease commitments, as it was looking to expand its clinics beyond Houston, Texas. In February 15, 2008, the Debtor entered into a commercial lease with P.V. North, L.L.C. to lease space for a clinic that was to be opened in Goodyear, Arizona. The lease was scheduled to commence on September 1, 2008, and it had a five year term. Because of liquidity issues, however, the Debtor was unable to open the clinic at this location, but the landlord did not release the Debtor of its obligations under the lease.

13.     In addition to the center that could not be opened, the Debtor also has been unable to adjust operating expenses at centers that are located in areas that (a) had patient populations and employers that were impacted more significantly by the economic downturn and/or (b) leased to Debtor by landlords who would not permit Debtor to adjust the terms of the leases such that they were comparable to market rates. The Debtor has been unable to close these centers because of the long-term lease commitments entered into with the respective landlords of these centers. Debtor monitors clinical and operational performance on a daily basis to ensure all benchmarking metrics are met. When necessary, the underperforming centers were put on notice that they needed to improve on their revenues generated. DA worked with clinical teams to

improve this performance, however, not all doctors have been able to meet these criteria and as a result have been removed and replaced.

14.     In 2008, the Debtor also proactively identified some commonly used billing codes for Medicare services that were in a "grey" zone, subject to interpretation as to their applicability in this provider setting. After the Debtor self-reported this issue to Texas Trailblazers, the intermediary, the Center for Medicare and Medicaid Services, the agency that administers Medicare and Medicaid payments to providers, imposed an ambitions payback plan to recoup funds for the claims that were in the alleged "grey" zone, which resulted in many months in 2009 (from approximately March through August),l where there was no revenue from Medicare or Medicaid patients seen at the Debtor's clinics.

15.     In 2008, Hurricane Ike, which was a Category 4 Hurricane, caused the Debtor to temporarily close several of its clinics in the Houston area and resulted in several clinics being inaccessible to patients, even when the clinics were re-opened. This resulted in nearly $1 million dollars in lost revenue, which could not be recouped by insurance.

16.     Furthermore, for a period of time since 2008, when the U.S. economy has been struggling, employers have reduced the scope of insurance benefits, many of which would fall into a non-acute provider program such as that of the Debtor.  Moreover, due to increased unemployment, a decrease in wages (and an increase in basic living expenses) and the shifting of healthcare costs from employers to employees, co-pays have risen.  These two factors have resulted in decreased patient visits at the Debtor's clinics in the areas most heavily impacted, as well as an increase in the inability of patients to pay their co-pays for their visits.

17.     Furthermore, Aetna recently determined that some billings that had been previously approved and accepted from years 2007 through 2008 should not have been allowed

at the rate they were initially approved. As a result, it instituted a repayment program where it reduced current reimbursement for claims by the amounts it determined had been incorrectly billed for prior years. The repayment process has been ongoing since May 2010, and is expected to continue for two years.  The Debtor has disputed the claims that Aetna determined were invalid, but thus far has been unsuccessful in reducing the amounts in the repayment program.

18.     Because it had not been profitable as of 2008, the Debtor determined to streamline its business and discontinued unprofitable services such as its interactive wellness programs and pharmacy services. The debt incurred for maintaining these services for several years, however, was not offset by the discontinuation and such debt still negatively impacts the Debtor's cash flow.

19.     In an attempt to meet its working capital needs, the Debtor has searched for potential equity investors. In mid-2008, Debtor was presented by three binding proposals for equity funding and another proposal in 2009 to raise funds for the company. The Board of Directors of the Debtor voted to accept funding on both occasions, however, due to the negative impact of the financial crisis in 2008, the financings could not be completed. Since that time, the Debtor has been unable to raise investment capital, in part, because although the market opportunity and clinical model are very well understood and attractive, potential investors have had concerns about the uncertainty of the Healthcare Reform. The Debtor is currently seeking alternative sources of funding, in addition to investment capital and is negotiating with other capital sources, but, as of the Petition Date, has not yet found financing.

