IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 10-41521** |
| **DIABETES AMERICA, INC.,** | § | |
| | § | **CHAPTER 11** |
| Debtor. | § | |
| | § | |

**EMERGENCY MOTION FOR AUTHORITY TO: (A) EMPLOY HEALTHCARE
MARKETS GROUP AS FINANCIAL ADVISORS AND TO PROVIDE
INTERIM MANAGEMENT ASSISTANCE; AND (B) DESIGNATE
MONTE B. TUCKER AS CHIEF RESTRUCTURING OFFICER**

**COMES NOW** Diabetes America, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"), and files this Emergency Motion for Authority to: (a) Employ Healthcare Markets Group as Financial Advisors and to Provide Interim Management Assistance; and (b) Designate Monte B. Tucker as Chief Restructuring Officer (the "Motion"). The Declaration of Monte B. Tucker in Support of the Debtor's Motion for Authority to (A) Employ Healthcare Markets Group as Financial Advisors and to Provide Interim Management Assistance; and (B) Designate Monte B. Tucker as Chief Restructuring Officer (the "Tucker Declaration") is attached to this Motion as Exhibit "1."  In further support of the Motion, the Debtor respectfully states as follows:

## I.  BACKGROUND

1.      On the date hereof (the "Petition Date"), the Debtor commenced the above-captioned case by filing a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code").  The Debtor is continuing in

possession of its properties and is managing its businesses, as a debtor-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      There are 24 million people with Diabetes in the United States, and the pace at which new patients are being diagnosed with Diabetes is growing faster than the U.S. population, with 44 million expected to be diagnosed by 2034.  The total estimated cost of Diabetes in 2007 was $174 billion, including $116 billion in direct health care costs and $58 billion in reduced national productivity due to absenteeism.  Studies conducted by Aetna have shown that meaningful and comprehensive Diabetic treatment designed and provided by the Debtor and its affiliates have significantly improved clinical outcomes for patients and materially reduced overall medical and other costs associated with Diabetes and its co-morbidities.

3.      Founded in 2004, the Debtor is a network of centrally managed medical clinics that provide comprehensive outpatient medical care, primarily to patients with Type 1, Type 2 and Gestational Diabetes.  The Debtor initially held clinics in Houston, Texas, but with the help of investment capital, it subsequently expanded its centers to the Dallas and San Antonio areas. By 2008, the Debtor had rapidly expanded to 17 clinics in Texas and 1 in Arizona.

4.      The Debtor treated over 30,000 patients as of 2010, and has over 51,000 visits per year by individuals diagnosed with Diabetes. Unlike other Diabetes medical providers, which are fragmented, the Debtor's clinics provide a multi-disciplinary treatment to their patients that include comprehensive medical care, education, diagnostics and lifestyle and nutrition counseling.  This comprehensive treatment has been shown by independent analytical studies to substantially improve the long-term well being of patients, reduce the overall medical costs and reduce other costs, like patient employee absenteeism and turnover, associated with Diabetes.

5.      By the end of 2008, the Debtor was not yet profitable, which caused the Debtor to streamline its business to include only profitable services.  The Debtor's original business plan was to generate revenue from 5 sources:  (a) medical services provided by physicians, (b) educational services by non-physician professionals, (c) screening tests recommended by the American Diabetes Association, (d) pharmaceutical services/products and (e) interactive real-time wellness programs.  By the end of 2008, however, the Debtor was compelled to discontinue non-profitable programs such as the interactive wellness programs and pharmaceutical services/products.

