July 7, 2011

Diabetes America, Inc.
d/b/a DiabetesAmerica
13171 Misty Willow Drive
Houston, Texas 77070

Attention:     Joe S. Wakil, M.D.
               Chairman, Board of Directors

Re:     *Engagement Agreement between Diabetes America, Inc. d/b/a DiabetesAmerica and WoodRock Securities, L.P. (the "Agreement")*

Dear Joe:

We are pleased to confirm our understanding and agreement pursuant to which Diabetes America, Inc. d/b/a DiabetesAmerica (the "Company") has engaged WoodRock Securities, L.P. (collectively, with its parent company, sister companies, assigns and designees, as "WoodRock"), on an exclusive basis, to render certain financial advisory and investment banking services to the Company as more particularly described herein. While we understand that the focus of our engagement will primarily be related to advising and assisting the Company with raising and obtaining equity and/or debt capital (a "Financing Transaction"), this Agreement also includes provisions for our services in the event that, during our efforts to raise capital, the Company enters into a financial or strategic transaction (which may include a sale, transfer, merger, acquisition, consolidation, or other type of transaction) involving the assets, securities, or business of the Company (an "M&A Transaction").

For purposes of this Agreement, a Financing Transaction, an M&A Transaction and/or a Combined Transaction (as defined herein), shall be collectively referred to herein as a "Transaction".

**IT IS AGREED AND UNDERSTOOD THAT THIS AGREEMENT IS SUBJECT TO REVIEW AND APPROVAL BY THE UNITED STATES BANKRUPTCY COURT AFTER NOTICE AND OPPORTUNITY FOR HEARING. ALL FEES PAYABLE HEREUNDER ARE SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT. WOODROCK AGREES THAT IT WILL COOPERATE IN PROVIDING ALL MATERIALS NECESSARY TO SEEK COURT APPROVAL OF THIS AGREEMENT.**

1.      **Services**.  In connection with our engagement hereunder, WoodRock will assist the Company by performing the following services with respect to each Transaction:

        (a)     **Financing Transaction**.  In performing its services relating to a Financing Transaction, WoodRock shall:

**Exhibit 1**

  (i) Assist management in preparing a confidential descriptive memorandum of the Company and its operations and finances, including estimates of the Company's development potential as described in its business plan, for use in discussions with potential investors/lenders (the "Financing Memorandum").

  (ii) Assist the Company in raising equity or debt capital from institutional or corporate lenders/investors.

  (iii) Discuss with the Company various alternative strategies that may be implemented in order to raise capital from new investors/lenders in a manner that will create the greatest value for the Company's shareholders and creditors.  Working with the Company's management, WoodRock will assist in evaluating these strategies and provide advice as to the manner in which to structure and implement a Financing Transaction designed to achieve the Company's stated objectives.

  (iv) Assist the Company in establishing achievable terms and conditions for a Financing Transaction as well as the valuation and sale price for the Company's securities or assets in any Financing Transaction.

  (v) Prepare a list of potential investors/lenders which will be submitted to the Company for the purpose of identifying, contacting and conducting discussions with target investors/lenders in order to determine the level of interest in a proposed Financing Transaction.  WoodRock will then qualify and screen potential investors/lenders as well as arrange and attend exploratory meetings.

  (vi) Render advice to the Company as to the values and financial implications of various negotiating strategies and other considerations, which could impact the likelihood and/or value of a Financing Transaction.  WoodRock will advise the Company regarding specific offers by potential investors/lenders and, to the extent deemed appropriate, assist and/or direct negotiations intended to lead to a closing of any proposed Transaction.

**_WoodRock does not guarantee that it will be successful in identifying, arranging for, or consummating a Financing Transaction, and shall have no liability to the Company in the event a Financing Transaction is not consummated for any reason_**.

 (b) **M&A Transaction**.  At the direction of the Company, and in performing its services relating to an M&A Transaction, WoodRock shall:

  (i) Assist the Company in a strategic review of objectives, targets and expectations in order to formulate a working strategy and plan, including the preparation of a confidential descriptive memorandum of the Company and its operations and finances for use in discussions with potential purchasers.