20.     In addition, in late 2009, the Debtor hired Healthcare Markets Group ("HMG") as financial advisors to assist in raising equity and debt capital.  With HMG's assistance, the Debtor

has developed a restructuring plan to reduce operating expenses, improve revenues and reduce the current liability, which continues to strain the Debtor's financial performance.

### *Relationship with DCOA –Physician Associate, P.A.*

21.     In Texas, the Debtor works closely with DCOA-Physicians Associates, PA ("DCOA"), which employs the doctors who provide medical services at the Debtor's Texas clinics. In Arizona, the Debtor, through its wholly-owned subsidiary, Diabetes America AZ LLC ("DAAZ"), employs all physicians and non-medical staff at its clinics. Both DCOA and DAAZ are separate entities that have not filed bankruptcy at this time.

22.     Pursuant to an Amended and Restated Management Services Agreement, signed by the Debtor and DCOA on or about December 10, 2008 (the "Management Agreement"), the Debtor is required to provide certain management services to the DCOA, including (a) billing and collection services, (b) cash management services, (c) facilities for DCOA Physicians to provide medical services, (d) provision of medical supplies for physicians and (e) non-medical and administrative staff to assist the physicians. In return for these services, DCOA pays the Debtor a management fee and pays the expenses incurred by the Debtor on behalf of DCOA.

23.     Prior to the Petition Date, the DCOA owed the Debtor approximately $3.5 million in fee and reimbursement expenses. The Debtor has made a demand on DCOA to pay these expenses. However, it is uncertain, at this time, whether the DCOA will be able to pay the Debtor at a future date.

### *Restructuring Plan*

24.     With the help of HMG, the Debtor has considered its various options and has formulated a plan to restructure its obligations, improve its revenue, discontinue underperforming operations and continue as a going concern. HMG and/or the principals of

HMG are expected to assist the Debtor in implementing such plan during the chapter 11 restructuring.

## First Day Motions

25.     An important and, in some cases, critical element of the Debtor's ability to achieve their objectives in this bankruptcy case requires approval of each of the First-Day Motions.[1]  I believe that the relief sought in each First-Day Motion is necessary to enable the Debtor to operate in chapter 11 as a debtor-in-possession. Factual information in support of the First-Day Motions is provided below, and I can attest to the veracity of these facts.

### *Complex Case Treatment*

26.     The Debtor seeks an Order Granting Complex Chapter 11 Bankruptcy Case Treatment (the "Complex Case Order"), subject to further order of the Court, which will: (a) direct that all non-emergency matters be heard at the pre-scheduled Omnibus Hearing Dates; (b) provide procedures for the timely filing of pleadings so that the underlying matters will be scheduled to be heard by the Court at the appropriate Omnibus Hearing Date; (c) limit the notice procedures in theses chapter 11 cases; and (d) establish procedures for being included in the service list.

27.     I believe this bankruptcy case is entitled to designation as a complex case because it has debt in excess of $10 million. In addition, there are more than 50 parties-in-interests involved in these cases.

28.     It is my belief and understanding that, by designating this case a "Complex Chapter 11, " and using the designated complex-case procedures, all parties will be assured of

---

[1] All capitalized terms not defined herein shall have the meanings assigned to them in their respective First-Day Motions.

receiving appropriate notice of matters affecting their interests and an ample opportunity to prepare and respond. Thus, no party will be adversely affected.

***Maintenance of Existing Cash Management System***

29.     It is my understanding that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. These guidelines require chapter 11 debtors to, among other things: (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes including payroll taxes; (c) maintain a separate debtor-in-possession account for all cash collateral; and (d) obtain checks for all debtor-in-possession accounts that bear the designation "Debtor-in-Possession", the bankruptcy-case number, and the type of account(s). As set forth below, I believe that, under the circumstances of this case, enforcing these requirements would not only disrupt the Debtor's operations and impose a financial burden on the estate, but could eliminate any chance of a successful reorganization while providing little, if any, benefit to the Debtor's estate and the creditors thereof.