6.      The Debtor has experienced several financial set-backs, which continue to strain its cash flow.  First, the Debtor has entered into several long-term lease commitments, which prevent it from discontinuing underperforming operations at several locations.  Second, in 2008, Medicare and Medicaid imposed an ambitious payback plan, based on self-reporting functions undertaken by the Debtor, which resulted in many months in 2009 where there was no revenue in respect of Medicare or Medicaid patients.  Third, Aetna insurance, which covers a significant portion of the patients treated at Debtor's facilities, determined that some of the Debtor's billings in 2007 and 2008 that had been previously accepted should not be allowed and subsequently imposed a repayment program for the Debtor, despite challenges by the Debtor that many of the contested claims were valid.  This repayment program continues to offset medical claims by the patients treated at the Debtor's facilities who are covered by Aetna.  Fourth, in the Fall of 2008, Hurricane Ike, a Category 4 Hurricane, caused a serious business disruption due to closures of many of the Debtor's clinics and/or inaccessibility to clinics by patients, resulting in nearly a million dollars in lost revenue that could not be recouped by insurance.  Fifth, for a period of time since 2008, when the U.S. economy has been struggling, employers have reduced the scope

of insurance benefits, many of which would fall into a non-acute provider program such as that of the Debtor.  Sixth, due to increased unemployment, a decrease in wages (and an increase in basic living expenses) and the shifting of healthcare costs from employers to employees, co-pays have risen.  The last two factors have resulted in decreased patient visits at the Debtor's clinics in the areas most heavily impacted, as well as an increase in the inability of patients to pay their co-pays for their visits.

7.      During this time period, despite having been presented with valid term sheets from strategic and financial investors, the Debtor was unable to secure investment capital from outside investors, due to the liquidity issues caused by the financial crisis of 2008 and 2009.  All of the aforementioned issues have been exacerbated by an uncertainty in the overall federal regulatory environment and in particular, federal Healthcare Reform, unpredictable changes in the tax code and new financial regulation all of which have contributed to a general lack of availability of growth capital from traditional funding sources such as venture capital and commercial asset-based lenders.  At this time, the Debtor is seeking other sources of funding, in addition to investment capital.

8.      The Debtor currently has 17 outpatient Diabetic centers, including 8 in the greater Houston area, 4 in the Dallas, Texas area, 3 in the San Antonio, Texas area, 1 in the Corpus Christi, Texas area and 1 in the Phoenix, Arizona, area.  As of December 2010, the Debtor employed approximately 133 non-physician employees.  The Debtor generated, on average, approximately $1.267 million in revenues per month during 2010.  Debtor is diligently working to reduce its operating expenses and to increase revenues.  As of October 31, 2010, the Debtor's total liabilities exceeded $11 million.

## II.   <u>RELIEF REQUESTED</u>

9.      By and through this Motion, the Debtor seeks to employ Healthcare Markets Group ("HMG") as its financial advisors and to provide interim management assistance in this bankruptcy case. The Debtor further seeks to designate Monte B. Tucker as Chief Restructuring Officer ("CRO") during the pendency of this case.

10.     The Debtor is familiar with the professional standing and reputation of HMG and its professionals in the health care industry, and believes HMG and Mr. Tucker are well-qualified to provide the services contemplated in the engagement letter, dated December 10, 2010 (the "HMG Engagement Letter"), a draft of which is attached as Exhibit "A" to the attached Tucker Declaration and incorporated herein by reference.  HMG is a healthcare advisory and investment banking firm that has three operating units: a healthcare advisory unit, which provides strategic guidance and customized research; a specialized healthcare investment banking unit, which develops and implements plans to enhance client value; and a finance unit, which raises debt/equity funding for healthcare related projects. HMG works with its clients on the formulation of sound business strategies, restructuring businesses, raising equity capital, and forming strategic alliances. HMG has gained extensive experience in the healthcare industry through its long term consulting and transactional relationships, its considerable research activities and its continued discourse with industry leaders.