  (ii) Hold discussions with Company management concerning business operations, competitive position, industry environment, and projected future operational and financial performance in order to assist in preparing an information package describing the Company's specific capital initiatives or any potential acquisition or merger partner as well as the Company's historical, current and future operations and financial condition.

        (iii)      Devise proposed acquisition or purchase terms, conditions and any related financing.

        (iv)      Coordinate legal, accounting and other advisors in connection with the delivery or receipt of any offer or proposal.

        (v)      Participate and assist in the planning and implementation of the due diligence process after a letter of intent is proposed and/or entered.

        (vi)      Assist in reviewing and completing documentation leading to the closing of any M&A Transaction or related transaction.

    (c)      **Valuation Opinion**. If requested, and for such additional fee as shall be agreed to at such time by WoodRock and the Company (as approved by the Bankruptcy Court), WoodRock shall deliver an opinion to the creditor's committee of the Company as to the fairness from a financial point of view of the consideration to be received by the stockholders and creditors of the Company who are not affiliates of the Company in any such Transaction.

2.    **Fees for Services**.

    (a)      **Financial Advisory Services Fee.** To develop the Financing Memorandum, and to assist the Company in pursuing its available options, WoodRock will charge a cash fee of $50,000.00 (the "**Financial Advisory Services Fee**"). This fee is non-refundable and shall be due upon approval of this Engagement Agreement by the Bankruptcy Court and paid out of funds raised by any debtor in possession ("**DIP**") financing and/or working capital facility released/refinanced provided to the Company during the term of this Engagement Agreement as those funds become available. If this fee is paid in its entirety, either in a single payment or in installments, within sixty (60) days of the date the parties execute this Engagement Agreement, WoodRock shall reduce each contingency transaction fee described below (see Subparagraphs 2(b), 2(c), and 2(d)) by one full percentage point, as may be applicable. For example, if the Financial Advisory Services Fee of $50,000.00 is paid to WoodRock within sixty (60) days from the date that the parties execute this Agreement, the applicable Financing Transaction Fee described in Subparagraph 2(b) below would be reduced from nine percent (9.00%) to eight percent (8.00%) for all equity capital committed and received by the Company.

    (b)      **Financing Transaction Fee**. Subject to Subparagraph 2(d) below:

        (i)      For all equity capital committed and received by the Company in connection with any Financing Transaction (for purposes hereof, "equity capital" shall include all capital raised in any form whatsoever, including without limitation any common stock, preferred stock, convertible preferred stock, debt convertible into equity, subordinate debt with options, warrants or similar instruments attached, or any other instrument with equity or equity-like components attached, specifically excluding any form of DIP financing), WoodRock shall be paid a cash fee equal to *the greater of*:

            (1)      Nine percent (9.00%) of the gross amount of such equity capital raised and actually received by the Company; or

    (2) $250,000.

  (ii) For all DIP financing capital or debt committed and received by the Company in connection with any Financing Transaction, including any equity capital or debt contributed by existing shareholders, arranged by RiverStone Wealth Management, and/or from third-party investors solicited by the Board of Directors (for purposes hereof, "DIP financing" shall include all capital raised in any form whatsoever, including without limitation any common stock, preferred stock, convertible preferred stock, debt convertible into equity, subordinate debt with options, warrants or similar instruments attached, or any other instrument with equity or equity-like components attached), WoodRock shall be paid a cash fee equal to:

    (1) Two (2.00%) of the gross amount of such DIP financing raised and actually received by the Company.

  (iii) For all senior debt capital committed to the Company in connection with any Financing Transaction (for purposes hereof, "senior debt capital" shall be defined to include all non-convertible, senior indebtedness without any options, warrants or similar instruments attached, including any asset-based, working capital revolving debt facility), WoodRock shall be paid a cash fee equal to *the greater of:*

    (1) Three and one-half percent (3.50%) of the gross amount of such debt capital facility so arranged by the Company; or

    (2) $150,000.

 (c) **M&A Transaction Fee**.  Subject to Subparagraph 2(d) below, with respect to any M&A Transaction (including without limitation any M&A Transaction involving any party with whom the Company, as of the date hereof, is in discussions regarding a potential M&A Transaction), WoodRock shall be paid a cash fee equal to *the greater of:*

    (1) Eight percent (8.00%) of the Total Transaction Value (as defined below);  or

    (2) $250,000.