30.     The Debtor manages cash for its operations through a depository account at Bank of America, N.A. ("BOA"), where all the Debtor's receipts from third-party payors are deposited, and an operating accounts (the "Operating Account") at Metro Bank, N.A. ("Metro Bank"), which the Debtor uses to pay payroll and other operating expenses. Money is regularly transferred from the BOA depository account to the Operating Account.

31.     In addition, the Debtor manages two depository accounts at BOA and one at Metro Bank, used for collection of all receipts to the DCOA, and one operating account at Metro Bank, on behalf of DCOA. Money from the depository accounts is regularly transferred to

DCOA's operating account. In turn, money from DCOA's operating account is regularly transferred to the Debtor's Operating Account to pay for the Debtor's management fee and other business expenses incurred on behalf of DCOA. All of the accounts held by the Debtor and DCOA are collectively referred to herein as the "Existing Accounts." The flow of funds between these accounts shall be referred to herein as the Debtor's "Cash Management System."

32.     The Cash Management System, of which the Existing Accounts are an integral part, provides an efficient and secure means of managing and disbursing cash for the Debtor's day-to-day operations. The closing of each of the existing accounts and the opening of new accounts could unnecessarily impair the Debtor's business operations and disrupt the Cash Management System, thereby hindering the operation of the businesses during the critical opening stages of these chapter 11 cases.

33.     A significant portion of the Debtor's cash comes from direct deposits made by Medicare and Medicaid on behalf of patients and residents. If the Debtor is forced to close its Existing Accounts and open new accounts, the Debtor will have to inform Medicare, Medicaid and other third party payors of the new account numbers. Until these payors update their systems to reflect the new account numbers (which could take as long as ninety (90) days), the Debtor's cash flow will be cut significantly. A debtor cannot reorganize without cash. Forcing the Debtor to alter the existing Cash Management System would preclude any hopes of reorganizing because the Debtor would not have access to valuable funds, in certain cases for up to ninety (90) days.

34.     The current Cash Management System is further beneficial to the Debtor's estate and creditors because it enables the Debtor to reduce the administrative expenses involved in moving funds, to maintain more accurate information regarding receipts, account balances and

disbursements, to maintain a more efficient process for the investment of cash, and to ensure compliance with the Debtor's accounting and disbursement control procedures.

35.     The Debtor has requested authority to: (i) maintain and continue to use any or all of the Existing Accounts in the names and with the account numbers existing immediately prior to the commencement of these chapter 11 cases (provided, however, that the Debtor reserves the right to close some or all of their Existing Accounts and open new debtor-in-possession accounts); (ii) deposit funds in and withdraw funds from any such accounts by all usual means, including checks, wire transfers, automated clearinghouse transfers, electronic funds transfers and other debits; and (iii) treat their Existing Accounts (and any accounts opened post-petition) for all purposes as debtor -in-possession accounts.

36.     I understand that any authorization to the banks in which the Existing Accounts are located will not authorize those banks to honor any check issued or dated prior to the Petition Date absent an order of this Court authorizing the banks to do so.

37.     The Debtor also requests a waiver of the requirement to include the term "Debtor-in-Possession" on its checks. The Debtor issues a large number of checks in the ordinary course of business, and it may be impractical to manually stamp "Debtor-in-Possession" on all checks (reflecting that the Debtor is operating as a debtor-in-possession). The Debtor requests authority simply to use their existing check stock rather than obtain new check stock reflecting its status as a debtor-in-possession and listing the case number of the Case. When the existing check stock is depleted, the Debtor will obtain new check stock reflecting their status as debtor-in-possession.

38.     I understand that the Bankruptcy Code requires that any deposit or other investment made by a chapter 11 debtor, except those insured or guaranteed by the United States, by a department, agency or instrumentality of the United States, or backed by the full faith and

credit of the United States, must be secured by a bond in favor of the United States and a corporate surety approved by the United States Trustee or the deposit of certain other prescribed securities. I have no reason to believe at this time that any of the Debtor deposits do not comply with this requirement, but if they do not, the Debtor requests a waiver of that noncompliance, given that all funds are deposited safely and prudently at financially stable banking institutions in a manner specifically designed to preserve capital, provide liquidity, and generate return.