11.     The principals of HMG have also spent the better part of their professional careers in senior management positions in the healthcare industry. Specifically, Mr. Tucker, a Principal of HMG, entered health care industry in the early 70's and has served in various senior management positions of national healthcare firms.  Mr. Tucker has served as an executive of several health care organizations ranging from start-ups to turnaround projects in complex

medical markets including long term acute care, home health care, management information systems, outpatient diagnostic imaging and ambulatory surgery centers. During his career, Mr. Tucker also has sponsored the acquisition, development or divestiture of acute care hospitals, outpatient rehabilitation centers, cancer treatment centers and medical office buildings and participated in an advisory role to leading healthcare companies for M&A activities, market strategies, restructuring and turnaround strategies, facility planning, joint ventures and strategic plans. Mr. Francis J. Curry, a Principal of HMG who has been assisting the Debtor, has spent the last 20 years in the healthcare industry assisting corporations with the assessment of their business models and operations to increase shareholder value. Among other things, Mr. Curry has performed this work for start-up, spin-off, Fortune 500, and some of the industry's leading healthcare companies focusing on areas for expansion and bottom-line improvement.

12.     HMG, Mr. Tucker and Mr. Curry also hold substantial knowledge of the Debtor's operations and capital needs, having worked closely with the Debtor's management and Board of Directors for over a year. In the Fall of 2009, the Debtor retained HMG as financial advisors to assist in raising equity and debt capital. During the course of its engagement, HMG's role expanded, at the request of the Debtor's management. In October 2010, HMG began assisting the Debtor to develop a preliminary restructuring plan to improve revenues, reduce inefficiencies and restructure obligations that currently impair the Debtor's ability to meet its working capital needs.

13.     The Debtor believes the financial advisory and interim management services of HMG and Mr. Tucker are necessary to enable the Debtor to maximize the value of its estates and to successfully reorganize.

### III.   SCOPE AND TERMS OF RETENTION OF THE CRO

14.     Pursuant to section 327 of the Bankruptcy Code, the Debtor seeks authority to engage Monte B. Tucker as the CRO to manage the Debtor's day-to-day operations and restructuring efforts, including negotiating with parties in interest and coordinating the "working group" of the Debtor's employees and external professionals who are assisting the Debtor in its restructuring.  The terms of such employment and retention of the CRO are set forth in the HMG Engagement Letter.

15.     The CRO will have direct control over all of the Debtor's employees. Furthermore, the CRO will have direct control over any officers of the Debtor, as well as any employees of HMG who are providing management assistance to the Debtor (the "Engagement Staff"). The CRO and the Engagement Staff will also be responsible, along with Debtor's counsel, for communicating with the Debtor's creditors and interest holders and this Court.

### IV.   SCOPE OF FINACIAL ADVISORY AND INTERIM MANAGEMENT SERVICES

16.     HMG's financial advisory and interim management assistance will include financial reporting, bankruptcy reporting, preparation of the Debtor's schedules and statements of financial affairs, preparing cash flow projections, evaluating the viability of the Debtor's business operations, and such other consulting and advisory services as the CRO and the Debtor deems appropriate and feasible in the course of this bankruptcy case. HMG's responsibilities will include, without limitation:

- Assisting the Debtor and CRO in the restructuring process, including (a) developing possible restructuring plans or strategic alternatives for maximizing value for stakeholders, (b) negotiating with lenders, vendors, suppliers and other stakeholders in connection with a restructuring including with respect to interim or other financing and any restructuring process, and (c) managing and overseeing

11 U.S.C. § 363 asset sales (if any), and (d) proposing plans of reorganization or liquidation;[1]

- Directing the cash management and treasury functions of the Debtor and/or affiliates, including but not limited to development/maintenance of short-term weekly case use budgets, disbursement of cash and managing overall liquidity;

- Assisting the Debtor and CRO develop overall strategic and business plans, including, but not limited to, analyzing alternative plans and exit strategies, and evaluation of the possible rejection of any executory contracts and unexpired leases;

- Assisting in the evaluation and analysis of avoidance actions, including fraudulent and preferential transfers;

- Analyzing creditor claims;

- Managing the Debtor's accounting and financial reporting functions; provided, however, that neither Mr. Tucker nor the Engagement Staff will provide any services as part of the services provided to the Debtor that would require a professional license such as that of a certified public accountant or attorney-at-law;