For purposes hereof, the term "**Total Transaction Value**" shall mean the total amount of cash and the fair market value (on the date of payment) of all other property paid or payable directly or indirectly (i) to the Company, its shareholders, employees, or security holders, (ii) by the Company, its partners, employees, or security holders, or (iii) into any new entity or joint venture.  Total Transaction Value shall also include (i) amounts paid or payable pursuant to covenants not to compete and making due allowance, without limitation, for amounts paid or payable pursuant to employment contracts, consulting agreements, employee benefit plans, or other similar arrangements, and (ii) the value of any liabilities (including the principal amount of any indebtedness for borrowed money) repaid or retired in connection with or in anticipation of an M&A Transaction, or existing on the balance sheet of the Company or any other party involved in an M&A Transaction (in the case of a merger, a purchase, or other

transfer of stock or similar transaction) or assumed directly or indirectly by the Company or such other party (in the case of a purchase or other transfer of assets or similar transaction).

   (d)   **Combined Transactions**.  Notwithstanding the foregoing, with respect to any transaction or series of related transactions which contemplate any combination of a Financing Transaction, and/or M&A Transaction (a "Combined Transaction"), WoodRock shall be paid a cash fee equal to *the greater of* (i) the aggregate amount of fees for each type of transaction involved calculated in accordance with Subparagraphs 2(b) and 2(c) above (as applicable), or (ii) $250,000.  In the event of multiple transactions, the $250,000 "floor" fee will apply only once.

All cash fees payable under these Subparagraphs 2(b), 2(c), and 2(d) above shall be due and payable coincident with the closing of the applicable Transaction out of the proceeds thereof.  It is understood that such fees shall be paid in cash and are due in full in respect of the gross amount of all capital, without deduction for fees, expenses, costs or charges of any kind, and regardless of whether the funding of such capital commitments or payment or receipt of consideration is to be made over time or in installments or whether such funding or payment may be subject to escrow requirements or other contingencies.  The foregoing fees shall be payable with respect to each and every Transaction, whether occurring in a single transaction or in a series of related transactions, consummated during the term of WoodRock's engagement hereunder, or during the Tail Period (as defined herein) to the extent the Company uses any of the materials produced by WoodRock hereunder in connection with the closing of any Transaction.  In the event that WoodRock is unsuccessful in completing a Transaction, the Company shall have no obligation to pay the contingency-based fees related to such transaction.

3. **Term**.  Unless previously terminated by either party pursuant to Paragraph 7, the term of this Engagement Agreement shall be one (1.0) year, commencing immediately upon the date of the Company's execution of this Agreement.  This Agreement may be extended by written agreement executed by both parties hereto on terms acceptable to the parties.

4. **Expenses**.  Regardless of whether any Transaction shall be proposed or consummated, the Company hereby agrees to reimburse WoodRock for all reasonable out-of-pocket expenses incurred on or after the execution of this Agreement (including, but not limited to, travel, meals and lodging expenses, expenses for presentation and financial materials, and legal fees and expenses); provided, however, that all expenses exceeding $500 must be approved in advance (either orally or in writing) by the Company.  Such expenses will be billed on a monthly basis and shall be payable within three (3) days after submission and approval by the Bankruptcy Court.

5. **Confidentiality**.  WoodRock hereby agrees to use all non-public information provided by the Company solely for the purpose of rendering services to the Company pursuant to its engagement hereunder and to treat confidentially such information for so long as such information remains non-public.  Except as contemplated by such engagement or as required by applicable law, WoodRock will not disclose such confidential information to a third party (other than directors, officers, employees, or outside advisors of WoodRock and its affiliates who have been informed of the confidential nature of such information) without the prior written consent of the Company.  WoodRock agrees that it shall be responsible for any breach of this Paragraph 5 by its directors, officers, employees, affiliates and outside advisors).