39.     I understand that proposed counsel for the Debtor conferred with the Office of the United States Trustee regarding the Cash Management System. The U.S. Trustee agreed to allow the Debtor to continue to use the Existing Accounts, but did not, at this time, agree to waive the requirements under section 345 of the Bankruptcy Code. While the Debtor still requests authority to waive such requirement, the Debtor will continue to coordinate with the U.S. Trustee to assure it that adequate compliance with Section 345 is maintained through the Existing Accounts.

### *Prepetition Wages and Other Employee-Benefit Claims*

40.     Prior to the Petition Date, the Debtor employed 133 hourly and salaried employees (each an "Employee" and, collectively, the "Employees"). The Employees are paid bi-weekly, one week in arrears. The most recent pay date that preceded the Petition Date was December 17, 2010. On that pay date, the Debtor paid prepetition compensation to the Debtor's Employees for the period of November 29, 2010 through December 12, 2010 in the net take home amount of $191,334.51. Accordingly, as of the Petition Date, prepetition compensation was owed to the Employees for services rendered to and expenses incurred on the Debtor's behalf prior to the Petition Date. Some of this prepetition compensation is due and payable, while some of it will become due and payable in the ordinary course of business after the

Petition Date.  Some of such checks delivered to Debtor's employees on December 17, 2010 may not have cleared the bank as of the Petition Date.

41.     Additionally, Debtor owes its employees for pre-petition wages, salaries and benefits accrued for the period of December 13, 2010 through December 19, 2010 in an amount equal to approximately one half of the payroll paid on December 17, 2010 (i.e. - $95,667.25 of take home pay).  The Debtor requests authority to pay all of such amounts outlined above (plus, to the extent necessary, pay the amounts to DCOA's physicians). The Debtor does not propose to pay any individual prepetition compensation in excess of the priority cap imposed by section 507(a)(4) of the Bankruptcy Code; thus, it does not request authority to pay any compensation to Employees in excess of that priority cap.[2]

42.     Additionally, in the ordinary course of business, and while performing in the scope of their employment, some Employees incur a variety of business expenses, including, without limitation, travel, meal, and lodging expenses. These business expenses are reimbursed or paid by the Debtor. All such business expenses are typically paid by the Debtor as they are submitted and processed. Although it is difficult for the Debtor to determine the actual amount of reimbursable expenses owed to the Employees on the Petition Date, I do not believe that much is owed on account of such expenses. The Debtor pays approximately $5,000.00 in these types of expenses per month. Because it would be inequitable and cause an undue hardship if the Employees were forced to bear the cost of ordinary and necessary business expenses - many of which may be substantial and all of which were incurred on the Debtor's behalf with the

---

[2]     In the ordinary course of business, the Debtor requires services of certain independent contractors.  The independent contractors consist of temporary staff and other health care professionals.  These health care providers are critical to the Debtor's business.  The Debtor pays these independent contractors at the same time that it pays its Employees.  The Debtor estimates that from November 29, 2010 through December 12, 2010, the total payment to these independent contractors was $8,763.00.  Therefore, the Debtor estimates that it owes such independent contractors for the period of December 13, 2010 through December 19, 2010, an amount equal to approximately $4,381.50, one half of the amount normally paid during a payroll cycle.

expectation that they would be reimbursed or paid promptly - the Debtor requests the authority to pay these reimbursable, ordinary and necessary business expenses up to a maximum amount of $5,000.00 to the extent that such amounts are owed.

43.     Like most major businesses, the Debtor provides its Employees with certain general welfare benefits, including, without limitation, medical, dental, vision, life and disability insurance, personal time-off, flexible spending accounts, other paid leave, 401(k) savings plans, severance benefits, and other similar programs and miscellaneous benefits. These benefits are an integral part of each full time Employee's total compensation package. Interruption of these additional benefits would seriously disrupt the morale of the Employees and would undermine the Debtor's efforts to preserve the value of its estate. Thus, the Debtor requests authority to pay certain prepetition amounts attributable to such benefits from time to time as and when such amounts become due in the ordinary course of business. These benefits are described below.