- Managing the Debtor's reporting activities pertaining to requirements of the Court, the U.S. Trustee's office and any post petition DIP lender, including, but not limited to, overseeing the preparation of the Debtor's Bankruptcy Schedules and Statement of Financial Affairs;

- Serving as the Debtor's primary restructuring liaison with the business representatives and financial advisors of parties in interest in this case or any committee subsequently appointed in this case;

- Providing testimony before the Court on matters within HMG's areas of expertise and consistent with the roles of CRO and its team;

- Directing the efforts and activities of the Debtor and assisting Debtor's bankruptcy counsel in connection with any section 363 asset sales, and, in connection with such sales, developing bid procedures, assisting in negotiating "stalking horse" agreements, managing the marketing/solicitation process, assisting in conducting auctions, and advising the Debtor's officers/management and bankruptcy counsel regarding determination of the "highest or best" offer; and

- Assisting in such other matters that fall within the expertise of HMG and are consistent with the roles of CRO as may be mutually agreed upon in writing between HMG and the Debtor, including serving in other officer positions, if required.

## V.   HMG'S DISINTERESTEDNESS

17.     HMG has informed the Debtor that, except as may be set forth in the Tucker Declaration, it (i) has no connection with the Debtor, its creditors, or other parties in interest in this case, (ii) does not hold any interest adverse to the Debtor's estate, and (iii) believes it is a "disinterested person" as defined within section 101(14) of the Bankruptcy Code.

18.     HMG will conduct an ongoing review of its files to ensure that no conflicts or disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, HMG will supplement its disclosures to the Court.

19.     HMG is not owed any amounts with respect to its pre-petition fees and expenses. The Debtor understands that HMG intends to apply to the Court for allowances of compensation and reimbursement of expenses for interim management and management assistance provided by the CRO and HMG professionals, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules for the Southern District of Texas, Orders of this Court, and guidelines established by the United States Trustee.

20.     HMG will be compensated for all its regular services on an hourly basis, based on an hourly fee of $275.00 per hour for Mr. Tucker and Mr. Curry, provided that the HMG's compensation will capped at $4,500.00 per week (the "Hourly Fees").  HMG will keep track of

the time spent by it professionals performing services in one-tenth of an hour increments, in accordance with the Bankruptcy Code and the Local Rules of this Court.[2]

21.     In addition to the Hourly Fees, the Debtor agrees to pay HMG a financing fee if HMG arranges post-petition financing for the Debtor, including debtor-in-possession financing and/or primer financing (the "Financing Fee"). The Financing Fee will be equal to three percent of the aggregate amount of any financing and will be paid out of the proceeds of such financing.

22.     In addition to the Hourly Fee, the Debtor agrees to pay HMG a Performance Fee (the "Performance Fee"), which will be awarded to HMG assuming the Debtor exits chapter 11 within 24 weeks from the day of filing as a going concern as defined by GAAP. The Performance Fee will consist of two separate payments, one in stock and one in cash. The cash portion of the Performance Fee will be in the amount of $150,000.  The equity portion of the Performance Fee will be determined by agreement of the Board of Directors of the Debtor and HMG, and will represent a percentage of the Debtor's post exit common equity, adjusted for any dilution caused by an equity financing. The cash portion is subject to a reduction of $10,000 a month for every month past week 24 that the Debtor does not exit bankruptcy.  The maximum the cash portion can be reduced is $30,000.

23.     In addition to the Hourly Fees, Financing Fee and Performance Fee, HMG will be compensated a Transaction Fee (the "Transaction Fee") if the Debtor completes a sale of its business with a purchaser that is identified by HMG.  The Transaction Fee will be equal to six percent of the value of the sale transaction, which value is defined as the total proceeds and any other consideration paid by a purchaser that is identified by HMG.  The Transaction Fee will be

---

[2] There may be additional employees of HMG who may be asked to assist Mr. Tucker and Mr. Curry, but who have lower billing rates.