6.      **INDEMNIFICATION**.  IN THE EVENT THAT WOODROCK BECOMES INVOLVED IN ANY CAPACITY IN ANY ACTION, PROCEEDING OR INVESTIGATION BROUGHT BY OR AGAINST ANY PERSON, INCLUDING SHAREHOLDERS OF THE COMPANY, IN CONNECTION WITH OR AS A RESULT OF EITHER OUR ENGAGEMENT OR ANY MATTER REFERRED TO IN THIS AGREEMENT, THE COMPANY SHALL REIMBURSE WOODROCK FOR ITS LEGAL AND OTHER EXPENSES TOGETHER WITH THE AMOUNT OF JUDGMENTS, PENALTIES, INTEREST AND COURT COSTS (INCLUDING THE COST OF ANY INVESTIGATION AND PREPARATION) INCURRED IN CONNECTION THEREWITH.  THE COMPANY SHALL ALSO PROTECT, INDEMNIFY AND HOLD WOODROCK HARMLESS AGAINST ANY AND ALL LOSSES, CLAIMS, DAMAGES OR LIABILITIES WITHOUT LIMITATION FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION OF EVERY KIND AND CHARACTER, INCLUDING, WITHOUT LIMITATION BY ENUMERATION OUR REPRESENTATION IN CONNECTION WITH OR AS A RESULT OF EITHER OUR ENGAGEMENT OR ANY MATTER REFERRED TO IN THIS AGREEMENT, REGARDLESS OF WHETHER SUCH ACTION OR DAMAGES IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF WOODROCK, EXCEPT TO THE EXTENT THAT ANY SUCH LOSS, CLAIM, DAMAGE OR LIABILITY IS FINALLY JUDICIALLY DETERMINED TO HAVE RESULTED SOLELY FROM THE NEGLIGENCE, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF WOODROCK IN PERFORMING THE SERVICES THAT ARE THE SUBJECT OF THIS AGREEMENT.

THE PROVISIONS OF THIS PARAGRAPH 6 SHALL SURVIVE ANY TERMINATION OR COMPLETION OF THE ENGAGEMENT PROVIDED BY THIS AGREEMENT.

7.      **Termination**.  Upon ten (10) business days' written notice to the other, either party may terminate this Agreement, with or without cause.  In such event, all expenses accrued pursuant to Paragraph 4 above and all cash fees pursuant to Paragraph 2(a) above shall be due and payable by the Company to WoodRock within three (3) day following approval of the Bankruptcy Court.  In the event of any termination of WoodRock's engagement hereunder, WoodRock will continue to be entitled to all of the compensation and reimbursement set forth in Paragraph 2 above in the event that, at any time prior to the expiration of 18 months after any such termination (the "Tail Period"), the Company directly or indirectly (i) obtains any capital (in any amount and in any form) from or on behalf of, or (ii) enters into any Transaction or other similar transaction with, any person or entity identified orally or in writing to the Company by WoodRock (including any party introduced or identified to the Company by a party previously introduced or identified to the Company by WoodRock) or with whom the Company held discussions during the term of this Agreement.  Upon any such termination, this Agreement shall terminate and be of no further force and effect, other than paragraphs 4, 5, 6, 7, 8, and 9 hereof, each of which shall survive any such termination hereof.

8.      **Contingencies**.  Should WoodRock be terminated and, if prior to such termination, the Company has pursued a deal on its own volition without disclosing said prospect, and/or utilizing materials prepared by WoodRock, or its agents and assigns, WoodRock shall be entitled to the contingent fees as set-forth above and pursuant to Paragraph 2.  This provision shall be applicable for the Tail Period, and is intended to protect WoodRock from the

Company failing to disclose potential prospects and intentionally deceiving WoodRock, thereby eliminating applicable contingency fees.

9. <u>**Disclosures; Company Representations and Covenants**</u>.

(a) Except as required by law or legal process, any financial or other advice, Financing Memorandum or other documentation rendered by WoodRock or prepared by or on behalf of WoodRock or the Company pursuant to this Agreement may not be disclosed publicly in any manner without the prior consent of WoodRock. The Company agrees to provide to WoodRock, among other things, all reasonable information requested or reasonably required by WoodRock or a potential investor/lender, underwriter, sale, merger, acquisition or business combination entity, including but not limited to, information concerning historical and projected financial results and possible, known or threatened litigation, environmental and other contingent liabilities or claims. The Company will advise WoodRock immediately, or as soon as reasonably possible, if any material change, adverse or otherwise, occurs in its business or finances during the term of this Agreement.