### *Medical Benefits*

44.     The Debtor offers medical and dental benefits (collectively, the "Prepetition Medical Benefits") to eligible Employees and their dependents. These medical benefits are provided to eligible Employees and their dependents. Debtor's medical insurance is provided by Blue Cross/Blue Shield.  Debtor deducts amounts from certain of its employees' paychecks on a monthly basis for health insurance coverage for certain of the employees and/or their dependents. Debtor pays a portion of the monthly health insurance premium for certain of its employees.  As of the Petition Date, Debtor owed Blue Cross & Blue Shield the gross sum of $46,525.77 for the monthly premium covering December, 2010.  Approximately $11,000.00 of such sum are funds deducted from the employee's paychecks.

45.     To avoid potential interruption of medical insurance coverage for the employees, Debtor seeks permission from this Court to make a payment of $46,525.77 to Blue Cross & Blue Shield for the December 2010 monthly premium to ensure that the medical insurance continues for the employees.  The morale of the employees would be seriously undermined if medical benefits were interrupted.  More importantly, however, the Debtor wants to avoid the risk that their employees would not be given needed treatment because healthcare providers have not been paid for pre-petition services.  Therefore, the Debtor requests authority to take all steps necessary to maintain continued medical benefits for their employees.

### *Personal Time-Off*

46.     Based on their tenure with the Debtor, full-time Employees accrue vacation, sick leave, and other personal days (collectively, "Personal Time-Off" or "PTO").[3] The PTO was accrued based on work performed before the Petition Date. The Debtor does not propose to pay such amounts in lump-sum cash payments, but rather request the authority to permit Employees to use their PTO and other paid leave after the Petition Date in the ordinary course of business and according to their prepetition policy. Therefore, no former Employee will receive compensation for unused PTO.

### *401(k) Plan*

47.     The Debtor offers all eligible Employees an opportunity to participate in a 401(k) savings plan (the "401(k) Plan") held at The Hartford.  The Debtor does not match any of the funds contributed to the 401(k) Plan by the employees.  The Debtor typically pays the amounts withheld from employees' paychecks for the 401(k) Plan to The Hartford approximately seven

---

[3] Employees must be full-time employees to accrue PTO. If an Employee switches from part-time or as-needed employment to full-time employment, their accrual date relate back to their original hire date and not the date that they switched to full-time status. Part-time or as-needed employees receive no PTO.

(7) days after a pay day.  As of the Petition Date, Debtor has withheld the approximate sum of $6,702.80 from employees' pay checks for contributions to their respective 401(k) plans from the payroll paid on December 17, 2010.  The Debtor anticipates a payroll deduction in a similar amount for 401(k) contributions for the payroll anticipated on December 31, 2010. [4]

48.      Therefore, Debtor requests authority to take steps to pay sums withheld from Debtor's employees' paychecks (and, to the extent necessary, DCOA's employees paychecks) for periods prior to the Petition Date for the 401(k) Plan to The Hartford, in the ordinary course of business, in the gross amount of $18,456.10 for the pay day on December 17, 2010, and a similar amount of withholdings for the employee pay day on December 31, 2010.

49.      It is essential for morale that necessary steps are taken to protect the 401(k) Plan. Because the Debtor typically pays these a few days after paying payroll, a portion of this expense accrued prepetition similar to a portion of the Debtor's payroll.  The Debtor therefore requests authority, but not direction, to pay any for prepetition obligations related to the 401(k) Plan.

### *Other Benefits*

50.      The Debtor also provides or makes available to certain Employees additional benefits, including, without limitation, dental, life insurance, flexible spending accounts, workers' compensation benefits, eye care coverage, and other optional coverages.  Debtor pays for maintenance and insurance coverage on these benefits for its employees.  The referenced dental, eye care, life and optional coverage is provided by Lincoln National.   Workers' compensation benefits are through Travelers Insurance and are paid by the Debtor.  If there were any prepetition amounts owed for these benefits (either by the Debtor or on account of payments made to the Debtor by the Employees), the Debtor requests authority but not direction to pay

---

[4]      As authorized pursuant to the Management Agreement, the Debtor also withheld the sum of $11,753.30 for DCOA's payroll for 401(k) contributions by its physician employees on December 17, 2010.

such amounts as and when they become due in the ordinary course of their businesses. The Debtor pays the premiums to Lincoln National on a monthly basis.  The monthly premium owing to Lincoln National as of the Petition Date for the month of December 2010 is $11,439.83 for which Debtor seeks authority to pay through this Motion.