**EMERGENCY MOTION FOR AUTHORITY TO: (A) EMPLOY HEALTHCARE MARKETS GROUP AS FINANCIAL ADVISORS; AND (B) DESIGNATE MONTE B. TUCKER AS CHIEF RESTRUCTURING OFFICER– PAGE 10**
424740.6

equal to six percent of the value of the sale transaction, which value is defined as the total proceeds and any other consideration paid by the purchases as part of such transaction.

24.     In addition, if HMG arranges equity or debt financing, HMG shall receive an additional Transaction Fee consisting of warrants to purchase the Debtor's common stock, equal to four percent of the fully diluted common stock of the Debtor.  Upon termination of HMG's engagement, the Debtor agrees to pay HMG the Finance Fee, Performance Fee, Transaction Fee and the additional Success Fee identified in the HMG Engagement Letter, if the transactions related to those fees are consummated within 12 months after HMG ceases to be the Debtor's financial advisor.

25.     HMG does not and will not share with any person or firm the compensation to be paid to HMG for professional services rendered in connection with this case except to the extent that HMG professionals and consultants are paid for their time out of the fees charged to the Debtor.

26.     Finally, the Debtor agrees to reimburse HMG for all reasonable out-of-pocket expenses incurred by HMG and Mr. Tucker in carrying out the terms of the engagement and in discharging the duties, including communication charges, travel expenses, telephone, postage, copy expenses, delivery and distribution charges.

27.     All compensation and reimbursement are subject to approval by this Court, in accordance with section 330 of the Bankruptcy Code and the Local Rule for the Southern District of Texas.

28.     The Debtor also has agreed to enter into the indemnification agreement attached to the HMG Engagement Letter as an Appendix. The Indemnification provided by such

agreement covers actions that do not constitute gross negligence or willful conduct resulting in injury to the Debtor.

## VI.  AUTHORITY FOR THE RELIEF REQUESTED

29.     Section 327 of the Bankruptcy Code permits the employment of professional persons who do not hold or represent an interest adverse to the estate, and who are disinterested persons, to represent or assist the debtor in carrying out its duties. As detailed above and in the Tucker Declaration, Mr. Tucker and the HMG are clearly qualified for the services for which they are being employed, and are disinterested persons pursuant to section 101(14) of the Bankruptcy Code.

30.     Further, under section 328(a) of the Bankruptcy Code, a debtor-in-possession can, with the Court's approval, employ a professional "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis or on a continent fee basis."  11 U.S.C. § 328(a).

31.     The CRO's engagement is necessary to ensure that the Debtor has executive leadership during its restructuring process. The Debtor's retention of the CRO will benefit the Debtor's estate by providing it with an objective and skilled professional to assist in, among other things, evaluating and implementing business strategies to facilitate its reorganization and provide other restructuring guidance. Accordingly, the retention of the CRO is in the best interest of the Debtor's estate, creditors, and other parties in interest.

32.     Entering into contractual arrangements for the provision of interim management also is within the ordinary course of the Debtor's business as contemplated by the Bankruptcy Code.  Corporations routinely hire and fire senior executives. The absence of executives capable

of achieving a successful reorganization would severely hinder a debtor's ability to reorganize in an efficient and effective manner.

33.     The indemnification provisions of the type specified in the HMG Engagement Letter are customary and reasonable for engagements of this type, in both out of court restructurings and chapter 11 cases, and reflect the qualifications and limitations on indemnification provisions that are customary in the Fifth Circuit and other jurisdictions. *See, e.g., In re Pilgrim's Pride Corp.,* Case No. 08-45665 (Bankr. N.D. Tex. Feb 9, 2009) (authorizing indemnification provisions relating to retention of CRO); *In re Tropicana Entm 't., LLC,* Case No. 08-10856 (Bankr. D. Del. May 30, 2008): *In re FLYi, Inc.,* Case No. 05-2001 (Bankr. D. Del. Jan. 17, 2006); *In re Oakwood Homes Corp.,* Case No. 02-13396 (Bankr. D. Del. July 21, 2003).