(b) The Company agrees to furnish WoodRock with all information concerning the Company within the Company's control or possession which WoodRock deems reasonably necessary or appropriate, and to provide WoodRock with access to the Company's shareholders, officers, directors, employees, accountants, counsel, and other representatives requested by WoodRock (collectively, the "<u>Representatives</u>"), it being understood that WoodRock will rely solely upon such information supplied by the Company and its Representatives without assuming any responsibility for the accuracy or completeness of such information or the independent investigation or verification thereof. The Company represents that all information that it furnishes to WoodRock shall be accurate and complete in all material respects.

(c) WoodRock will work with the Company to confirm and provide support for the information contained in the Financing Memorandum, but the Company will be responsible for the contents of any Financing Memorandum and any other disclosure documents used in connection with a Financing Transaction. Furthermore, the Company represents that such documents will not, at the time they are delivered to any potential investors or partners, contain any untrue statements of a material fact, and that they will not, at the time they are delivered to any potential investors or lenders, omit any material fact in order to make the statements contained therein misleading.

(d) The Company hereby agrees to commit such necessary time of its management that may be reasonably required by WoodRock in the preparation of the Financing Memorandum or other disclosure documents.

(e) Until this Agreement is terminated, any Memorandum and any collateral marketing materials developed by WoodRock will remain the property of WoodRock and may not be used by the Company or its shareholders, employees, agents, advisors, and/or assigns to raise capital or to enter into a transaction or series of transactions in connection with raising capital, other than with respect to persons or companies who have been identified and disclosed to WoodRock. Upon termination of this Agreement, any Memorandum and marketing material that WoodRock may have developed in conjunction with this Agreement will become the property of the Company. The Company agrees to remove any references to WoodRock before it uses any of these materials for any purposes whatsoever. Upon such

termination, the Company will be provided with an electronic copy of any Memorandum and related marketing materials.

(f)     The Company understands and acknowledges that WoodRock is a registered "broker/dealer" with the Financial Industry Regulatory Authority ("FINRA") and, consequently, is prohibited from paying "finders' fees", commissions or other payments to persons or entities not registered with the FINRA.  In connection with the foregoing, the Company represents and warrants to WoodRock that no persons or entities are entitled to "finders' fees", commissions or other payments in connection with the Company's consummation of a Transaction as the result of any act, promise, or agreement of the Company.

10.    **Exclusive Engagement**.  The Company hereby represents and warrants to WoodRock that it has not engaged any other financial advisors with respect to the matters described in this Agreement with the sole exception of RiverStone Wealth Management, who represents itself as a registered broker/dealer under FINRA, with which the Company has previously entered into a direct fee agreement related to potential DIP financing.  WoodRock shall assist RiverStone Wealth Management as may be necessary to finalize any DIP financing; however, WoodRock shall have no financial, regulatory, and/or legal obligations or responsibilities associated with the activities of RiverStone Wealth Management as they may relate to the Company or any of the activities contemplated under this Agreement.  Other than RiverStone Wealth Management, and during the term of this Agreement, the Company hereby agrees and covenants that it shall not engage, hire, employ, or otherwise consult with any other financial advisors, investments bankers, or placement agents in connection with the matters described in this Agreement, including, without limitation, any Financing Memorandum, Financing Transaction, or M&A Transaction.

11.    **Notices**.  Any notices required or permitted hereunder shall be sufficiently given if personally delivered or sent by registered mail or certified mail, postage prepaid, by prepaid telegram, or by overnight courier (with receipt for delivery), addressed as follows:

       If to the Company, to:   Joe S. Wakil, M.D.
                                Diabetes America, Inc.
                                d/b/a DiabetesAmerica
                                13171 Misty Willow Drive
                                Houston, Texas  77070

       If to WoodRock, to:      John P. Dennis III
                                WoodRock & Co.
                                4265 San Felipe, Suite 600
                                Houston, Texas 77027

Any of the above addresses may be changed at any time by notices given as set forth above provided, however, that any such notices of change of address shall be effective only upon receipt.  All notices, requests, or instructions given in accordance herewith shall be deemed received on the date of delivery, if hand delivered or if delivered by facsimile transmission, and two business days after the date of mailing, if mailed in accordance with the preceding provisions.