51.    The Debtor may have additional *de minimis* prepetition obligations related to employee contribution and benefits that have not been identified expressly in this Motion. Accordingly, the Debtor requests authority to pay any such additional obligations related to employee benefits up to an aggregate amount of $15,000. The Debtor reserves its rights to seek permission from this Court to pay obligations in excess of the $15,000 cap.

52.    To retain and maintain Employee confidence and morale, the Debtor requests authority to continue providing benefits to their Employees (as described herein) consistent with their prepetition customs and policies and to make all required payments (as described herein) for those benefits as reasonably necessary.

### *Honoring Prepetition Checks and Electronic Transfers*

53.    The Debtor requests that, to the extent available, all applicable banks and other financial institutions shall be directed to receive, process, honor, and pay all checks presented for payment and to honor all fund-transfer requests made by the Debtor relating to the claims or obligations addressed herein (including, to the extent necessary, payroll checks made to DCOA physicians), regardless if such checks were presented or fund-transfer requests were submitted before or after the Petition Date. The Debtor further requests authority to issue postpetition checks or to effectuate postpetition fund transfers for replacement checks regarding the relief requested herein if their checks or fund-transfer requests were previously dishonored or denied because of the commencement of this case.

54.     To retain and maintain Employee confidence and morale, the Debtor requests authority to continue providing benefits to their Employees (as described herein) consistent with their prepetition customs and policies and to make all required payments (as described herein) for those benefits as reasonably necessary.

55.     The Debtor believes, and I agree, that payment of each of the above amounts is crucial to the ability to preserve the value of Debtor's assets. Without payment of the above amounts, employees will most likely stop providing quality treatment for the Debtor's patients, thus reducing the amount of patient visits. If that occurs, the Debtor may not be able to reorganize.

### *Use of Cash Collateral*

56.     Prior to the Petition Date, the Debtor has been unable to obtain financing to fund its working capital needs. At this time, the Debtor intends to fund its operating expenses with the use of their cash flow stream. It is fair to say that the only liquidity the Debtor had, at this time, are the revenues generated by the Debtor and DCOA.

57.     Because of the Debtor's urgent need to use such revenues, the Debtor has filed an emergency motion to use cash collateral in which certain secured parties, including Metro Bank, claim a security interest. The Motion also seeks authority to provide the secured parties with adequate protection in the form of replacement liens on the Debtor's assets. The Motion does not, however, seek a determination of the extent and validity of the security interests claimed by third parties.

58.     The Debtor is seeking to use Cash Collateral on an emergency basis given the immediate and irreparable harm that will be suffered by the Debtor and its patients if the Debtor is denied the ability to use Cash Collateral. Cash Collateral is necessary for the Debtor to sustain

business operations, and continue caring for its current patients. The Cash Collateral use will permit the Debtor to, among other things, maintain the operations of DCOA and the Debtor's clinics and thereby preserve the value of the bankruptcy estate.

59.     Absent immediate use of Cash Collateral, the Debtor must cease business operations, leaving its existing patients with no means of obtaining proper medical treatment. The Debtor therefore needs to ensure the availability of such working capital now.

***Employment of HMG as Financial Advisors***
***and Appointment of Monte B. Tucker as Chief Restructuring Officer***

60.     Pursuant to an engagement letter, dated December 20, 2010 (the "HMG Engagement Letter"), the Debtor seeks to employ HMG as financial advisors to assist the company in pursuing and implementing various long-term strategic options, including raising debt or equity financing, discontinuing certain inefficient operations and potentially selling the company.  The Debtor also proposes to appoint Monte B. Tucker as the Chief Restructuring Officer of the Debtor, to provide necessary interim turnaround management while the Debtor reorganizes through this chapter 11 bankruptcy.