34.     The Debtor respectfully requests that the Court authorize the employment and indemnification of the CRO and HMG be approved under section 327 of the Bankruptcy Code.

## VII.     IMMEDIATE AND IRREPARABLE HARM

35.     Rule 6003 to the Federal Rules of Bankruptcy Procedure generally precludes the Court from authorizing certain relief until 21 days after the first petition is filed, except to the extent necessary to prevent "immediate and irreparable harm." Specifically, Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following:
>
> a) an application under Rule 2014;
>
> b) a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001; and

      c)  a motion to assume, assign, or reject an executory contract
           or unexpired lease in accordance with Section 365.

FED. R. BANKR. P. 6003.

36.     The Debtor believes the relief sought in the Motion is critical to the success of this case. The Debtor has been operating without a President, Chief Executive Office or Chief Financial Officer for several months prior to the Petition Date, despite the efforts of the Board of Directors to find suitable professionals to fill these roles. The Debtor urgently requires a CRO to provide needed management to oversee and direct the Debtor's day-to-day affairs. The Debtor cannot aim to accomplish any of its goals in this case, let alone remain compliant with the obligations of a debtor-in-possession without this clear leadership, as contemplated by the appointment of the CRO and HMG, and financial and interim management consultants.

37.     Accordingly, the Debtor submits that the relief sought herein is essential to the Debtor's ability to comply with the reporting requirements under the Bankruptcy and comply with the daily obligations of a debtor-in-possession. The relief sought is also critical to maximize the value of its estate, and without such relief, the Debtor will suffer immediate and irreparable harm. Pending this Court's approval of the Motion, the CRO will be required to perform the duties and obligations as an officer of the Debtor without corporate or Court authority. Because HMG and the CRO have agreed to serve without the benefit of D&O insurance coverage, it is critical that the Court authorize HMG's employment and the appointment of the CRO on an interim basis.  Accordingly, the Debtor seeks immediate interim approval of the Motion, with a final hearing to be set as soon as practicable.

38.     In light of the foregoing, the Debtor respectfully submits that the relief requested represents an exercise of the Debtor's sound business judgment, is in the best interest of the

Debtor's estate and creditors, and is necessary to prevent immediate and irreparable harm to this estates.

## VIII.     CONCLUSION

WHEREFORE, based upon the foregoing, the Debtor respectfully requests that the Court enter an Order:  (a) authorizing the Debtor to retain and employ HMG as financial advisors and to provide interim management assistance, (b) authorizing the Debtor to designate Monte B. Tucker as Chief Restructuring Officer; and (c) granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: December 21, 2010                    By: _/s/ H. Joseph Acosta_____
                                                  Micheal W. Bishop, Esq.
                                                  State Bar No. 02354860
                                                  H. Joseph Acosta, Esq.
                                                  State Bar No. 24006731
                                                  **LOOPER REED & MCGRAW, P.C.**
                                                  1601 Elm Street, Suite 4600
                                                  Dallas, Texas 75201
                                                  Telephone:  (214) 954-4135
                                                  Facsimile:  (214) 953-1332

                                                  **PROPOSED COUNSEL FOR DEBTOR
                                                  AND DEBTOR-IN-POSSESSION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the following Emergency Motion for Authority to: (a) Employ Healthcare Markets Group as Financial Advisors and to Provide Interim Management Assistance; and (b) Designate Monte B. Tucker as Chief Restructuring Officer was filed via the CM/ECF system and served on those who are entitled to receive such notice via the CM/ECF system, and also served via regular U.S. First Class Mail to the persons listed on Exhibit "A" attached hereto on December 21, 2010.  A copy will also be served via overnight delivery service and/or U.S. Priority Mail to the persons listed on Exhibit "A" attached hereto on December 22, 2010.


_____ */s/ H. Joseph Acosta*_____
H. Joseph Acosta