12. **Attorneys' Fees**.  In the event of a suit, action, arbitration, or other proceeding of any nature whatsoever, including, without limitation, any proceeding under the U.S. Bankruptcy Code, is instituted by either party hereto to interpret or enforce any provision of this Agreement, then the prevailing party shall be entitled to recover from the other party hereto its reasonable attorneys', paralegals', accountants' and other experts' fees, and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith.

13. **Transaction Announcement**.  Following the completion of any Transaction, the Company agrees that WoodRock has the right to place transaction details on the WoodRock website, descriptive documents, advertisements, tombstones, or notices in financial and other newspapers and journals as WoodRock deems appropriate, describing its services to the Company.  WoodRock shall submit copies of such advertisements, tombstones, or notices to the Company so that the Company may approve the form, content, and timing of such communication.  Such approval by the Company shall not be unreasonably withheld or delayed.

14. **WoodRock's Representations, Warranties and Covenants**.

    (a)     WoodRock represents and warrants that it has all necessary licenses and permits to perform its obligations under this Agreement.

    (b)     WoodRock shall perform its obligations under this Agreement in accordance with all applicable laws and regulations, and shall not solicit potential investors that would cause the Company to be in violation of any applicable securities laws or regulations.

15. **Dispute Resolution**.  While the Company remains under the jurisdiction of the United States Bankruptcy Court for the Southern District of Texas, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by the United States Bankruptcy Court for the Southern District of Texas.  Should the Bankruptcy Court no longer have jurisdiction, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by FINRA, in Houston, Texas, in accordance with the procedures and rules as prescribed and adopted by FINRA, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.  In any such arbitration, the parties shall be entitled to conduct discovery to the fullest extent permitted under Rule 26 of the Federal Rules of Civil Procedure; provided, however, that the arbitrator or arbitration panel, as applicable, shall resolve all discovery dispute upon a motion of either party.

16. **Non-Solicitation of Employees**.  Each of the Company and WoodRock agrees that during the term of this Agreement and for a one year period thereafter, it shall not solicit for employment or hire any employee of the other who became known to it in connection with the matters contemplated by this Agreement; provided, however, that neither the Company nor WoodRock shall be precluded from hiring any employee of the other who (a) responds to any general public advertisement, (b) has been terminated by the other party prior the commencement of employment discussions or (c) is solicited or hired by employees of a party who have no knowledge of the Agreement.

DIABETES AMERICA, INC.                                                                                          Confidential
JULY 7, 2011

17. **Other Matters**.

(a) Any advice or opinions provided by WoodRock may not be disclosed or referred to publicly or to any third party except in accordance with WoodRock's prior written consent.

(b) The Company represents that it has all requisite power and authority to enter into this Agreement, and that this Agreement has been duly and validly authorized by all necessary corporate action on the part of the Company and has been duly executed and delivered by the Company.

(c) This Agreement cannot be modified or changed, nor can any of its provisions be waived, except by written agreement executed by both parties hereto.

(d) WoodRock shall have the right to assign its right to receive fees hereunder to any affiliate of WoodRock, at any time without the necessity of obtaining the Company's consent or authorization.

(e) This Agreement shall be binding upon the Company and WoodRock and their respective successors and assigns.

(f) This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflicts of law principles thereof.

(g) This Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings or agreements.

If this Agreement correctly sets forth your understanding of our agreement, please execute where indicated below and return to my attention an original executed version at your earliest convenience.

Thank you for engaging WoodRock as the exclusive financial advisor to the Company. We are pleased to have the opportunity to work with you and look forward to a mutually beneficial relationship.

    Sincerely,

    WOODROCK SECURITIES, L.P.


    John P. Dennis III
    Managing Director and Principal

    Date: _____

*Diabetes America, Inc.*  *Confidential*
*July 6, 2011*

AGREED AND ACCEPTED:

DIABETES AMERICA, INC. d/b/a DIABETESAMERICA

*Joe S. Wakil, M.D.* (signature)

Joe S. Wakil, M.D.
Chairman, Board of Directors

Date: _____