61.     The Debtor is familiar with the extensive experience of HMG and its professionals in providing financial and restructuring advisory services in the healthcare industry.  The principals of HMG, including Mr. Tucker and Francis Curry, who is assisting in this engagement, have spent the better part of their professional careers in senior management positions in the healthcare industry.  Thus, Mr. Tucker and HMG professionals are well-qualified in providing the interim management services and financial advisory services contemplated by the HMG Engagement Letter.

62.     HMG and Mr. Tucker have worked closely with the Debtor for over a year, assisting it in attempting to raise capital and evaluate its operations.  Indeed, Mr. Tucker and

other HMG professionals have assisted the Debtor in developing a preliminary restructuring plan to discontinue certain operations that are not efficient, fund operations with the use of existing revenues from the Debtor and DCOA, and pursue various types of financing options.

63.     The Debtor is also in a critical need of interim management at this time.  The Debtor is currently operating without a President or CFO, as the former officers in those positions either temporarily occupied those positions and/or resigned from the Debtor.  While the Board of Directors of the Debtor has sought to replace those officers, it has been unable to fill those positions with permanent officers.   It is crucial that the Debtor has established and knowledgeable management in place, while it attempts to reorganize in bankruptcy.  The Debtor therefore requests the employment of HMG as financial advisors and the appointment of Mr. Tucker as the Chief Restructuring Officer.

### *Motion to Prohibit Utilities from Altering Service*

64.     The Debtor receives electricity, gas, telephone, internet, water, sewer, and trash removal services (the "Utility Services") from approximately 90 utilities (the "Utility Companies") and possesses over 38 individual accounts.  To the extent the Debtor does not hold an individual account, the landlords of the Debtor's various clinics (the "Landlords") pay the Utility Companies on behalf of the Debtor, pursuant to their respective leases.

65.     For the most part, the Debtor attempted to remain current with regard to its individual accounts with the Utility Companies.  Furthermore, to the best of the Debtor's knowledge, the Debtor is current on all amounts owing to the Utility Companies, other than the payment interruptions that may be caused by the commencement of this Bankruptcy Case or checks failing to clear prior to filing this case.

66.     Continued and uninterrupted utility services are vital to the Debtor's ability to sustain its clinics on a daily basis.  Inability to ensure sustained Utility Services could jeopardize the Debtor's ability to provide medical and non-medical services to its patients, maintain its operations and ultimately reorganize.  The Debtor therefore requests that the Court enter an order prohibiting Utility Companies or the Landlords from altering, refusing and/or discontinuing utility services on account of prepetition invoices.  The Debtor also proposes procedures for providing Utility Companies with adequate assurance of future performance, pursuant to section 366 of the Bankruptcy Code.

***Motion to Extend Time to File Bankruptcy***
***Schedules and Statement of Financial Affair***

67.     The Debtor has over eleven million dollars in debt, has numerous operations in Texas and Arizona, and has over 133 non-physician employees.  In addition to its own administrative tasks, the Debtor is also responsible for providing cash management, financial and management services to DCOA and its physician employees.  The Debtor does not have sufficient administrative staff to provide such services and assist the Debtor with all of its initial disclosure requirements upon the commencement of this case.  Moreover, given the Holidays, the Debtor is expected to have even less administrative staff readily available to prepare the Debtor's Bankruptcy Schedules and Statement of Financial Affairs. Given the foregoing, the Debtor requests an additional thirty (30) days beyond the current deadline to file its Schedules and Statement of Financial Affairs.  Such additional time will help ensure that the Debtor's financial information is accurately collected and reported and will still afford parties in interest ample time to review such bankruptcy disclosure.

Pursuant to 28 U.S.C. § 1749, I declare, under penalty of perjury, that the foregoing is true and correct.

**EXECUTED** this 21[th] day of December, 2010.

*Bonita L. Groesser*

Bonita L. Groesser