# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DIABETES AMERICA, INC., | § | CASE NO. 10-41521 |
| | § | Chapter 11 |
| Debtor. | § | Judge Isgur |

## SECOND AMENDED DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION

THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS AND INTEREST HOLDERS OF THE DEBTOR ENTITLED TO VOTE ON THE SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION SUBMITTED BY DIABETES AMERICA, INC. HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE CONCERNING THE PLAN. ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE ENTIRE DISCLOSURE STATEMENT AND PLAN WITH CARE.

ON SEPTEMBER 1, 2011, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE. SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN HEREIN DESCRIBED IS BEING SOUGHT FROM CREDITORS AND INTEREST HOLDERS WHOSE CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR ARE IMPAIRED UNDER THE PLAN. CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE COMPLETED BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT IN THE ACCOMPANYING ENVELOPE ADDRESSED TO PORTER HEDGES LLP, ATTENTION: JOSHUA W. WOLFSHOHL, 1000 MAIN STREET, 36TH FLOOR, HOUSTON, TEXAS 77002, NOT LATER THAN 12:00 P.M. (CENTRAL TIME) ON OCTOBER 3, 2011.

**Porter Hedges LLP**
David R. Jones
Joshua W. Wolfshohl
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000
(713) 228-1331 (facsimile)
**Counsel for the Debtor**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 INTRODUCTION** ................................................................................................1
  1.1  GENERAL INFORMATION CONCERNING DISCLOSURE STATEMENT AND PLAN. ...........1
  1.2  DISCLAIMERS...................................................................................................................1
  1.3  ANSWERS TO COMMONLY ASKED QUESTIONS. ..............................................................3

**ARTICLE 2 OVERVIEW OF PLAN** .......................................................................................5

**ARTICLE 3 THE DEBTOR** ....................................................................................................8
  3.1  THE DEBTOR'S BUSINESS AND CAPITAL STRUCTURE. ...................................................8
  3.2  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE. ..............................................14

**ARTICLE 4 CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN** ................17
  4.1  ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS. .............................................17
  4.2  CLASSIFIED CLAIMS AGAINST AND INTERESTS IN THE DEBTOR....................................18

**ARTICLE 5 IMPAIRMENT OF CLASSES AND RESOLUTION OF CLAIM CONTROVERSIES** ............18
  5.1  IMPAIRED CLASSES. .......................................................................................................18
  5.2  UNIMPAIRED CLASSES. ..................................................................................................18
  5.3  CONTROVERSY CONCERNING CLASSIFICATION, IMPAIRMENT OR VOTING RIGHTS. .........19

**ARTICLE 6 TREATMENT OF CLAIMS AND EXECUTORY CONTRACTS** ...............................19
  6.1  TREATMENT OF IMPAIRED CLASSES. .............................................................................19
  6.2  TREATMENT OF UNIMPAIRED CLASSES..........................................................................20

**ARTICLE 7 MEANS OF IMPLEMENTATION** .........................................................................21
  7.1  CLOSING OF EDG SALE OR ALTERNATIVE SALE. .........................................................21
  7.2  VESTING OF PROPERTY OF THE ESTATE IN THE LIQUIDATING DEBTOR.........................22
  7.3  CONTINUATION OF OPERATIONS. ...................................................................................22
  7.4  CONTINUED CORPORATE EXISTENCE..............................................................................22
  7.5  GENERAL POWERS OF THE PLAN AGENT. ......................................................................22
  7.6  OBLIGATIONS OF THE PLAN AGENT. ..............................................................................24
  7.7  LIMITATIONS ON THE POWERS OF THE PLAN AGENT. ....................................................25
  7.8  THE COMMITTEE. ..........................................................................................................25
  7.9  THE POST-CONFIRMATION COMMITTEE. ......................................................................26
  7.10 RESIGNATION/REMOVAL OF THE PLAN AGENT. ...........................................................26
  7.11 APPOINTMENT OF SUCCESSOR PLAN AGENT. ...............................................................26
  7.12 RIGHTS AND DUTIES OF THE POST-CONFIRMATION COMMITTEE...................................27
  7.13 COMPENSATION PROCEDURES. ......................................................................................27

**ARTICLE 8 CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF DISPUTED CLAIMS/INTERESTS AND PROCEDURES FOR ASSERTING CLAIMS**................................28
  8.1  OBJECTION PROCESS. .....................................................................................................28
  8.2  FILING OF CLAIMS AND CAUSES OF ACTION. ................................................................28
  8.3  DISPUTED CLAIMS RESERVE. ........................................................................................28
  8.4  DISTRIBUTIONS TO HOLDERS OF DISPUTED CLAIMS AND DISPUTED INTERESTS.............29
  8.5  DISALLOWANCE OF LATE FILED PROOFS OF CLAIM. .....................................................29
  8.6  PROVISIONS GOVERNING DISTRIBUTIONS.......................................................................29

**ARTICLE 9 EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......................................30
  9.1  REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ...............................30
  9.2  ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES......................................30
  9.3  ASSIGNMENT OF LEASES; CURE AMOUNTS. ...................................................................31
  9.4  CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES. ............31
  9.5  RESERVATION OF RIGHTS. ..............................................................................................32

**ARTICLE 10 EFFECT OF CONFIRMATION** ................................................................**32**

   10.1   LEGALLY BINDING EFFECT. ................................................................ 32
   10.3   LIMITED PROTECTION OF CERTAIN PARTIES IN INTEREST ................ 32
   10.4   INDEMNIFICATION. ........................................................................... 34
   10.5   CONTINUATION OF ANTI-DISCRIMINATION PROVISIONS OF THE BANKRUPTCY CODE. ............ 34
   10.6   PRESERVATION OF CLAIMS AND RIGHTS. ....................................... 35

**ARTICLE 11 CONFIRMATION OF THE PLAN** ..................................................**36**

   11.1   CONFIRMATION HEARING. ............................................................... 36
   11.2   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. ..... 36
   11.3   CRAMDOWN. ................................................................................... 38
   11.4   CONDITIONS PRECEDENT TO EFFECTIVE DATE. ............................. 39
   11.5   ANNULMENT OF PLAN IF CONDITIONS NOT WAIVED OR SATISFIED. ................ 40
   11.6   RETENTION OF JURISDICTION BY BANKRUPTCY COURT. ................ 40

**ARTICLE 12 COMPROMISES AND SETTLEMENTS** .................................**41**

   12.1   EFFECT OF CONFIRMATION ORDER. ............................................... 41

**ARTICLE 13 MISCELLANEOUS PROVISIONS** .........................................**41**

   13.1   BAR DATE FOR ADMINISTRATIVE CLAIMS. .................................... 41
   13.2   OBJECTIONS TO ADMINISTRATIVE CLAIMS. .................................. 41
   13.3   PAYMENT OF PROFESSIONAL CLAIMS. ........................................... 41
   13.4   PAYMENT OF UNITED STATES TRUSTEE FEES. ............................... 42
   13.5   EMPLOYEE BENEFITS PLANS. ......................................................... 42
   13.6   DIRECTIVE TO STATE AGENCIES. ................................................... 42
   13.7   SATISFACTION OF LIABILITIES. ...................................................... 42
   13.8   WARRANTY OF TRANSFERS FROM LIQUIDATING DEBTOR. ............. 42
   13.9   COMPLIANCE WITH TAX REQUIREMENTS. ....................................... 43
   13.10  AMENDMENT OF THE PLAN. ........................................................... 43
   13.11  TIMING OF DISTRIBUTIONS. ........................................................... 43
   13.12  ENFORCEMENT OF SUBORDINATION AGREEMENTS/SETTLEMENT AGREEMENTS. ......... 43
   13.13  FILING OF DOCUMENTS IN PUBLIC RECORDS. ............................... 43
   13.14  RIGHT TO SEEK FURTHER ORDERS. ............................................... 44
   13.15  REGULATORY APPROVALS. ............................................................. 44
   13.16  WITHDRAWAL OF PLAN. ................................................................. 44
   13.17  DUE AUTHORIZATION BY CREDITORS. ........................................... 44
   13.18  FILING OF ADDITIONAL DOCUMENTATION. .................................... 44
   13.19  IMPLEMENTATION. ......................................................................... 44
   13.20  SUBSTANTIAL CONSUMMATION. .................................................... 44
   13.21  FURTHER EFFECT OF CONFIRMATION. ........................................... 45
   13.22  DATES. ........................................................................................... 45
   13.23  GOVERNING LAW. .......................................................................... 45
   13.24  CONFLICT. ...................................................................................... 45
   13.25  SEVERABILITY. ............................................................................... 45
   13.26  SETOFFS. ........................................................................................ 45
   13.27  OTHER CONSIDERATIONS. .............................................................. 46
   13.28  FEASIBILITY OF THE PLAN. ............................................................ 46
   13.29  CONTINUATION OF THE CASE. ....................................................... 46
   13.30  ALTERNATIVE PLANS OF LIQUIDATION. ........................................ 46
   13.31  LIQUIDATION UNDER CHAPTER 7 .................................................. 46
   13.32  RISK FACTORS. ............................................................................... 47
   13.33  TAXATION. ..................................................................................... 47

**ARTICLE 14 CAUSES OF ACTION** ...............................................................**50**

   14.1   PREFERENCES. ................................................................................ 50
   14.2   FRAUDULENT TRANSFERS. ............................................................. 50
   14.3   OTHER CAUSES OF ACTION. .......................................................... 51

**ARTICLE 15 VOTING PROCEDURES AND REQUIREMENTS** ..................................................**51**

 15.1 BALLOTS AND VOTING DEADLINE..................................................................51
 15.2 CREDITORS ENTITLED TO VOTE...................................................................52
 15.3 VOTING PROCEDURES...............................................................................52
 15.4 VOTE REQUIRED FOR CLASS ACCEPTANCE....................................................52
 15.5 CRAMDOWN AND WITHDRAWAL OF THE PLAN...............................................53

## ARTICLE 1
## INTRODUCTION

**1.1    General Information Concerning Disclosure Statement and Plan.**

Diabetes America, Inc. (the "Debtor") submits this Disclosure Statement, as may be amended from time to time, under § 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to all of the Debtor's known Creditors and Interest Holders entitled to vote on the Debtor's Second Amended Chapter 11 Plan of Liquidation (the "Plan"). The purpose of this Disclosure Statement is to provide adequate information to enable Creditors and Interest Holders who are entitled to vote on the Plan to arrive at a reasonably informed decision in exercising their respective right to vote on the Plan. A copy of the Plan is included with this Disclosure Statement. Capitalized terms used but not defined in this Disclosure Statement shall have the meanings assigned to them in the Plan or in the Bankruptcy Code and Bankruptcy Rules. All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Debtor has proposed the Plan consistent with the provisions of the Bankruptcy Code. The purpose of the Plan is to facilitate the sale of substantially all of the Debtor's operating assets to the highest bidder and then distribute those proceeds to Creditors and Interest Holders in accordance with the Bankruptcy Code. Once the Plan is completed, the Debtor will be dissolved. The Debtor believes that the Plan provides for the maximum recovery available for all Classes of Claims and Equity Interests.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Equity Interests under the Plan. It is submitted as an aid and supplement to your review of the Plan and to explain the terms of the Plan. Every effort has been made to fairly summarize the Plan and to inform Creditors and Interest Holders how various aspects of the Plan affect their respective positions. If any questions arise, the Debtor urges you to contact either the Debtor's counsel or the Committee's counsel. These attorneys will attempt to resolve your questions. You are also encouraged to consult with your own counsel. The respective counsel for the Committee and the Debtor are likewise available to answer any questions that your counsel may have regarding the Plan and this Disclosure Statement.

**1.2    Disclaimers.**

**NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND § 1125 OF THE BANKRUPTCY CODE. NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTOR TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTOR OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT, ANY ATTACHMENTS THERETO AND THE PLAN.**

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATION CONCERNING THE DEBTOR, ITS ASSETS, ITS LIABILITIES, PAST OR FUTURE OPERATIONS, OR CONCERNING THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.   ANY REPRESENTATIONS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE IMMEDIATELY REPORTED TO COUNSEL FOR THE DEBTOR OR COUNSEL FOR THE COMMITTEE.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT.   NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION PROVIDED HEREIN WAS OBTAINED FROM A VARIETY OF SOURCES AND IS BELIEVED TO BE RELIABLE.   HOWEVER, THE DEBTOR HAS NOT BEEN ABLE TO INDEPENDENTLY VERIFY EACH AND EVERY STATEMENT CONTAINED HEREIN.   ACCORDINGLY, THE DEBTOR AND ITS PROFESSIONALS CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THE DEBTOR'S BUSINESS AFFAIRS ARE COMPLEX.   IT IS POSSIBLE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN COULD HAVE NEGATIVE TAX AND OTHER ECONOMIC CONSEQUENCES.   THE DEBTOR MAKES NO REPRESENTATIONS REGARDING THE TAX IMPLICATIONS OF ANY TRANSACTION CONTEMPLATED UNDER THE PLAN.   IT IS NOT UNCOMMON FOR PARTIES TO RETAIN THEIR OWN TAX ADVISORS TO ANALYZE THE PLAN. THE DEBTOR ENCOURAGES ALL PERSONS THAT MIGHT BE AFFECTED TO SEEK INDEPENDENT ADVICE REGARDING THE TAX EFFECTS OF THE PLAN.

DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE DEBTOR OR ITS PROFESSIONALS THAT THE PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE LIQUIDATION OF THE DEBTOR'S ASSETS OR THAT ALL POTENTIAL ADVERSE EVENTS HAVE BEEN ANTICIPATED.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

**THIS DISCLOSURE STATEMENT AND THE PLAN SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

**1.3     Answers to Commonly Asked Questions.**

As part of the Debtor's efforts to inform Creditors and Interest Holders regarding the Plan and the Plan confirmation process, the following summary provides answers to questions which parties who receive a disclosure statement often ask.

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

**1.3.1     Who is the Debtor?**

The Debtor is Diabetes America, Inc. The Debtor's business model consists of a network of centrally managed medical clinics that provide comprehensive outpatient medical care primarily to patients with Type 1, Type 2 and Gestational Diabetes. The Debtor's business was founded in 2004 with clinics established in the Houston, Texas area. With the help of investment capital, the Debtor eventually expanded its centers to the Dallas and San Antonio, Texas areas. On the Petition Date, the Debtor (i) had 17 clinics in Texas and 1 in Arizona; and (ii) employed approximately 135 non-physician employees. The Debtor has since closed 4 non-profitable locations and reduced its workforce. The Debtor continues to streamline its operations in an effort to implement cost-cutting initiatives.

**1.3.2     What is a Chapter 11 bankruptcy?**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their assets in a controlled fashion. The Debtor is proposing to liquidate all of its assets. The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed. During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the Court orders the appointment of a trustee. A creditor's attempt to insert a trustee in this case was previously denied by the Bankruptcy Court.

**1.3.3     If the Plan governs how my Claim or Interest is treated, what is the purpose of this Disclosure Statement?**

The Bankruptcy Code requires that in order to solicit votes on a bankruptcy plan, the proponent of the plan must first prepare a disclosure statement that provides sufficient information to allow creditors and interest holders to make an informed decision about the plan. The disclosure statement and plan are distributed to creditors and interest holders only after the Bankruptcy Court has approved the disclosure statement and determined that the disclosure statement contains information adequate to allow creditors and interest holders to make an

informed judgment about the plan.  At that time, creditors and interest holders whose claims and interests are impaired under the Plan also receive a voting ballot and other materials.

### 1.3.4   Has this Disclosure Statement been approved by the Bankruptcy Court?

Yes.  On September 1, 2011, the Bankruptcy Court approved this Disclosure Statement as containing adequate information.  "Adequate information" means information of a kind, and in sufficient detail, as far as is practicable considering the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a hypothetical investor typical of holders of claims or interests of the relevant classes to make an informed judgment whether to vote to accept or reject the Plan.  The Bankruptcy Court's approval of this Disclosure Statement does not constitute an endorsement of any of the representations contained in either the Disclosure Statement or the Plan.

### 1.3.5   How do I determine how my Claim or Interest is classified?

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest. Under the Plan, Claims and Interests are classified into a series of classes.  The pertinent articles and sections of the Disclosure Statement and Plan disclose, among other things, the treatment that each class of Claims or Interests will receive if the Plan is confirmed.

### 1.3.6   Why is confirmation of the Plan important?

The Bankruptcy Court's confirmation of the Plan is a condition to the Debtor carrying out the treatment of Creditors and Interest Holders under the Plan.  Unless the Plan is confirmed, and any other conditions to confirmation or to the effectiveness of the Plan are satisfied, the Debtor is legally prohibited from satisfying Claims or Interests as provided in the Plan.  <u>Put more simply, confirmation of a plan in chapter 11 is required before the Debtor can begin making payments to pre-petition Creditors.</u>

### 1.3.7   What is necessary to confirm the Plan?

Under applicable provisions of the Bankruptcy Code, confirmation of the Plan requires that, among other things, at least one class of impaired Claims or Interests vote to accept the Plan.  Acceptance by a class of claims or interests means that at least two-thirds in the total dollar amount and more than one-half in number of the allowed Claims or Interests actually voting in the class vote in favor of the Plan.  Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims/interests.  Besides acceptance of the Plan by a class of impaired creditors or interests, a bankruptcy court also must find that the Plan meets a number of statutory tests before it may confirm the Plan.  These requirements and statutory tests generally are designed to protect the interests of holders of impaired claims or interests who do not vote to accept the Plan but who will nonetheless be bound by the Plan's provisions if the bankruptcy court confirms the Plan.

If one or more classes vote to reject the Plan, the Debtor may still request that the Bankruptcy Court confirm the Plan under § 1129(b) of the Bankruptcy Code. To confirm a plan not accepted by all classes, the plan proponent must demonstrate that the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and that has not accepted, the plan. This method of confirming a plan is commonly called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the plan itself also provides for certain conditions that must be satisfied as conditions to confirmation.

### 1.3.8   Is there a Committee in this case?

Yes. The Office of the United States Trustee has appointed an official committee of unsecured creditors in this case. The Official Committee of Unsecured Creditors represents the interests of all unsecured creditors in this Chapter 11 Case.

### 1.3.9   When is the deadline for returning my ballot?

The Bankruptcy Court has directed that, to be counted for voting purposes, your ballot must be received by the Debtor's counsel by October 3, 2011 at 12:00 p.m.

**IT IS IMPORTANT THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE ON THE PLAN. THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO CREDITORS AND INTEREST HOLDERS. THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS AND RECOMMENDS THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE TO ACCEPT THE PLAN.**

### ARTICLE 2
### OVERVIEW OF PLAN

An overview of the Plan is set forth below. This overview is qualified in its entirety by reference to the Plan. If the Bankruptcy Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

Under the Plan, the Debtor is selling substantially all of its operating assets (defined in the Plan as the "Business"). At the time this Disclosure Statement was filed, the Debtor had accepted an offer from EDG Partners Fund II, L.P. (together with its affiliates and assigns, "EDG") for $4,750,000 cash plus the assumption of up to $925,000 in certain post-petition accrued liabilities (the "EDG Sale"). The offer is subject to a court-approved bidding process that will determine the highest and best offer. The bidding process will be completed prior to the Confirmation Hearing. Except for specifically identified assumed liabilities and permitted liens, the Business will be conveyed to the winning bidder free and clear of all liens, claims, interests and encumbrances under 11 U.S.C. §§ 1129(b)(2)(A)(iii) and 1123(a)(5).

Upon closing of the EDG Sale or Alternative Sale (a sale to a party that submits the highest and best offer that is not EDG), the sales proceeds and all Excluded Assets (as defined in

the EDG Asset Purchase Agreement), will be vested in the Liquidating Debtor and administered by an independent Plan Agent appointed by the Bankruptcy Court pursuant to the terms of the Plan.  An oversight committee appointed by the Unsecured Creditors Committee will be created to oversee the Plan Agent.

Under the Plan, the Plan Agent[1] will use the sales proceeds to satisfy Allowed Claims and Interests in accordance with the Bankruptcy Code.  The treatment of specific classes of claims is set forth below.  You are encouraged to pay special attention to the treatment provided to the class containing your claim.  In addition, the Plan Agent will be vested with authority to (i) take such actions necessary to liquidate the Liquidating Debtor's remaining assets; (ii) file claim objections; (iii) make distributions and take such other actions as provided for under the Plan; and (iv) prosecute causes of action owned by the Debtor's estate, including all claims and causes of action arising under the Bankruptcy Code.  Once all distributions have been made, the Plan Agent will file a final tax return and dissolve the Liquidating Debtor.

Assuming that the EDG Sale (or, if applicable, the Alternative Sale) closes and the Plan is confirmed, the Debtor estimates that funds will be distributed as follows:

|  | Estimated recovery under proposed Chapter 11 Plan |
|---|---|
| **Cash Proceeds of Sale, plus Assumed Liabilities** | $5,675,000[2] |
| **WoodRock Fees Associated with Sale** | ($504,000) |
| **Estimated Proceeds Available for Distribution** | **$5,171,000** |
|  | **Estimated Claims if Allowed** |
| **Total Assets Available for Distribution** |  |
| Less Secured Claims:<br>    Metro Bank Secured Claim | $578,997 |

---

[1]  The Debtor has proposed that H. Malcolm Lovett, Jr. serve as the initial Plan Agent under the Plan.

[2]  The sales proceeds of $5,675,000 assumes that the Debtor's Qualifying Accounts Receivable (as defined in the EDG APA) will total at least $2,400,000 at Closing.  There is some risk that the such amount will not total $2,400,000, in which case the purchase price under the EDG APA will be adjusted dollar-for-dollar in accordance with Article 3 of the EDG Asset Purchase Agreement.

| | |
|---|---|
| Other Secured Claims[3] | $800,000 |
| **Total Secured Claims** | **$1,378,997** |
| Less Chapter 11 Administrative and Priority Claims: | |
|     Allowed Administrative Expense Claim | $200,717 |
|     Current Trade Payables | $925,000 |
|     Priority tax claims | $1,388,826 |
|     Chapter 11 professional fees | $500,000 |
| **Total Administrative and Priority Claims** | **$3,014,543** |
| **Total Estimated Liquidation Proceeds Available to Unsecured Claims:** | $777,460 |
| **Total Filed Unsecured Claims** | **$2,888,136** |
|     Potential Re-classified Unsecured Claims[4] | $650,000 |
| **Total Unsecured Claims** | **$3,538,136[5]** |
| **Estimated Distribution to Unsecureds** | **<u>22%</u>** |

---

[3]  The Debtor estimates that Allowed Secured Claims will be approximately $800,000.  This includes all Secured Claims asserted by taxing authorities, as well as certain filed Secured Claims that the Debtor does not believe are disputed.  This amount does not include the secured claims asserted by (i) Afton Capital, Inc. ($150,000); (ii) Bonita Groesser ($50,000); (iii) Frank Basile ($150,000); (iv) Jon Locy ($25,000); (v) Longmont Capital ($250,000); (vi) Mark and Jane Osman ($25,000); or (vii) Apelles Master Fund #1, Ltd. ($4,557,464.44).

[4]  This amount assumes that the secured claims asserted by (i) Afton Capital, Inc. ($150,000); (ii) Bonita Groesser ($50,000); (iii) Frank Basile ($150,000); (iv) Jon Locy ($25,000); (v) Longmont Capital ($250,000); and (vi) Mark and Jane Osman ($25,000) will be allowed as general unsecured claims.

[5]  This amount assumes that the claim filed by Apelles is either disallowed, subordinated to general unsecured claims and/or re-characterized from debt to equity.  If the Apelles claim is allowed as a general unsecured claim, the Debtor estimates that distribution to general unsecured creditors will be 10% or less.

**ARTICLE 3**
**THE DEBTOR**

**3.1     The Debtor's Business and Capital Structure.**

   **3.1.1    The Debtor's Pre-Petition Business.**

   The Debtor was formed in 2004.  The Debtor's business model consisted of a network of centrally managed medical clinics providing comprehensive outpatient medical care primarily to patients with Type 1, Type 2 and Gestational Diabetes.  The Debtor initially operated in the Houston, Texas area.  With the aid of investment capital, the Debtor subsequently expanded its operations to the Dallas, San Antonio and Corpus Christi areas.  By 2008, the Debtor was operating 17 clinics in Texas and 1 in Arizona. Unlike other Diabetes medical providers, which are fragmented, the Debtor's clinics provide a multidisciplinary treatment approach to their patients that include comprehensive medical care, education, diagnostics and lifestyle and nutrition counseling. This comprehensive treatment approach has been shown to substantially improve the long-term well being of patients, reduce the overall medical costs and reduce other indirect costs, like patient employee absenteeism and turnover, associated with Diabetes.  In 2010, the Debtor treated over 20,000 patients and conducted over 55,000 office visits.

   The Debtor's original business plan contemplated revenues from five sources: (a) medical services provided by physicians, (b) educational services by non-physician professionals, (c) screening tests recommended by the American Diabetes Association, (d) pharmaceutical services/products and (e) interactive real-time wellness programs.  Due to financial setbacks, however, the Debtor was subsequently required to streamline its business operations and discontinue certain unprofitable services such as its interactive wellness programs and pharmacy services.

   On the Petition Date, the Debtor operated 18 outpatient Diabetic centers, including 9 in the Houston area, 4 in the Dallas area, 3 in the San Antonio area, 1 in the Corpus Christi area and 1 in the Phoenix, Arizona area.  The Debtor employed approximately 135 non-physician employees.  According to its unaudited financials, the Debtor generated average revenues of approximately $840,000 per month during 2010.  On the Petition Date, the Debtor's total liabilities exceeded $10 million.  A substantial amount of these liabilities are insider-related and are subject to dispute.  These disputes will be resolved by the Plan Agent and/or the Post-Confirmation Committee.

### 3.1.2   The Debtor's Capital Structure.

The Debtor's primary long-term secured debt consists of the outstanding amount owed to MetroBank, N.A. under that certain promissory note and associated loan and security documents dated September 7, 2007 in the original principal amount of $600,000.   The loan from MetroBank is secured by the Debtor's accounts receivable and deposit accounts.   The amount outstanding on the Petition Date was approximately $578,996.03.

In 2009 and 2010, the Debtor issued secured notes to a number of investors and former insiders totaling in excess of $1 million.   Some of these notes were timely perfected and others were not.   These notes are purportedly secured by all of the Debtor's assets.   The Debtor continues to investigate the enforceability of these notes.   In addition, in the days leading up to the bankruptcy filing, several of the Debtor's former officers attempted to grant and perfect security interests for amounts in excess of $4 million owed to a partnership in which they are owners.   The Debtor believes that these liens are avoidable under applicable bankruptcy law and that these actions were illegal.   The Plan Agent and/or the Post-Confirmation Committee will have authority to file the necessary actions to resolve all of the foregoing issues.

### 3.1.3   Debtor's Financial Information.

The chart set forth below reflects the revenues, net income and EBITDA for the fiscal years 2008-2010.

**2008**

|  | Diabetes America, Inc. |
|---|---|
| Revenues | $7,903,598.00 |
| EBITDA | ($7,407,731.00) |
| Net Income | ($8,914,165.00) |

**2009**

|  | Diabetes America, Inc. |
|---|---|
| Revenues | $10,080,238.00 |
| EBITDA | ($2,695,317.00) |
| Net Income | ($3,724,432.00) |

**2010**

|  | Diabetes America, Inc. |
|---|---|
| Revenues | $10,096,411.00 |
| EBITDA | ($2,769,037.00) |
| Net Income | ($3,593,397.00) |

The Debtor files monthly operating reports with the Bankruptcy Court which reflect current financial information and are publicly available for inspection at the office of the Clerk of the Court.   Attached hereto as **Schedule 1** is a copy of the latest monthly operating report filed by the Debtor.

### 3.1.4   Events Leading to Bankruptcy.

In its initial filings with the Court, the Debtor identified a number of factors that led to the bankruptcy filing.  First, the Debtor identified its entry into a long-term commercial lease in Arizona that remained vacant due to a lack of funding to open a new clinic.  Second, the Debtor identified several underperforming clinics that were burdened by above-market commercial leases.  Third, the Debtor identified a series of systemic billing errors with Medicare that resulted in a recoupment situation.  Finally, the Debtor identified the negative economic impact of Hurricane Ike and rising unemployment associated with the national economic downturn as contributing factors.

In the Spring of 2011, a controlling group of the Debtor's shareholders removed the existing board of directors, as well as several officers and retained professionals.  Two of these parties are partners/owners in a lender that asserts a large claim against the Debtor.  The lender responded to the removal of its partners/owners by filing a motion to appoint a chapter 11 trustee in this case.  During the June 21, 2011 hearing on that motion, the Debtor believes that the lender's representative testified that the Debtor's bankruptcy case was filed to protect the distribution priority of the lender's purported claim.  Looper Reed does not believe that the Debtor's characterization of the foregoing testimony of the lender's representative is accurate or complete.  After retaining new, independent counsel, the Debtor has concluded that its bankruptcy filing was not well-planned and commenced for an improper purpose.  The Debtor intends to seek redress for damages caused by the parties participating in these actions.  Looper Reed denies that (i) the Debtor=s bankruptcy case was not well-planned under the circumstances or commenced for an improper purpose, and (ii) there is any legitimate basis for the Debtor seeking redress for damages by any parties who participated in these actions.

### 3.1.5   The Debtor's Relationship with DCOA – Physician Associates, P.A.

In Texas, the Debtor works closely with DCOA-Physicians Associates, P.A. ("DCOA"), which employs the doctors who provide medical services at the Debtor's Texas clinics.  In Arizona, the Debtor, through its wholly-owned subsidiary, Diabetes America AZ LLC ("DAAZ"), employs all physicians and non-medical staff at its clinics.  Neither DCOA nor DAAZ have filed bankruptcy.

Pursuant to an Amended and Restated Management Services Agreement dated on or about December 10, 2008 (the "Management Agreement"), the Debtor is required to provide certain management services to DCOA, including (a) billing and collection services, (b) cash management services, (c) facilities for DCOA Physicians to provide medical services, (d) provision of medical supplies for physicians and (e) non-medical and administrative staff to assist the physicians.  In return for these services, DCOA pays the Debtor a management fee and reimburses the Debtor for its expenses incurred on behalf of DCOA.

On the Petition Date, the Debtor's books and records reflected a receivable from DCOA in the amount of approximately $3.5 million (the "DCOA Receivable").  The Debtor believes that DCOA may have significant offsets against the DCOA Receivable for, among other things, the Debtor's failure to pay 941 wage withholding taxes to the Internal Revenue Service.  The

Debtor has also analyzed the collectability of the DCOA Receivable and determined that the receivable has little or no value.

### 3.1.6   The Debtor's Assets.

On the Petition Date, the Debtor's most valuable assets consisted of (i) accounts receivable; (ii) furniture and equipment; (iii) intellectual property; and (iv) certain contract rights, causes of action and other intangibles.

On February 4, 2011, the Debtor filed with the Bankruptcy Court its Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, as amended, the "Schedules"). The Schedules contain a detailed listing of the Debtor's assets and the amounts owed to their Creditors based on the Debtor's books and records.   In connection with this Disclosure Statement, Creditors and Interest Holders are referred to the Schedules.  A copy of the Schedules is available from the Clerk's office or from the Debtor upon request.  As more fully described herein, the Debtor objects to a substantial portion of the liabilities set forth on the Schedules prepared by its former counsel.  In addition, based on the advice received from its new counsel, the Debtor has concluded that the values assigned to certain of its assets are significantly overstated.  The Debtor intends to file (or has filed) amendments to its Schedules.

Pursuant to the Plan, substantially all of the Debtor's operating assets will be sold to EDG or an alternative purchaser.  Upon closing of the EDG Sale or Alternative Sale, the sales proceeds and all of the Debtor's remaining non-operating assets will be revested in the Liquidating Debtor and administered by the Plan Agent with oversight from the Post-Confirmation Committee.

### 3.1.7   Debtor's Real and Personal Property Leases and Executory Contracts.

On the Petition Date, the Debtor was a party to approximately 20 real property leases. Certain of these leases will be assigned pursuant to the Plan and EDG Asset Purchase Agreement (or such other Alternative Sale as may be approved under the Plan).  The ultimate disposition of the Debtor's real property leases will be heavily dependent upon the identity of the successful purchaser of the Debtor's assets.

The Debtor is also a party to a number of equipment leases and executory contracts.  The Debtor's unexpired leases and executory contracts, to the extent not already assumed or rejected by order of the Bankruptcy Court, will either be assumed and assigned pursuant to the EDG Sale/Alternative Sale or rejected on the Effective Date of the Plan.

### 3.1.8   Liabilities and Claims against the Debtor.

The Schedules contain a detailed listing of Creditors, together with the estimated amount of Claims.  Creditors and Interest Holders are referred to the Debtor's Schedules. The Debtor's respective Schedules generally organize Creditors into three general groupings: (i) Schedule D-Secured Claims, (ii) Schedule E-Unsecured Priority Claims, and (iii) Schedule F-Unsecured Nonpriority Claims.  In addition, approximately 102 proofs of claims have been filed in the Bankruptcy Case totaling approximately $9.4 million.  A number of the proofs of claim are duplicative of the Debtor's Schedules.  The last day to file a proof of claim was May 4, 2011.

### 3.1.9   Secured Claims.

The Debtor scheduled secured claims totaling $5,984,150.62.  A substantial portion of the secured claims will be disputed as to amount, whether a valid, unavoidable lien exists, or both. A number of creditors also filed secured proofs of claim.   The Debtor and/or the Committee/Post-Confirmation Committee are continuing to review claims and intend to object to and/or bring causes of action to, among other things, avoid and/or subordinate certain asserted secured claims.  The following table sets forth the scheduled secured claims and filed secured claims against the Debtor:

| Creditor | Scheduled Claims | Filed Claims |
|---|---:|---:|
| Afton Capital, Inc. | $150,000.00 (disputed) | n/a |
| Apelles Master Fund #1, Ltd. | $4,219.593.00 (disputed) | $4,557,464.44 |
| Baytree Leasing Company, LLC | $1,057.62 | $13,755.54 |
| Bonita Groesser | $50,000.00 (disputed) | $65,450.00 |
| Denly ACI Partners, Ltd. | $93,500.00 | $419,201.01 |
| Dennis C. Von Waaden and Sally Von Waaden, Co-Trustees of the Von Waaden 2004 Revocable Trust | $450,000.00 | $239,611.09 |
| Frank Basile | $150,000.00 (disputed) | $161,402.39 |
| John Locy | $25,000.00 (disputed) | n/a |
| Longmont Capital, Ltd. | $250,000.00 (disputed) | n/a |
| Mark and Jane Osman | $25,000.00 (disputed) | n/a |
| MetroBank, N.A. | $570,000.00 | $578,996.03 |
| Dallas County Utility & Reclamation District | n/a | $2,401.37 |
| Richardson ISD | n/a | $1,688.53 |
| Tarrant County | n/a | $5,886.12 |
| Katy ISD | n/a | $532.77 |
| Harris County et al | n/a | $6,101.42 |
| Bexar County | n/a | $8,633.80 |
| US Bancorp Equipment Finance, Inc. | n/a | $37,608.22 |
| Collin County Tax Assessor Collector | n/a | $1,999.01 |
| Aldine ISD | n/a | $734.31 |

| Creditor | Scheduled Claims | Filed Claims |
|---|---|---|
| Nueces County | n/a | $1,554.07 |
| Montgomery County | n/a | $1,476.77 |
| Carrollton-Farmers Branch I.S.D. | n/a | $1,723.85 |
| Fort Bend Independent School District | n/a | $700.55 |
| Harris County M.U.D. #346 | n/a | $141.34 |
| Clear Creek I.S.D. | n/a | $1,845.03 |
| HC MUD #170 | n/a | $464.61 |
| Brazoria County Tax Assessor-Collector | n/a | $1,240.06 |
| Pasadena Independent School District | n/a | $823.25 |
| San Jacinto Community College District | n/a | $215.00 |
| Aqua Solutions | n/a | $757.96 |
| Matlock Park Place, LP | n/a | $12,803.40 |
| Venue at Hometown, Ltd. | n/a | $203,130.97 |
| Pru CB Limited Partnership | n/a | $7,422.50 |
| K.B. Centre, Ltd. | n/a | $25,052.36 |
| Fort Bend County | n/a | $418.12 |

### 3.1.10  Priority Claims.

The following table sets forth the potential priority unsecured claims in the Debtor's case:

| Creditor | Scheduled Claims | Filed Claims |
|---|---|---|
| Arizona Department of Economic Security | $1,176.01 | n/a |
| Arizona Department of Revenue | $8,931.60 | n/a |
| Internal Revenue Service | $1,348,350.46 | $14,999.97 |
| Texas Workforce Commission | $4,046.48 | $3,641.57 |
| Rosemary Mazanet | n/a | $11,725.00 |

No determination has yet been made by the Debtor and the Committee regarding the validity of any of the foregoing claims.

Certain creditors have also asserted administrative expense claims that may be entitled to priority under 11 U.S.C. § 507. The Court has entered orders allowing (i) PSS World Medical, Inc.'s claim under 11 U.S.C. § 503(b)(9) in the amount of $61,149.21; and (ii) EBK-DA, LLC and EBKT-DA, LLC's claim under 11 U.S.C. §§ 365(d)(3) and 503(b)(1)(A) in the amount of $139,567.50. In addition, unpaid professional fees have accrued during the chapter 11 case, a substantial portion of which will be disputed by the Debtor.

### 3.1.11  General Unsecured Claims.

Based on the Claims Register, unsecured claims of approximately $2,888,136.09 have been filed against the Debtor. This number may not include all tort claims, unliquidated claims or claims for rejection damages. In addition, this number does not include any potential unsecured claims held by creditors filing secured claims that might be subject to avoidance and/or subordination. The Debtor expects to file objections to a significant number of unsecured proofs of claims. Should additional or amended proofs of claim be filed, the Debtor will review such claims and may file additional objections. The Plan also provides a mechanism for other parties to object to claims under certain circumstances. The Debtor is unable to predict the outcome of any anticipated claim objections that may be filed.

**THE RIGHT OF ALL PARTIES, INCLUDING THE DEBTOR, THE COMMITTEE, THE POST-CONFIRMATION COMMITTEE AND/OR THE PLAN AGENT (WHETHER EXISTING OR FORMED UNDER THE PLAN) TO OBJECT TO ANY CLAIM FILED IN THIS CASE IS EXPRESSLY RESERVED. THE INCLUSION OF A CLAIM OR CLAIMS WITHIN THIS DISCLOSURE STATEMENT IS NOT AN ADMISSION REGARDING THE VALIDITY OR ALLOWANCE OF ANY CLAIM. YOU SHOULD NOT ASSUME THAT A VOTE FOR OR AGAINST THE PLAN WILL HAVE ANY AFFECT OF THE STATUS OF YOUR CLAIM. IF ANYONE SUGGESTS THAT THE STATUS OF YOUR CLAIM MAY BE AFFECTED BY YOUR VOTE, YOU SHOULD REPORT SUCH INCIDENT TO COUNSEL FOR THE DEBTOR OR COUNSEL FOR THE COMMITTEE IMMEDIATELY AS ANY SUCH SUGGESTION MAY VIOLATE TITLE 18.**

### 3.2    Significant Events during the Chapter 11 Case.

### 3.2.1    First-Day Pleadings.

Shortly after the Petition Date, the Debtor obtained authority to pay prepetition employee wages and benefits and other employee obligations in the ordinary course of the Debtor's business. As a result, all third-party, non-insider claims related to employee compensation and benefits entitled to priority under §§ 507(a)(4), (5) and (8) of the Bankruptcy Code were satisfied.

The Debtor also obtained orders authorizing them to, among other things: (i) use cash collateral; (ii) continue the use of its existing bank accounts and cash management system; and (iii) establish procedures for determining adequate assurance requests from utility companies.

### 3.2.2   Retention and Termination of Professionals.

On December 22, 2010, the Court entered an order authorizing the interim retention of Healthcare Markets Group ("HMG") as the Debtor's financial advisor and chief restructuring officer.  In its order, the Court reserved approval of final retention for a later date but authorized the Debtor to make interim payments to HMG in an amount not to exceed $4,500 per week.  The Court also provided, if final approval was not obtained, that (i) HMG would be compensated for its interim services at a fair market rate of compensation (plus ordinary and necessary expenses), with the precise amounts of the compensation to be determined after notice and hearing; and (ii) interim payments would be subject to disgorgement after final hearing.  Final approval of HMG's employment was never obtained and in May, 2011, HMG was terminated when certain of HMG's actions came to the attention of the new board.  HMG was paid a total of $99,000.00 in interim payments.  HMG has informed the Debtor that it intends to seek compensation of $404,100.00, in addition to the interim payments. The Debtor intends to object to any additional compensation and seek disgorgement of interim payments previously made to HMG due to their actions in the case.  The Debtor and/or the Post-Confirmation Committee may also initiate affirmative claims against HMG in connection with its role in this bankruptcy case.

On February 10, 2011, the Court approved the Debtor's motion to employ Looper, Reed & McGraw, P.C. ("Looper Reed") as its bankruptcy counsel.  Looper Reed was subsequently terminated in May/June, 2011 by the Debtor's new board.  Looper Reed received $125,000 in post-petition payments from the Debtor pursuant to Court's order approving interim compensation procedures.   On June 20, 2011, Looper Reed filed its first application for compensation seeking a total award of $367,374.78.   After the Debtor filed its objection, the application was withdrawn without prejudice.   It is anticipated that Looper Reed will refile its application at a future date.  Based on the currently known facts, an objection will be filed.  The Debtor and/or the Post-Confirmation Committee may also initiate affirmative claims against Looper Reed in connection with its role in this bankruptcy case.

Looper Reed denies that there is any legitimate basis for either an affirmative claim against the firm or an objection to the firm's proposed compensation for professional services rendered and expenses incurred on behalf of the Debtor.

On February 17, 2011, the Court entered an order authorizing the employment of AHF Financial Services, LLC ("AHF") to perform collection services in connection with the Debtor's accounts receivable.  AHF's services yielded little or no benefit to the estate.  On June 24, 2011, the Debtor terminated AHF.   The Debtor paid AHF a total of $115,369.57 prior to its termination.

On June 14, 2011, the Debtor filed its application to employ and substitute Porter Hedges LLP as the company's bankruptcy counsel.  On July 14, 2011, the Debtor filed its application to employ WoodRock & Co. as the company's investment banker.  The Bankruptcy Court orally granted WoodRock's application on August 19, 2011.  The application of Porter Hedges LLP remains pending.

### 3.2.3    Appointment of the Committee.

On January 31, 2011, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (previously defined as the "Committee"), consisting of (i) Physician Sales & Service, (ii) Stradling Yocca Carlson & Rauth and (iii) Riverstone Wealth Management.  On February 10, 2011, the U.S. Trustee reconstituted the Committee to include:  (i) Physician Sales & Service, (ii) Stradling Yocca Carlson & Rauth, (iii) Cardinal Health, and (iv) Afton Capital, Inc.  The Committee has employed Butler, Snow, OMara, Stevens & Cannada PLLC as its bankruptcy counsel.  On March 22, 2011, the U.S. Trustee reconstituted the Committee a second time to include: (i) Physician Sales & Service, (ii) Stradling Yocca Carlson & Rauth, (iii) Afton Capital, Inc.; and (iv) Identity Architects, Inc.

### 3.2.4    Lease/Contract Rejection

Since engaging new counsel, the Debtor has dedicated significant time evaluating its real property leases and exchanging information and ideas with its landlords and their representatives.  At this point in the case, a number of leases have been assumed and several have been rejected.  In addition, agreements were reached to extend the deadline for the Debtor to decide whether to assume or reject certain leases.

### 3.2.5    The Marketing and Sale Process.

On July 14, 2011, the Debtor filed its application to employ WoodRock as its investment banker in this case.  After assembling the necessary marketing and due diligence materials, WoodRock immediately initiated a process designed to evaluate all options to (i) raise new equity capital; (ii) sell all or part of the Debtor's assets; or (iii) achieve a combination of the foregoing.  During the process, WoodRock contacted approximately 20 different potential financial and strategic partners regarding their interest in the Debtor.

After evaluating the potential options, the Debtor determined that a sale of its assets was the only viable means of ensuring a meaningful distribution to creditors.  Consequently, the Debtor focused its efforts on marketing and selling its assets.  These efforts resulted in several indications of interest.  WoodRock fully explored each indication of interest that was received. The Debtor ultimately received term sheets from two interested parties.  Each term sheet went through multiple iterations and price increases.  After extensive negotiations with both interested parties, the Debtor selected EDG as its stalking horse bidder.

On August 11, 2011, the Debtor filed its Expedited Motion to Approve (i) Sale Procedure, Form of Asset Purchase Agreement and Form of Notice; and (ii) Bid Protections (the "Bidding Procedures Motion").  On August 17, 2011, the Debtor entered into an agreement with EDG for the purchase of substantially all of the Debtor's operating assets (the "EDG Asset Purchase Agreement") for $4,750,000 cash plus the assumption of up to $925,000 in certain post-petition accrued liabilities.

On August 18, 2011, the Court entered an order granting the Bidding Procedures Order and approving the EDG Asset Purchase Agreement (the "Bidding Procedures Order").  Under the Bidding Procedures Order, the EDG Sale is subject to higher and better offers.  Specifically, pursuant to the Court approved bidding procedures, potential purchasers must submit qualifying

bids by 5:00 p.m. Central Time on September 21, 2011.  Qualifying bidders must (i) execute and deliver to WoodRock a confidentiality agreement prepared by the Debtor and approved by EDG, (ii) deposit with counsel for the Debtor the sum of $500,000 (each, the "Alternative Buyer's Deposit") which deposit shall be nonrefundable unless such qualified bidder is not the highest and best offer as determined by the Court; (iii) submit to the Debtor an unqualified and binding cash bid of at least $5,250,000, plus the assumption of up to $925,000 in post-petition accrued non-professional liabilities along with an executed written agreement substantially in the form of the EDG Asset Purchase Agreement as determined by the Debtor ("Qualified Bids"); and (iv) provide financial and other information to WoodRock, the Debtor and the Committee that allows them to make a reasonable determination as to such bidder's ability to consummate the sale. Credit bids shall not be considered Qualified Bids.

On or before 5:00 p.m. Central Time on September 26, 2011, the Debtor will file a notice with the Court identifying all Qualified Bids and attaching copies of the bids that were timely received.  If one or more Qualified Bids are received, an auction will be held on October 4, 2011 at 10:00 a.m., Central Time, at the offices of Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas.  The minimum overbid at the auction will be $150,000.  The Court will consider approval of the sale to the highest and best bidder, pursuant to 11 U.S.C. §§ 1129(b)(2)(A)(iii) and 1123(a)(5), at the confirmation hearing on October 5, 2011 at 10:00 a.m. (Houston time).

**ARTICLE 4**
**CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN**

The Claims against and Interests in the Debtor are classified as set forth in this Article.

**4.1**     **Administrative Claims and Priority Tax Claims.**

In accordance with § 1123(a)(l) of the Bankruptcy Code, certain Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  These unclassified Claims are treated as follows.

**4.1.1   Administrative Claims.**     Allowed Administrative Claims arising under 11 U.S.C. § 503(b), including Cure Costs against the Debtor, will be paid in Cash and in full by the Plan Agent from the Sales Proceeds on the later of (i) the Administrative Claim Distribution Date, (ii) the date on which such Administrative Claim becomes an Allowed Claim; or (iii) such other date as the Plan Agent and the holder of the Allowed Administrative Claim shall agree.  Allowed Administrative Claims that are not secured by a valid, perfected, post-petition Lien are not entitled to post-petition interest or legal fees and expenses.

**4.1.2   Priority Tax Claims.**  Priority Tax Claims against the Debtor will be paid in Cash and in full by the Plan Agent from the Sales Proceeds on the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Claim; or (iii) such other date as the Plan Agent and the holder of the Allowed Priority Tax Claim shall agree.  Allowed Priority Tax Claims that are fully Secured Claims shall be entitled to interest at the Plan Rate.

**4.2**     **Classified Claims Against and Interests in the Debtor**.

The Claims against and Interests in the Debtor are classified as follows:

**4.2.1    Class 1 – Priority Non-Tax Claims.**   Class 1 comprises all Allowed Priority Non-Tax Claims against the Debtor.

**4.2.2    Class 2 – MetroBank Secured Claim.**   Class 2 comprises the Allowed Secured Claim held by MetroBank.

**4.2.3    Class 3 – Other Secured Claims**.   Class 3 comprises all Allowed Secured Claims held by persons other than MetroBank, Apelles and *ad valorem* taxing authorities.   Each Allowed Other Secured Claim shall be classified in a separate subclass and shall have all rights associated with separate classification under the Bankruptcy Code.

**4.2.4    Class 4 – Apelles Claim**.   Class 4 comprises the Allowed Claim held by Apelles.

**4.2.5    Class 5 – General Unsecured Claims**.   Class 5 comprises all Allowed General Unsecured Claims against the Debtor.

**4.2.6    Class 6 – Subordinated Claims**.   Class 6 comprises all Allowed Subordinated Claims.

**4.2.7    Class 7 – Equity Interests.**   Class 7 comprises all Allowed Equity Interests in the Debtor.

**4.2.8    Class 8 – Subordinated Equity Interests.**   Class 8 comprises all Allowed Subordinated Equity Interests in the Debtor.

## ARTICLE 5
## IMPAIRMENT OF CLASSES AND RESOLUTION OF CLAIM CONTROVERSIES

**5.1     Impaired Classes.**

Only holders of Claims that are in impaired Classes may vote on the Plan.  The following Classes of Claims and Interests are impaired under the Plan:

**5.1.1**   Class 4 – Apelles Claim.
**5.1.2**   Class 5 – General Unsecured Claims.
**5.1.3**   Class 6 – Subordinated Claims.
**5.1.4**   Class 7 – Equity Interests.
**5.1.5**   Class 8 – Subordinated Equity Interests.

**5.2     Unimpaired Classes.**

Holders of Claims that are in unimpaired Classes are deemed to have accepted the proposed Plan and are not entitled to vote on the Plan.  The following Classes of Claims are not impaired under the Plan:

**5.2.1**   Class 1 – Priority Non-Tax Claims.
**5.2.2**   Class 2 – MetroBank Secured Claim.
**5.2.3**   Class 3 – Other Secured Claims.

**5.3**   **Controversy Concerning Classification, Impairment or Voting Rights.**

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, prior to the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy.  Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes the amount of any contingent or unliquidated Claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the Chapter 11 Case.  In addition, the Bankruptcy Court may in accordance with § 506(b) of the Bankruptcy Code conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

**ARTICLE 6**
**TREATMENT OF CLAIMS AND EXECUTORY CONTRACTS**

**6.1**   **Treatment of Impaired Classes.**

**6.1.1**   **Class 4.**  To the extent that any portion of the Apelles Claim becomes an Allowed Secured Claim, in the sole discretion of the Plan Agent, after consultation with the Post-Confirmation Committee, Apelles shall receive on the later of the Effective Date or the date on which such Claim becomes an Allowed Claim either (i) the proceeds of any Collateral sold under the Plan that secures the Apelles Claim after satisfaction in full of all superior liens up to the Allowed Amount of the secured portion of the Apelles Claim; or (ii) any unsold Collateral securing the Allowed Amount of the secured portion of the Apelles Claim in full and final satisfaction of such Claim.  To the extent that any portion of the Apelles Claim becomes an Allowed General Unsecured Claim, such claim will receive Pro Rata treatment with holders of Allowed Class 5 Claims.

**6.1.2**   **Class 5.**  The Plan Agent shall distribute Available Cash Pro Rata to holders of Allowed General Unsecured Claims in Class 5 and/or the Disputed Claims Reserve pursuant to Articles 8.3 and 8.4 of the Plan, if applicable, on the Initial Distribution Date. The Plan Agent shall make additional future distributions to holders of Allowed General Unsecured Claims in Class 5 from Available Cash on subsequent Interim Distribution Dates as the Plan Agent determines appropriate after consultation with the Post-Confirmation Committee.  In the event that Creditors in Class 5 are paid in full and there exists remaining Available Cash, holders of Allowed General Unsecured Claims shall receive interest at the Plan Rate.  Any Available Cash remaining after the satisfaction of Allowed General Unsecured Claims in Class 5 shall be distributed in accordance with Article 6.1.3 and, if applicable, Articles 6.1.4, and 6.1.5 of the Plan.

**6.1.3**   **Class 6.**  Each holder of an Allowed Subordinated Claim in Class 6 shall receive a Pro Rata share of Available Cash up to the Allowed Amount of such Claim after payment in full of all Allowed Claims in the corresponding superior class set forth in Articles 6.1.1 and 6.1.2 of the Plan.  For purposes of clarity, a holder of an Allowed Class 6 Claim is

entitled to a Distribution if and only if all Allowed Class 4 and Class 5 Claims are paid in full with interest.  In the event that Creditors in Class 6 are paid in full and there exists remaining Available Cash, holders of Allowed Claims in such class shall receive interest at the Plan Rate.  Any Available Cash remaining after the satisfaction of Allowed Subordinated Claims in Class 6 shall be distributed in accordance with Article 6.1.4 and, if applicable, Article 6.1.5 of the Plan.

**6.1.4    Class 7.**  All Equity Interests in Class 7 shall be canceled as of the Effective Date.  Any Available Cash after payment in full of Class 6 shall be distributed to Equity Interest Holders (as of the Equity Interest Record Date) in accordance with the Debtor's bylaws and/or other documents governing distributions on account of Equity Interests in the Debtor.  Any Available Cash remaining after the satisfaction of Allowed Equity Interests in Class 7 shall be distributed in accordance with Article 6.1.5 of the Plan.

**6.1.5    Class 8**  All Subordinated Equity Interests in Class 8 shall be canceled as of the Effective Date.   Any Available Cash after payment of Class 7 Equity Interests in accordance with Article 6.1.4 of the Plan shall be distributed to Subordinated Equity Interest Holders (as of the Equity Interest Record Date) in accordance with the Debtor's bylaws and/or other documents governing distributions and/or applicable law on account of Subordinated Equity Interests in the Debtor.

**6.2     Treatment of Unimpaired Classes.**

The Unimpaired Classes will be treated as follows:

**6.2.1    Class 1.**  Allowed Priority Non-Tax Claims will be paid in Cash and in full by the Plan Agent from the Sales Proceeds on the later of (i) the Initial Distribution Date, (ii) the date on which such Claim becomes an Allowed Claim; or (iii) such other date as the Plan Agent and the holder of the Allowed Claim in Class 1 shall agree.  Allowed Class 1 Claims are not entitled to post-petition interest or post-petition legal fees and expenses.

**6.2.2    Class 2.**  The Allowed Secured Claim of MetroBank shall be paid in full and in Cash by the Plan Agent on the later of (i) the Effective Date; (ii) the date on which such Claim becomes an Allowed Claim; or (iii) such other date as the Plan Agent and MetroBank shall agree.

**6.2.3    Class 3.**  In the sole discretion of the Plan Agent, after consultation with the Post-Confirmation Committee, the holder of an Allowed Other Secured Claim in Class 3 shall receive on the later of the Effective Date or the date on which such Claim becomes an Allowed Claim either (i) the proceeds of any Collateral sold pursuant to the Plan securing such Claimant's Allowed Other Secured Claim after satisfaction in full of all superior liens up to the Allowed Amount of the Claimant's Allowed Other Secured Claim; or (ii) any unsold Collateral securing such Claimant's Allowed Other Secured Claim in full and final satisfaction of such Claim.

# ARTICLE 7
## MEANS OF IMPLEMENTATION

**7.1     Closing of EDG Sale or Alternative Sale.**

The Confirmation Order shall authorize a sale of certain or substantially all of the Debtor's operating assets under sections 365, 1123(a)(5), 1123(b)(4), 1129(b)(2)(A), 1141, 1145 and 1146(a) of the Bankruptcy Code under the terms and conditions of the EDG Asset Purchase Agreement free and clear of any Claims, Liens, Interests or encumbrances, including without limitation any Claim or Interest that may be asserted by any Governmental Unit, other than Specifically Assumed Liabilities and Permitted Post-Closing Liens (each as defined in the EDG Asset Purchase Agreement).  Any sale conducted via auction shall be conducted in accordance with applicable orders of the Court, including, without limitation, the Bidding Procedures Order. The Confirmation Order shall provide that the successful purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code (unless the successful purchaser is an insider or affiliate); that the successful purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder; and that the successful purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to all of the assets purchased pursuant to the EDG Asset Purchase Agreement.  The Confirmation Order shall further provide that (i) the transactions contemplated under the EDG Asset Purchase Agreement do not amount to a consolidation, merger or *de facto* merger of the successful purchaser and the Debtor and/or the Debtor's estate; (ii) there is no substantial continuity or continuity of enterprise between the successful purchaser and the Debtor; (iii) the successful purchaser is not a mere continuation of the Debtor or its estate; and (iv) the successful purchaser does not constitute a successor to the Debtor or its estate.  Upon the closing of the EDG Sale or an Alternative Sale, all creditors, employees and Equity Interest Holders of the Debtor, including without limitation all Governmental Units, shall be permanently and forever barred, restrained and enjoined from asserting any Claims or enforcing remedies against the successful purchaser under any theory of successor liability, *de facto* merger or substantial continuity.  Except for foregoing and as specifically set forth in the EDG Asset Purchase Agreement, all assets shall be transferred "as is, where is" with no representation or warranty of any kind.  Unless an Alternative Sale is approved, confirmation of the Plan shall constitute approval of the EDG Sale under the EDG Asset Purchase Agreement, which shall be deemed incorporated into this Plan as if set forth in the Plan.  Notwithstanding the foregoing, in the event that the Bankruptcy Court approves the Debtor's selection of an Alternative Bid, the Debtor shall consummate an Alternative Sale as set forth in the Confirmation Order.

**7.2**     **Vesting of Property of the Estate in the Liquidating Debtor.**

On the Effective Date, all remaining property of the Debtor and of the Estate including all rights to object to Claims, all avoidance actions, causes of action, alter-ego rights, derivative claims, breach of fiduciary duty claims, veil piercing rights, the right to pursue such claims and all other remaining property of the estate as defined in § 541 of the Bankruptcy Code, shall vest in the Liquidating Debtor, free and clear of liens, claims and encumbrances, except as otherwise provided in the Plan.  The Plan Agent shall be the sole officer, director and shareholder of the Liquidating Debtor.  On the Effective Date, the Liquidating Debtor is deemed to have satisfied all liabilities for purposes of dissolution under applicable state law.  The Plan Agent is authorized to execute and file all documents necessary to effectuate the dissolution of the Liquidating Debtor once the Plan Agent determines that all Estate property has been administered in accordance with the Plan, including the abandonment of any burdensome property.

**7.3**     **Continuation of Operations.**

From and after the Effective Date of the Plan, the Liquidating Debtor is authorized to (i) take such action as is necessary to complete an orderly wind-down of its operations; (ii) file claim objections; (iii) make distributions; (iv) prosecute causes of action owned by the Estate, including all claims and causes of action arising under the Bankruptcy Code; (v) pursue, liquidate and administer Estate property; (vi) file tax returns and respond to any audits; and (vii) take such other action as provided for under the Plan.

**7.4**     **Continued Corporate Existence.**

From and after the Effective Date, the Liquidating Debtor shall continue to exist in accordance with the applicable laws of its state of incorporation/organization.  The Liquidating Debtor shall promptly after the closing of the EDG Sale or, if applicable, an Alternative Sale file all documents necessary to remove the term "Diabetes America" or any derivation thereof from its legal name.

**7.5**     **General Powers of the Plan Agent.**

Subject to any express limitations, the Plan Agent, on behalf of the Liquidating Debtor, shall have all of the rights, powers and privileges set forth in the Plan and the Confirmation Order.  The Plan Agent is authorized and shall have the obligation to take all such actions as in his/her judgment are necessary and appropriate to effectuate the purposes of the Plan, including but not limited to the following:

**7.5.1**   Make all Distributions contemplated under the Plan;

**7.5.2**   Consistent with maintaining the value and liquidating the residual assets of the Liquidating Debtor, invest in time or demand deposits, including certificates of deposit issued by any bank approved as a depository institution by the United States Trustee's office, United States Treasury bonds and other securities guaranteed by the full faith and credit of the United States of America or any agency thereof;

**7.5.3**   Supervise and administer the resolution, settlement and payment of Claims and Interests and the distributions to the holders of Allowed Claims and Allowed Interests in accordance with the Plan;

**7.5.4**   Enter into any agreement on behalf of the Liquidating Debtor required by or consistent with the Plan and perform all of the obligations required of the Plan Agent under the Plan;

**7.5.5**   Abandon any of the assets of the Liquidating Debtor if the Plan Agent, after consultation with the Post-Confirmation Committee, concludes that such assets are of no benefit to the Creditors or Interest Holders;

**7.5.6**   Participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding and litigate claims on behalf of the Liquidating Debtor, including without limitation all state and federal causes of action or any other litigation which constitute an asset of the Liquidating Debtor and pursue to settlement or judgment such actions except to the extent that the litigation of such Claims is to be brought by the Post-Confirmation Committee;

**7.5.7**   Participate as a party-in-interest in any proceeding before the United States Bankruptcy Court involving the Chapter 11 Case;

**7.5.8**   Act in the name of or in the place of the Liquidating Debtor in any action before the United States Bankruptcy Court or any other judicial or administrative body;

**7.5.9**   Take actions and exercise remedies against any entity that owes money to the Liquidating Debtor, including without limitation, the remedies available under any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document; make compromises regarding any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document; and, declare or waive defaults regarding any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document;

**7.5.10** Subject to the limitations provided under Section 7.7, select and employ such professionals, agents or employees as the Plan Agent deems necessary to assist in the administration of the affairs of the Liquidating Debtor and compensate such persons;

**7.5.11** Hold any unclaimed distribution or payment to the holder of an Allowed Claim in accordance with this Plan;

**7.5.12** Propose any amendment, modification or supplement to this Plan or the Liquidating Debtor's governance documents;

**7.5.13** File dissolution/termination documents with the appropriate governmental agencies to dissolve the Liquidating Debtor once all Distributions have been made pursuant to the Plan;

**7.5.14**  Receive, conserve and manage the assets of the Liquidating Debtor and sell or otherwise dispose of such assets for a price and upon such terms and conditions as the Plan Agent, in consultation with the Post-Confirmation Committee, deems most beneficial to the Creditors and Interest Holders and execute such deeds, bills of sale, assignments and other instruments in connection therewith;

**7.5.15**  Open and maintain bank accounts on behalf of or in the name of the Liquidating Debtor;

**7.5.16**  Pay all taxes, make all tax withholdings and file tax returns and tax information returns and make tax elections by and on behalf of the Liquidating Debtor;

**7.5.17**  Pay all lawful expenses, debts, charges and liabilities of the Liquidating Debtor;

**7.5.18**  Enforce all provisions of this Plan, including all rights under the EDG Asset Purchase Agreement or similar agreement and any allocation of Sales Proceeds;

**7.5.19**  Protect, perfect and defend the title to any of the assets of the Liquidating Debtor and enforce any bonds, mortgages or other obligations or liens owned by the Liquidating Debtor;

**7.5.20**  Carry insurance coverage, including insurance to protect the Liquidating Debtor, the Plan Agent and the Post-Confirmation Committee against claims brought against the Liquidating Debtor, the Plan Agent or the Post-Confirmation Committee acting within their capacities with the Liquidating Debtor, in such amounts as they deem advisable;

**7.5.21**  Establish such reserves for taxes, assessments and other expenses of administration of the Liquidating Debtor (including without limitation the Disputed Claims Reserve) as may be necessary and appropriate for the proper operation of matters incident to the affairs of the Liquidating Debtor; and

**7.5.22**  Exercise such other powers and duties as are necessary or appropriate in the Plan Agent's discretion to accomplish the purposes of the Plan.

**7.6**     **Obligations of the Plan Agent.**

Notwithstanding anything in the Plan to the contrary, the Plan Agent shall have the following duties:

**7.6.1**   Subject to the provisions of Section 8.1 and 8.2 of the Plan, the Plan Agent shall consult with the Post-Confirmation Committee regarding all material issues affecting the Liquidating Debtor, including the (i) timing and amount of Distributions; (ii) resolution of Claims objections, (iii) the pursuit of Causes of Action, and (iv) the sale and other disposition of assets.  If the Post-Confirmation Committee submits a written objection to the Plan Agent within 10 days of such consultation regarding any anticipated action, the

Plan Agent shall seek Bankruptcy Court approval prior to taking such action.  Otherwise, the Plan Agent may take such action without further notice to or approval from any party.

**7.6.2**    The Plan Agent shall consult with and obtain approval of the Post-Confirmation Committee regarding the retention of, and fee arrangements with professionals representing the Plan Agent and/or Liquidating Debtor.  If the Plan Agent wishes to employ a professional to which the Post-Confirmation Committee fails to provide its approval within 10 days of receiving a written request from the Plan Agent (including by electronic mail), the Plan Agent may employ such professional without further notice to or approval from any party. If the Plan Agent wishes to employ a professional to which the Post-Confirmation Committee timely objects, the Plan Agent may seek such approval from the Bankruptcy Court after notice and opportunity for hearing.

**7.6.3**    The Plan Agent shall cause to be prepared a quarterly report illustrating (i) receipts and disbursements during the prior quarter, (ii) a schedule of all asset dispositions, (iii) a schedule of Distributions made, and (iv) a summary listing of the status of the resolution of objections to Claims and Causes of Action.  Such quarterly report shall be distributed to the Post-Confirmation Committee within fifteen (15) business days after the end of the relevant report preparation period.

**7.6.4**    The Plan Agent shall maintain records relating to the Liquidating Debtor's assets, the management thereof and all transactions undertaken by the Plan Agent on behalf of the Liquidating Debtor.  The Plan Agent shall also maintain records and books of account relating to all Distributions contemplated under the Plan.

## 7.7    Limitations on the Powers of the Plan Agent.

**7.7.1**    Notwithstanding anything in this Plan to the contrary, and only with a Bankruptcy Court Order entered after notice and opportunity for hearing and subject to the rights of EDG under the EDG Asset Purchase Agreement (or any other party pursuant to an Alternative Sale), may the Plan Agent modify or amend this Plan in accordance with § 1127 of the Bankruptcy Code.

**7.7.2**    In the event that the Post-Confirmation Committee makes a written request to the Plan Agent that the Plan Agent take some action and the Plan Agent either fails or refuses to take such action with 10 days of such request, the Post-Confirmation Committee may seek authority from the Bankruptcy Court to take such action on behalf of the Liquidating Debtor.  Any party may object to any such request.

## 7.8    The Committee.

The Committee shall continue in existence until the Effective Date at which time the Committee shall be terminated.  On the Effective Date, a Post-Confirmation Committee shall be formed.  The Post-Confirmation Committee shall be initially composed of at least 3 members designated by the Committee at least 3 days prior to the commencement of the Confirmation Hearing.  In the event of death or resignation of any member of the Post-Confirmation Committee, (i) the remaining members of the Post-Confirmation Committee appointed by the

Committee shall have the right to designate a successor.  If a Post-Confirmation Committee member assigns or releases its Claims against the Liquidating Debtor or releases the Liquidating Debtor of the obligation to pay its Claim, such act shall constitute a resignation from the Post-Confirmation Committee.  Until a vacancy on the Post-Confirmation Committee is filled, the Post-Confirmation Committee shall function in its reduced number.  Upon Final Distribution, the Post-Confirmation Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from their service as Post-Confirmation Committee members.

**7.9     The Post-Confirmation Committee.**

The members of the Post-Confirmation Committee shall undertake their duties as specified in the Plan.  In serving as a member of the Post-Confirmation Committee, such members shall not assume or be deemed to have assumed any liability to Creditors, Interest Holders, the Debtor, the Liquidating Debtor, the Plan Agent, or any other parties in interest in the Chapter 11 Case and shall not be liable for any acts or omissions while acting in that capacity, except for acts or omissions in bad faith and acts or omissions constituting malfeasance or gross negligence.  The Post-Confirmation Committee shall have the right to retain counsel or other professionals without further order of the Bankruptcy Court, who shall be paid their reasonable fees and expenses by the Liquidating Debtor.  In addition, the members of the Post-Confirmation Committee shall be entitled to reimbursement from the Liquidating Debtor of their reasonable expenses incurred in connection with their duties as members of the Post-Confirmation Committee.  The Bankruptcy Court shall retain jurisdiction to hear any disputes relating to the fees and expenses of the Post-Confirmation Committee's professionals, which disputes, if any, shall be resolved by the Bankruptcy Court after notice and hearing.

**7.10     Resignation/Removal of the Plan Agent.**

The Plan Agent may resign at any time by filing a written notice of resignation with the Bankruptcy Court.  Any such resignation shall become effective on the earlier to occur of (i) sixty (60) days after the filing date of such notice; or (ii) the appointment of a successor Plan Agent.  The Post-Confirmation Committee may remove the Plan Agent at its discretion upon unanimous vote of all members without approval of the Bankruptcy Court, provided, however, that the Post-Confirmation Committee shall provide the Plan Agent with thirty (30) days written notice of its intent to remove the Plan Agent.  If the Plan Agent believes that his/her removal is not in the best interests of Creditors, then the Plan Agent may seek Bankruptcy Court approval to continue as Plan Agent.  If such authority is sought, the Plan Agent shall continue in his/her capacity as Plan Agent pending a Final Order resolving the issue.  All fees and expenses incurred by the Plan Agent and the Post-Confirmation Committee in pursuit of the removal or continuation of the Plan Agent shall be paid by the Liquidating Debtor.

**7.11     Appointment of Successor Plan Agent.**

In the event of the death, resignation or removal of the Plan Agent, the Post-Confirmation Committee shall designate a successor Plan Agent.  Any successor Plan Agent appointed hereunder shall execute and file a statement accepting such appointment and agreeing to be bound by the terms of the Plan and upon such filing, the successor Plan Agent shall immediately become vested with all the rights, powers, trusts and duties of the Plan Agent.

**7.12     Rights and Duties of the Post-Confirmation Committee.**

The Post-Confirmation Committee shall:

**7.12.1** have the right to review, approve and object to settlements and proposed prosecution, release or abandonment of objections to Claims, Claims or Causes of Action by the Plan Agent in accordance with this Plan;

**7.12.2** have the right, to the extent agreed to by the Plan Agent and/or authorized by order of the Bankruptcy Court, to review, prosecute and settle objections to claim, claims and Causes of Action, provided that any recovery shall be delivered to the Plan Agent to be distributed in accordance with the Plan;

**7.12.3** have the right to review, approve and object to proposed sales and other dispositions of assets belonging to the Liquidating Debtor;

**7.12.4** be vested with authority to remove the Plan Agent, or any successor Plan Agent, appointed pursuant to this Plan;

**7.12.5** perform such additional functions as may be agreed to by the Plan Agent, or are otherwise provided for in this Plan, the Confirmation Order, or are provided for by further Order of the Court entered after the Effective Date;

**7.12.6** be authorized to assert, prosecute and settle any Claim or Cause of Action that the Plan Agent elects not to bring, subject to the limitations set forth herein;  or as otherwise authorized by the Bankruptcy Court; and

**7.12.7** consult with the Plan Agent in connection with any other matters related to the Plan.

**7.13     Compensation Procedures.**

The Plan Agent, the Liquidating Debtor, the Post-Confirmation Committee, and all professionals employed by them shall be entitled to payment of their fees and reimbursement of all reasonable expenses on a monthly basis, provided, however, that the Plan Agent and the Post-Confirmation Committee shall be provided with written notice of any requested fees and expenses and, if either the Plan Agent or the Post-Confirmation Committee object to such fees and expenses, they must file with the Bankruptcy Court a notice of such objection within 10 days of their receipt of the written notice of fees and expenses.  If an objection is filed as set forth above, the Bankruptcy Court shall determine whether the disputed fees and/or expenses will be paid by the Plan Agent.

**ARTICLE 8**
**CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF DISPUTED**
**CLAIMS/INTERESTS AND PROCEDURES FOR ASSERTING CLAIMS**

**8.1     Objection Process.**

Subject to the limitations provided under Article 7, the Plan Agent shall have the sole right to object to the allowance of any Claims or Interests provided for under the Plan.  The Plan Agent may object to all claims, whether scheduled or not.  The scheduling of a claim or interest as undisputed, non-contingent and/or liquidated by the Debtor shall have no preclusive effect on the Plan Agent.  All objections shall be litigated to Final Order; provided, however, that the Plan Agent shall have the authority to compromise, settle or otherwise resolve all objections, for any Claim filed in the amount of $25,000 or less without approval of the Bankruptcy Court or notice to the Post-Confirmation Committee.  For all Claims in excess of $25,000, the Plan Agent shall provide counsel for the Post-Confirmation Committee with 10 days written notice (including by electronic mail) of any proposed settlement.  If no objection is served on the Plan Agent within 10 days of the date of such notice, the Post-Confirmation Committee shall be deemed to have consented to such settlement and the Plan Agent may settle such Claim without approval of any other person or entity.  If the Post-Confirmation Committee objects to any proposed settlement, the Plan Agent shall either (i) withdraw the settlement; or (ii) bring the matter before the Bankruptcy Court for final resolution after notice and hearing.  Unless otherwise ordered by the Bankruptcy Court, the Plan Agent shall file and serve all objections to Claims and Equity Interests no later than (i) 120 days after the later of (a) the Effective Date; or (b) the date on which a proof of claim, proof of interest or request for payment is filed with the Bankruptcy Court or (ii) such other date as may be approved by the Bankruptcy Court after notice and hearing.

**8.2     Filing of Claims and Causes of Action.**

Subject to the limitations provided under Article 7, the Plan Agent shall have the exclusive right to file and prosecute any Claims and Causes of Action on behalf of the Liquidating Debtor, including all derivative Causes of Action.  The Plan Agent shall have the authority to compromise, settle or otherwise resolve all Claims and Causes of Action filed or asserted in the amount of $25,000 or less without approval of the Bankruptcy Court or notice to the Post-Confirmation Committee.  For all Claims and Causes of Action in excess of $25,000, the Plan Agent shall provide counsel for the Post-Confirmation Committee with 10 days written notice (including by electronic mail) of any proposed settlement.  If no objection is served on the Plan Agent within 10 days of the date of such notice, the Post-Confirmation Committee shall be deemed to have consented to such settlement and the Plan Agent may settle such Claim or Cause of Action without approval of any other person or entity.  If the Post-Confirmation Committee objects to any proposed settlement, the Plan Agent shall either (i) withdraw the settlement; or (ii) bring the matter before the Bankruptcy Court for final resolution after notice and hearing.

**8.3     Disputed Claims Reserve.**

A Disputed Claims Reserve shall be established by the Plan Agent for the treatment of Disputed Claims.  The Plan Agent shall deposit into a Disputed Claims Reserve an amount equal to the Pro Rata share of the Distribution allocable to such Disputed Claims, in accordance with

the distribution scheme contemplated in the Plan, as if such Claims and/or Equity Interests were Allowed Claims or Equity Interests. Amounts deposited into the Disputed Claims Reserve shall be held in trust for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. Once such Disputed Claim is determined by Final Order or settlement to be an Allowed Claim, the Plan Agent is authorized to pay the Allowed Amount of such Claim without further approval from or notice to any person or entity.

**8.4     Distributions to Holders of Disputed Claims and Disputed Interests.**

Within 10 Business Days after such time as a Disputed Claim becomes an Allowed Claim, but in no event earlier than the Initial Distribution Date, any Distributions reserved for such Allowed Claim shall be released from the Disputed Claims Reserve and delivered to the holder of such Allowed Claim in an amount proportionate to the Allowed Amount of any such Claim. In the event that the Disputed Claim is disallowed in whole or in part, or otherwise settled in amount less than the Disputed Claim amount, the disallowed or reduced portion of such Claim shall be distributed from the Disputed Claim Reserve to holders of Allowed Claims as Available Cash on the next Interim Distribution Date in accordance with the Plan without further approval from or notice to any person or entity.

**8.5     Disallowance of Late Filed Proofs of Claim.**

Except as otherwise provided in the Plan, any proof of claim filed by the holder of such Claim after the Bar Date is hereby disallowed without further notice.

**8.6     Provisions Governing Distributions.**

**8.6.1     Record Date for Claims and Equity Interests.**

The record date for Distributions to Allowed Claims and Allowed Interests under the Plan shall be the date the Bankruptcy Court enters its order approving the Disclosure Statement. For purposes of Distributions to holders of Allowed Claims, the Plan Agent will rely on the claims docket maintained by the Clerk for proofs of claim filed in the Chapter 11 Case except to the extent a notice of transfer of Claim or Interest has been filed with the Court prior to the record date pursuant to Bankruptcy Rule 3001. For purposes of Distributions on account of Equity Interests, the Plan Agent will rely on the relevant stock transfer ledger(s).

**8.6.2     Delivery of Distributions to Holders of Allowed Claims.**

Subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth on the proofs of claim filed by such holders, or at the last known address of such holder if no proof of claim is filed, unless the holder of the Allowed Claim has otherwise notified the Plan Agent in writing of a change of address. If any holder's Distribution is returned as undeliverable, it will be treated in accordance with Article 8.6.4 herein. The Plan Agent may, but shall not be required to make any Distribution of less than $25.00.

### 8.6.3    Delivery of Distributions to Holders of Allowed Equity Interests.

Distributions to holders of Allowed Equity Interests, to the extent they are entitled to distributions under the Plan, will be made at the address of the registered holder of each such Equity Interest as set forth in the relevant stock transfer ledger(s).  If any holder's distribution is returned as undeliverable, it will be treated in accordance with Article 8.6.4 herein.  The Plan Agent may, but shall not be required to make any Distribution of less than $25.00.

### 8.6.4    Unclaimed Distributions.

The Plan Agent shall file a Notice of Distribution within 10 Business Days of the date on which Distributions are made under the Plan.  All claims for undeliverable Distributions must be made no later than the 60th day following the date that the Notice of Distribution is filed.  After such date, all unclaimed Distributions will revert to the Liquidating Debtor for distribution in accordance with this Plan and the remaining Claim or Equity Interest of any holder with respect to such Distribution will be discharged and forever barred.

### 8.6.5    Uncashed Checks.

Checks issued in respect of Allowed Claims and/or Equity Interests will be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Distributions with respect to such un-negotiated checks will revert to the Liquidating Debtor for distribution in accordance with this Plan and the remaining Claim or Equity Interest of any holder with respect to such Distribution will be discharged and forever barred.

## ARTICLE 9
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 9.1    Rejection of Executory Contracts and Unexpired Leases.

All executory contracts and unexpired leases that are not assumed under this Plan are rejected, unless otherwise dealt with by the Plan or the Confirmation Order, or any other Order of the Court entered prior to the Effective Date, or which is the subject of a motion to assume pending on the Effective Date.

### 9.2    Assumed Executory Contracts and Unexpired Leases.

Each executory contract and unexpired lease that is assumed will include (a) all amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease; and (b) with respect to any executory contract or unexpired lease that relates to the use, ability to acquire, or occupancy of real property, all executory contracts or unexpired leases and other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal,

powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Bankruptcy Court or are the subject of a motion to reject filed on or before the Confirmation Date.   Amendments, modifications, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtor during its Chapter 11 Case shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**9.3     Assignment of Leases; Cure Amounts.**

The EDG Sale (and any Alternative Sale that might occur) contemplates that numerous executory contracts and unexpired leases will be assumed and assigned to EDG.  As part of the Plan, the Debtor will file and serve a list of such executory contracts and unexpired leases that may potentially be assigned and assumed along with the proposed Cure Costs.  Any party taking exception to the proposed Cure Costs must file a detailed statement setting forth its reason and the Bankruptcy Court shall determine the proper amount of the Cure Costs at the Confirmation Hearing.  The fixing of the Cure Costs shall constitute the Debtor's right to assume and assign the executory contract and/or unexpired lease to EDG (or an alternative purchaser) under Bankruptcy Code §§ 365(c) and (f) and the Debtor shall assign the Desired 365 Contracts (as defined in the EDG Asset Purchase Agreement) to EDG (or an alternative purchaser) upon closing the EDG Sale or Alternative Sale; *provided, however*, that the listing of an executory contract or unexpired lease or the fixing of Cure Costs shall not impose (i) upon the Debtor, the obligation to assume such contract or lease; and (ii) upon EDG (or an alternative purchaser) any obligation to take assignment of such contract or lease until such contract or lease is designated as a Desired 365 Contract.  All Cure Costs shall be paid by the Liquidating Debtor.  The Confirmation Order shall specifically provide for the approval of the assumption (as applicable) and assignment of those executory contracts and unexpired leases designated as Desired 365 Contracts.  The Debtor and EDG (or an alternative purchaser) may amend the list of assumed executory contracts and unexpired leases to be assumed and assigned at any time before the Confirmation Date.

**9.4     Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Damages arising from the rejection of an executory contract or unexpired lease to which the Debtor is or was a party shall be a General Unsecured Claim against the Debtor unless subordinated under applicable law.  Any Claim for damages arising from the rejection of an executory contract or unexpired lease must be asserted in a proof of claim filed with the Bankruptcy Court no later than 20 days following the earlier of: (a) the date of entry of an order of the Bankruptcy Court approving such rejection, or (b) the Effective Date of the Plan.  Any Claims not filed within such times shall be forever barred from assertion against the Debtor, the Liquidating Debtor or the Plan Agent.  The Plan Agent shall mail a notice to all known affected parties and shall publish a notice in the HOUSTON CHRONICLE of (i) the Debtor's rejection of executory contracts and unexpired leases and (i) the deadline for asserting claims for damages arising from the rejection of such executory contracts and unexpired leases.

**9.5     Reservation of Rights.**

Nothing contained in the Plan shall constitute an admission by the Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Plan Agent shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE 10**
**EFFECT OF CONFIRMATION**

**10.1     Legally Binding Effect.**

The provisions of the Plan shall bind all Creditors and Interest Holders, whether or not they accept the Plan.  On and after the Effective Date, all holders of Claims shall be precluded and enjoined from (i) asserting any Claim against the Debtor, the Liquidating Debtor or their assets or properties based on any transaction or other activity of any kind that occurred prior to the Confirmation Date except as permitted under the Plan; (ii) asserting any derivative claims, including claims against third parties asserting alter ego claims, fraudulent transfer claims or any other type of successor liability; and (iii) otherwise interfering with the Plan Agent/Liquidating Debtor's administration of assets and claims under the Plan.  The entry of the Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all Claims and Interests dealt with under the Plan and all pending legal proceedings, if any, against the Debtor and its assets and properties and any proceedings not yet instituted against the Debtor or its assets and properties, except as otherwise provided in the Plan, concerning Claims and Interests dealt with under the Plan.  Unless otherwise provided in the Plan or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in these cases pursuant to § 105, if any, or § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until the Effective Date..

**10.2     Limited Protection of Certain Parties in Interest.**

Except as specifically limited herein, the Debtor and the Estate shall release under the Plan (a) the Plan Agent, the Liquidating Debtor and EDG (or, if applicable, an alternative purchaser under an Alternative Sale) and all of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, and any other professional persons employed by the Plan Agent, EDG and the Liquidating Debtor (or, if applicable, an alternative purchaser under an Alternative Sale), (b) each Professional for the Debtor and any of its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, and any other professional persons employed by any of them, (c) the Committee and each of its members and any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, and any other professional persons employed by any of them, (d) the Post-Confirmation Committee and each of its members and any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, and any other professional persons employed by any of them (the persons identified in (a), (b), (c) and (d) are

collectively referred to as "Protected Persons,"[6] provided, however, that the following do not constitute "Protected Persons" for purposes of this Plan: (i) Apelles and its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by Apelles; (ii) Nicholas Vita; (iii) Rosemary Mazanet; (iv) Alan Goldberg; (v) Donald Goldman; (vi) Healthcare Markets Group and its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by Healthcare Markets Group; (vii) Kimon Angelides and any entity owned or controlled by him; (viii) Frank Basile and any entity owned or controlled by him; (ix) George McGinn and any entity owned or controlled by him; (x) Anan Anabtawi and any entity owned or controlled by him; and (xi) Looper Reed & McGraw, P.C. and its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by Looper Reed & McGraw, P.C. [collectively, the "Non-Released Parties"] and, notwithstanding anything to the contrary herein, any and all claims and causes of action against the Non-Released Parties, or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any them, shall be fully preserved), from any and all liability to any Person or Entity under any theory of liability for any act or omission occurring on or after the Petition Date in connection or related to the Debtor, the Chapter 11 Case, or the Estate, including, but not limited to, (i) negotiating, drafting or executing the EDG Asset Purchase Agreement or any other actions performed in furtherance of the consummation of the EDG Sale or an Alternative Sale; (ii) formulating, preparing disseminating, implementing, confirming, consummating or administering this Plan (including soliciting acceptances or rejections thereof); or (iii) formulating, preparing or disseminating the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan, except for acts constituting willful misconduct, gross negligence, or *ultra vires* activity and in all respects such Protected Persons shall be entitled to rely in good faith upon the advice of counsel.  In any action, suit or proceeding by any Person contesting any action by, or non-action of any Protected Person as constituting willful misconduct, gross negligence, or *ultra vires* activity or not being in good faith, the reasonable attorneys' fees and costs of the prevailing party will be paid by the losing party and as a condition to going forward with such action, suit, or proceeding at the outset thereof, all parties thereto will be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.

In addition to the foregoing, except as specifically limited herein, neither (a) EDG (or, if applicable, an alternative purchaser under an Alternative Sale) or any of its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by EDG (or, if applicable, an alternative purchaser under an Alternative Sale), nor (b) the Committee and each of its members or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them, nor (c) the Post-Confirmation Committee and each of its members or any of their employees, officers, directors, agents, representatives,

---

[6] The Debtor has reviewed potential claims against the Protected Persons relating to post-petition conduct related to the Debtor, the Chapter 11 Case and the Estate.  Based on the Debtor's investigation, it does not believe such claims have any value.  The Debtor does think that it may have objections to claims and/or claims related to the perfection of secured claims asserted by certain Protected Persons.  The Debtor fully reserves such claims and does not believe that the release set forth in Article 11.2 of the Plan covers such claims and/or objections to claim.

affiliates, attorneys, financial advisors, or any other professional persons employed by any of them, shall have or incur any liability to any Person or Entity under any theory of liability for any act or omission occurring on or after the Petition Date in connection or related to the Debtor, the Chapter 11 Case, or the Estate, including, but not limited to, (i) negotiating, drafting or executing the EDG Asset Purchase Agreement or any other actions performed in furtherance of the consummation of the EDG Sale or an Alternative Sale; (ii) formulating, preparing disseminating, implementing, confirming, consummating or administering this Plan (including soliciting acceptances or rejections thereof); or (iii) formulating, preparing or disseminating the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan, except for acts constituting willful misconduct, gross negligence, or *ultra vires* activity and in all respects such parties identified in (a), (b) and (c) of this paragraph shall be entitled to rely in good faith upon the advice of counsel.  In any action, suit or proceeding by any Person contesting any action by, or non-action of any party identified in (a), (b) or (c) of this paragraph as constituting willful misconduct, gross negligence, or *ultra vires* activity or not being in good faith, the reasonable attorneys' fees and costs of the prevailing party will be paid by the losing party and as a condition to going forward with such action, suit, or proceeding at the outset thereof, all parties thereto will be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.

**10.3    Indemnification.**

The Liquidating Debtor shall indemnify each Person identified as a Protected Person against any and all costs and expenses (including attorneys' fees) incurred by any of them in defending against post-Confirmation Date claims released pursuant to Article 11.2 of the Plan; provided, however, that no Protected Person shall be entitled to indemnification under this Plan for the costs and expenses of defending a cause of action in which it is ultimately judicially determined that such Protected Person was grossly negligent or acted fraudulently or with willful misconduct in performing such Protected Person's duties hereunder or under any Final Order of the Bankruptcy Court or applicable law, or *ultra vires* activity.  Any Protected Person entitled to indemnification under this section shall have a priority distribution right that is senior to the holders of Allowed General Unsecured Claims against the Liquidating Debtor.  The Plan Agent may, in his sole discretion, use the Liquidating Debtor's assets (as an expense of consummating this Plan) to purchase indemnification insurance to satisfy any potential indemnification claims that may arise under this section.

**10.4    Continuation of Anti-Discrimination Provisions of the Bankruptcy Code.**

A Governmental Unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Debtor, the Liquidating Debtor, the Plan Agent or another Person with whom the Debtor has been or are associated or affiliated, solely because of the commencement, continuation, or termination of the case or because of any provision of the Plan or the legal effect of the Plan, and the Confirmation Order will constitute an express injunction against any such discriminatory treatment by a Governmental Unit.  Moreover, a Governmental Unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to the Debtor or the Liquidating Debtor based upon any requirement that the

Debtor or the Liquidating Debtor place a bond or other surety obligation with such governmental unit as a condition of receipt of such a license, permit, charter, franchise, or other similar grant to the Debtor or the Liquidating Debtor.  All licenses, permits, charters, franchises, or other similar grants to the Debtor are hereby transferred and assigned on the Effective Date (which transfer and assignment is without the assumption of any liabilities arising prior to the Effective Date which liabilities arise out of such license, permit, charter, franchise or similar grant) to the Liquidating Debtor or, if applicable, to EDG on the closing date of the EDG Asset Purchase Agreement (or to an alternative purchaser under an Alternative Sale) as applicable without the need for further application or approval by any Governmental Unit.

**10.5      Preservation of Claims and Rights.**

Confirmation of this Plan effects no settlement, compromise, waiver or release of any Claim, Cause of Action, Right of Action or claim for relief unless this Plan or the Confirmation Order specifically and unambiguously so provides.  The non-disclosure or non-discussion of any particular Claim, Cause of Action, Right of Action or claim for relief is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim, Cause of Action, Right of Action or claim for relief.

**The Debtor, the Liquidating Debtor and the Plan Agent reserve any and all claims and rights against any and all third parties, whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, the Record Date and/or any Distribution date, including, without limitation, any and all Causes of Action, Rights of Action and/or claims for relief that the Debtor, the Liquidating Debtor or the Plan Agent has against (i) any insurer and/or insurance policies in which either the Debtor and/or their current or former personnel have an insurable or other interest in or right to make a claim against, any other of the Debtor's insurers; (ii) any recipient of a transfer identified in the Debtor's statements of financial affairs, including any amendments thereto, filed in this Chapter 11 Case, including but not limited to the parties identified on the attached <u>Schedule 2</u>; and (iii) the Non-Released Parties for claims of breach of fiduciary duty, fraudulent transfer, preferential transfer, unauthorized post-petition transfer under 11 U.S.C. § 549, turnover under 11 U.S.C. §§ 542 and 543, subordination, re-characterization of debt to equity, malpractice, constructive trust, disgorgement, counter-claims, claims to determine the extent and validity of liens under 11 U.S.C. § 506 and any other claims that the Estate may have against such Non-Released Parties.  The entry of the Confirmation Order shall not constitute *res judicata* or otherwise bar, estop or inhibit any actions by the Debtor, the Liquidating Debtor or the Plan Agent relating to any claims, Causes of Action or Rights of Action referred to in this Article 10.6, or otherwise.  Except as specifically set forth herein, the Plan Agent shall constitute the representative of the Estate for purposes of retaining, asserting and/or enforcing Rights of Action under § 1123(b)(3)(B) of the Bankruptcy Code.  On the Effective Date, the Plan Agent shall be substituted as a party of record in all pending litigation brought by or against the Debtor without need for further order of the Bankruptcy Court.**

## ARTICLE 11
## CONFIRMATION OF THE PLAN

**11.1    Confirmation Hearing.**

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan ("Confirmation Hearing"). The Confirmation Hearing has been scheduled before the Honorable Marvin Isgur, Chief United States Bankruptcy Judge, on October 5, 2011 at 10:00 a.m. (Houston time), in Courtroom No. 404, 4th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) provides that any party in interest may object to confirmation of the Plan. However, an impaired Creditor, who votes to accept the Plan, may not have standing to object to the Plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and any applicable Local Rules of the Bankruptcy Court. **The deadline for filing objections to confirmation of the Plan is October 3, 2011 at 12:00 p.m. (Noon).** Objections to confirmation must be filed with the Clerk of Court.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**11.2    Statutory Requirements for Confirmation of the Plan.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in § 1129 of the Bankruptcy Code, these requirements are as follows:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The proponent of the Plan complies with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or to be made by the Plan proponent, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with the cases, or in connection with the Plan and incident to the cases, has been approved by, or is subject to the approval of, the Court as reasonable.

5.    The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint Plan with the Debtor, or a successor to the Debtor under the Plan; and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and with public policy; and the

proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

6.      Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor, has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

7.      With respect to each class of impaired claims or equity interests:

(a)      each holder of a claim or interest of such class:

(i) has accepted the Plan; or

(ii) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Plan Proponent were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

(b)      if § 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of the effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secured such claims.

8.      With respect to each class of claims or interests:

(a)      such class has accepted the Plan; or

(b)      such class is not impaired under the Plan;

9.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that:

(a)      with respect to a claim of a kind specified in § 507(a)(1) or § 507(a)(2) of the Bankruptcy Code, on the effective date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)      with respect to a class of claims of a kind specified in §§ 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, each holder of a claim of such class will receive:

(i)      if such class has accepted the Plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(ii)      if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; and

(c)      with respect to a claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim deferred cash payments, over a

period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim.

10.     If a class is impaired under the Plan, at least one class of claims that is impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider.

11.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the plan proponent or any successor to the plan proponent under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the proposal of the Plan is made in good faith.

The Debtor further believes that the holders of all Claims impaired under the Plan will receive payments or distributions under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if the Debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code.

Finally, as the Plan contemplates a sale of the Debtor's operating assets, the Debtor does not believe that the confirmation of the Plan will likely be followed by the need for further reorganization of the Debtor.

**11.3    Cramdown.**

In the event that any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired class which has not accepted the Plan, the Plan does not discriminate unfairly and is "fair and equitable."  A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in § 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.     With respect to a class of secured claims, the Plan provides:

(a)     (i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Plan Proponent or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)      for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing such claims, free and clear of such claims, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)      for the realization by such holders of the indubitable equivalent of such claims.

2.      With respect to a class of unsecured claims, the Plan provides:

(a)      that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(b)      the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property.

3.      With respect to a class of interests, the Plan provides:

(a)      that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(b)      the holder of any interest that is junior to the interests of such class will not receive or retain under the Plan on account of such junior interest any property.

The Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims.  The Debtor believes that the Bankruptcy Court will find these requirements satisfactory and will confirm the Plan.

**11.4    Conditions Precedent to Effective Date.**

**11.4.1**  The following are conditions precedent to the occurrence of the Effective Date: (i) the Confirmation Order, in a form and in substance reasonably satisfactory to the Debtor and EDG (or, if applicable, an alternative purchaser under an Alternative Sale), shall have been entered by the Bankruptcy Court; (ii) the form of all documents necessary or appropriate to give effect to the transactions contemplated under the Plan, if any, have been approved and executed; (iii) all documents and agreements necessary to implement the EDG Asset Purchase Agreement (or equivalent document should an Alternative Sale be approved) shall have (a) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery and (c) been effected or executed; (iv) all required consents, approvals, and authorizations, if any, have been obtained; (v) there shall be

no stay of the Confirmation Order in effect; (vi) the Plan Agent shall have determined, in consultation with the Post-Confirmation Committee, that the Liquidating Debtor is holding good and available funds from the EDG Sale, or Alternative Sale, for payment of Claims under the Plan and (vii) all other actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

The Effective Date is defined in the Plan as the day selected by the Debtor that is no earlier that the first Business Day after (i) the date the Confirmation Order has been entered; and (ii) all conditions specified in Article 13 of the Plan have been satisfied or waived.

**11.5    Annulment of Plan if Conditions Not Waived or Satisfied.**

The Debtor reserves the right to waive any of the conditions precedent to the Effective Date.  If any of the conditions precedent are not waived, and are not satisfied within six months of the Confirmation Date or can no longer occur, the Debtor shall convert the Chapter 11 Case to chapter 7 and any proceeds of the EDG Sale (or, if applicable, an Alternative Sale) shall be administered by a chapter 7 trustee.

**11.6    Retention of Jurisdiction by Bankruptcy Court.**

The Court shall retain and have exclusive jurisdiction over this Chapter 11 Case to the maximum extent provided by law for the follow purposes following the Confirmation Date: (a) to determine any and all objections to the allowance and classification of Claims or Interests; (b) to determine the validity and priority of any Lien; (c) to determine the Allowed Amount of any Claim, whether secured or unsecured; (d) to allow any and all applications for allowances of compensation and reimbursement of expenses payable from the estate; (e) to determine any and all applications or motions pending before the Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any executory contract or unexpired lease; (f) to consider and approve any modification of the Plan, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Court, including the Confirmation Order; (g) to hear and determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan, the Confirmation Order, the EDG Asset Purchase Agreement (or similar agreement in the event of an Alternative Sale), any transactions or payments contemplated hereby or any agreement, instrument or other document governing or related to any of the foregoing; (h) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor; (i) to issue orders in aid of execution and implementation of the Plan and the Confirmation Order, to the extent authorized by 11 U.S.C. § 1142 or provided by the terms of the Plan; and (j) to hear and determine matters concerning federal, state or local taxes in accordance with §§ 346, 505 or 1146 of the Bankruptcy Code.

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334.

## ARTICLE 12
## COMPROMISES AND SETTLEMENTS

**12.1    Effect of Confirmation Order.**

Pursuant to Bankruptcy Rule 9019 and applicable provisions of the Bankruptcy Code, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtor.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

**13.1    Bar Date for Administrative Claims.**

No Administrative Claim, other than Professional Fees, United States Trustee fees and, if applicable, the Expense Reimbursement (as defined in the EDG Asset Purchase Agreement), will be paid unless the holder of such Administrative Claim has filed an application for payment of such Administrative Claim on or before the Administrative Claim Bar Date.  Upon the filing of any application for payment, the entity seeking payment of an Administrative Claim shall provide notice by United States Mail in accordance with the Bankruptcy Rules.   Any Administrative Claim, other than Professional Fees, United States Trustee fees and, if applicable, the Expense Reimbursement (as defined in the EDG Asset Purchase Agreement), not filed in accordance with this section shall be barred and the Debtor, the Liquidating Debtor and the Plan Agent shall have no liability for payment of any such Administrative Claim.

**13.2    Objections to Administrative Claims.**

Objections to Applications for payment of Administrative Claims may be filed by any party in interest.  In order to be considered, such objections must be filed on or before the 21st day following the date on which the application was filed.  Any objections will be determined by the Bankruptcy Court.

**13.3    Payment of Professional Claims.**

Each holder of a Professional Fee Claim shall be paid in respect of such Professional Fee Claim in Cash, in full, on the Effective Date, or, if such Claim has not been approved by the Bankruptcy Court on or before the Effective Date, promptly after Bankruptcy Court approval of the Professional Fee Claim by a Final Order.  Final fee applications for any Professional Fee Claim that has not been approved as of the Effective Date shall be filed within 45 days of the

Effective Date and such applications and objections thereto (if any) shall be filed in accordance with and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, applicable local rules, and the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Professionals entered by the Bankruptcy Court on February 17, 2011 [Docket No. 116]. The failure to file an application by the foregoing deadline shall constitute a waiver of all such Professional Fee Claim.

**13.4    Payment of United States Trustee Fees.**

Within 30 days of the date that such payments are due, the Debtor or the Liquidating Debtor shall pay all amounts owing to the United States Trustee as fees and costs imposed in connection with this Chapter 11 Case.

**13.5    Employee Benefits Plans.**

Unless terminated earlier under the terms of the EDG Asset Purchase Agreement, prior to 30 days after to the Effective Date, all Employee Benefit Plans shall be terminated in accordance with the applicable provisions of the state and federal law. Neither EDG nor any purchaser under an Alternative Sale shall have any liability, including successor liability, for any obligations under any Employee Benefit Plan. The Liquidating Debtor and the Plan Agent shall have no liability for any obligations under any Employee Benefit Plan.

**13.6    Directive to State Agencies.**

At such time as any of the Liquidating Debtor files articles of dissolution, all governmental agencies are directed to accept such articles and recognize the dissolution of the Liquidating Debtor regardless of whether all Claims, including taxes have been paid in full.

**13.7    Satisfaction of Liabilities.**

The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction and release of all Claims and Interests of any nature whatsoever against the Debtor and/or the Estate, as well as assets, properties, and interests in property of the Debtor and/or the Estate. The Liquidating Debtor shall not be responsible for any pre-Effective Date obligations of the Debtor except those expressly assumed by the Liquidating Debtor.

**13.8    Warranty of Transfers from Liquidating Debtor.**

All property, whether real or personal, to be transferred by the Plan Agent on behalf of the Liquidating Debtor to any person or entity under this Plan, is transferred "as is, where is," with no representation or warranty of any kind except that all transfers shall be transferred free and clear of all liens, claims and encumbrances pursuant to the applicable provisins of the Bankruptcy Code, including 11 U.S.C. § 1123(a)(5).

**13.9    Compliance with Tax Requirements.**

In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Plan Agent shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law.  With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Plan Agent within thirty (30) days from the date of such request, the Plan Agent may, at his option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received.

**13.10    Amendment of the Plan.**

Subject to the rights of EDG under the EDG Asset Purchase Agreement, this Plan may be amended or modified by the Debtor before, or by the Plan Agent after the Effective Date, as provided in § 1127 of the Bankruptcy Code.

**13.11    Timing of Distributions.**

Unless otherwise specified herein, all payments and Distributions shall be made on an Interim Distribution Date determined by the Plan Agent after consultation with the Post-Confirmation Committee.  When a provision of this Plan requires that a payment shall be made on a certain date, such payment may be made (i) at any time prior to the date on which such payment is due; (ii) in more frequent intervals than set forth in such provision of the Plan; or (iii) not more than 14 days after the date any such payment is due.  Notwithstanding the foregoing, no payment shall be considered late or otherwise result in a default unless the Plan Agent has failed to make the payment after the passage of 30 days following the receipt by the Plan Agent of a written notice advising that a payment has not been received in accordance with the times set forth in this paragraph.

**13.12    Enforcement of Subordination Agreements/Settlement Agreements.**

Any written (i) subordination agreement between holders of Allowed Claims; and (ii) settlements approved by the Bankruptcy Court during this Chapter 11 Case will be honored according to their terms for the purposes of distribution under this Plan.

**13.13    Filing of Documents in Public Records.**

Pursuant to § 1146 of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making of an instrument of transfer under this Plan (including without limitation the filing of any mortgage, deed of trust, security agreement, uniform commercial code financing statement or other similar document) shall not be taxed under any law imposing a stamp tax or similar tax.  All state or local governmental officials or agents are hereby directed to forego the collection of any such tax or governmental assessment and to accept for Filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**13.14    Right to Seek Further Orders.**

The Plan Agent, if and to the extent necessary, will seek such orders, judgments, injunctions, regulatory approvals, and rulings that may be required to carry out and further the intentions and purposes, and give full effect to the provisions, of the Plan.

**13.15    Regulatory Approvals.**

As the Plan is not intended to modify or supplant any regulatory authority over the Debtor or the Liquidating Debtor, all regulatory approvals required in connection with the Plan will be sought and obtained.

**13.16    Withdrawal of Plan.**

Upon termination of the EDG Asset Purchase Agreement in accordance with its terms and satisfaction of the Debtor's obligations thereunder and under the Bidding Procedures Order, the Debtor reserves the right to withdraw this Plan at any time prior to the Confirmation Date.

**13.17    Due Authorization by Creditors.**

Each and every Creditor who elects to participate in the Distributions provided for herein (i) warrants that it is authorized to accept in consideration of its Claim against the Debtor the Distributions provided for in this Plan; (ii) states that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by it under this Plan; and (iii) indemnifies and holds harmless the Liquidating Debtor, the Post-Confirmation Committee, the Plan Agent and their professionals and representatives with respect to such Distributions.

**13.18    Filing of Additional Documentation.**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**13.19    Implementation.**

The Debtor, the Liquidating Debtor and the Plan Agent shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Plan.

**13.20    Substantial Consummation..**

On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code §§ 1101 and 1127(b).

**13.21  Further Effect of Confirmation.**

Confirmation of this Plan effects no settlement, compromise, waiver or release of any Claim or cause of action unless this Plan or the Confirmation Order specifically so provides. The non-disclosure or non-discussion of any particular Claim or cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim or cause of action.

**13.22  Dates.**

The provisions of Bankruptcy Rule 9006 shall govern the calculation of any dates or deadlines referenced in the Plan.

**13.23  Governing Law.**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to any conflicts of law principles.

**13.24  Conflict.**

Except as otherwise provided in the Plan, to the extent the Confirmation Order and/or this Plan are inconsistent with the Disclosure Statement, any other agreement entered into between the Debtor and any third party, the Plan controls the Disclosure Statement and any such agreements and the Confirmation Order (and any other orders of the Bankruptcy Court) controls the Plan.  To the extent the EDG Asset Purchase Agreement (or, if applicable, any alternative asset purchase agreement entered into pursuant to an Alternate Sale) is inconsistent with the Disclosure Statement or any other agreement entered into between the Debtor and any third party, the EDG Asset Purchase Agreement (or, if applicable, any alternative asset purchase agreement entered into pursuant to an Alternate Sale) shall control.

**13.25  Severability.**

The Plan Agent may, but shall not be required to, set off against any Claims and the payments or Distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities and claims of every type and nature whatsoever that the Estate or the Liquidating Debtor may have against the Holder of any Claim, but neither the failure to do so nor the Allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Plan Agent or the Liquidating Debtor of any such claims they may have against such Holder of any Claim, and all such claims shall be reserved for and retained by the Plan Agent.

**13.26  Setoffs.**

The Plan Agent may, but shall not be required to, set off against any Claims and the payments or Distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities and claims of every type and nature whatsoever that the Estate or the

Liquidating Debtor may have against the Holder of any Claim, but neither the failure to do so nor the Allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Plan Agent or the Liquidating Debtor of any such claims they may have against such Holder of any Claim, and all such claims shall be reserved for and retained by the Plan Agent.

**13.27   Other Considerations.**

The Plan affords holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the Chapter 11 Case; (b) alternative plans of reorganization/liquidation; (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code; and (d) dismissal of the Chapter 11 Case.

**13.28   Feasibility of the Plan.**

Pursuant to the Plan, the Debtor proposes to sell all of its operating assets to EDG (or an alternative bidder, if applicable).  Upon consummation of the EDG Sale or Alternative Sale, the proceeds of the sale and all of the Debtor's remaining property will be vested in the Liquidating Debtor and administered by the Plan Agent for the benefit of holders of Allowed Claims and Interests pursuant to the terms of the Plan.  Inasmuch as the Plan is based on the sale/liquidation of assets, the Plan is feasible.

**13.29   Continuation of the Case.**

Upon consummation of the EDG Sale or Alternative Sale, the Debtor will cease operations and the sales proceeds and all remaining assets will be administered by the Plan Agent pursuant to the Terms of the Plan.  There is no strategic or economic advantage to continuing the case for any significant period of time.  To the contrary, the Debtor believes that in view of the current situation, Creditors will best be served by the rapid resolution of this bankruptcy case.

**13.30   Alternative Plans of Liquidation.**

If the Plan is not confirmed, the Debtor or another party in interest in the case could attempt to formulate and propose a different plan or plans.  Such plans might, theoretically, involve some other form of reorganization or liquidation of the Debtor's operations and assets. Any alternative plans, however, would likely result in additional administrative expenses to the estate and would provide little or no benefit.  The Plan proposed by the Debtor is straightforward, meets the requirements of § 1129 and provides the best outcome for Creditors.

**13.31   Liquidation under Chapter 7.**

The Debtor does not believe that the case should be converted to Chapter 7.  Conversion to Chapter 7 would result in the loss of the going concern value of the Debtor as well as the additional administrative expenses attributable to statutory trustee fees and professional fees for the trustee's professionals.  In a chapter 7 liquidation, the Debtor believes that all proceeds would go to MetroBank and that no payments would be made to other creditors.  To the contrary,

under the Plan, several million dollars in cash will likely be available for the payment of administrative, priority and other unsecured claims. If the true amount of Claims is close to that scheduled by the Debtor as undisputed, General Unsecured Creditors could receive between 20-40% on their claims. This is an estimate only and constitutes the Debtor's best guess based upon the data currently available. Attached hereto as **Schedule 3** is a chart reflecting the Debtor's distribution and liquidation analysis.

**13.32  Risk Factors.**

Both failure to achieve confirmation of the Plan, and consummation of the Plan, are subject to certain risks. First, the effectiveness of the Plan is contingent on closing the EDG Sale or Alternative Sale. A number of factors can impact the closing of the EDG Sale/Alternative Sale, including factors that are outside of the Debtor's control. While the Debtor believes that consummation of the EDG Sale is likely, there is always some risk involved in the type of transaction that is contemplated.

In addition, there are certain risks inherent in the liquidation and administration process under the Bankruptcy Code. If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if Creditors and Interest holders accept the Plan. Although the Debtor believes that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtor to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan. The Debtor believes that the solicitation of votes on the Plan will comply with § 1126(b) and that the Bankruptcy Court will confirm the Plan. The Debtor cannot, however, provide assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a re-solicitation of acceptances.

**13.33  Taxation.**

**13.33.1      Introduction.**

The following discussion summarizes certain federal income tax consequences of the transactions described herein and in the Plan. This discussion is for informational purposes only and does not constitute tax advice. This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice as of the date of this Disclosure Statement and will not be updated for subsequent tax or factual developments. Neither the impact on foreign holders of claims and equity interests nor the tax consequences of these transactions under state and local law is discussed. Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, insurance companies, mutual funds, regulated investment companies, real estate investment trusts, trusts, S corporations, dealers and traders in securities and currencies, partnerships and other entities classified as partnerships for federal tax purposes and tax-exempt organizations. Furthermore, due to the complexity of the transactions contemplated in the Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties including subsequent legislative and other tax changes. No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service ("IRS") on

these or any other tax issues.  There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

### 13.33.2      Tax Consequences to the Debtor and Equity Interest Holders.

The Debtor will realize cancellation of indebtedness ("COI") income in respect of each Claim generally in an amount equal to the excess, if any, of (i) the portion of the Claim (including accrued and previously deducted but unpaid interest) from which the Debtor is (or is deemed to be) discharged; and (ii) the sum of any cash or the "issue price," under the Internal Revenue Code of 1986 (the "Internal Revenue Code") §§ 1273(b) and 1274, of any debt obligations distributed under the Plan in discharge of such Claims.  The exact amount of COI income realized upon consummation of the Plan has not been finally determined. Under the Internal Revenue Code, a taxpayer is generally required to include COI income in gross income. COI income is not includable in gross income, however, if it occurs in a case under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a Court in such case and the cancellation of indebtedness is granted by the Court or is pursuant to a plan approved by the Court.   The Debtor's COI income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtor.  COI income that is excluded from gross income will reduce certain tax attributes of the taxpayer, including net operating loss suspended under Internal Revenue Code Section 1361(d) (hereinafter "NOLs") carryovers, capital loss carryovers and the tax basis of assets, in a specified order of priority beginning with the NOLs and NOL carryovers, unless the taxpayer elects to have the reduction applied first to the tax basis of depreciable assets.  The reduction of tax basis is limited to the excess of (i) the aggregate of the tax bases of the taxpayer's property (determined immediately after the discharge); and (ii) the aggregate liabilities of the taxpayer (determined immediately after the discharge).   The exclusion for COI is deemed to occur immediately following the end of the Debtor's tax year, and not during the tax year.

The Debtor will recognize gain or loss on the sale of assets to third parties equal to the sales price of such assets less the Debtor's adjusted tax basis in such properties.  The sales price includes all indebtedness assumed by a buyer as well as all other consideration received by the Debtor.  The amount and tax character of such gain and loss will depend on the applicable facts and circumstances.

To the extent any proceeds from the sale of assets of the Debtor remain after satisfaction of all Allowed Claims and Interests in accordance with the Bankruptcy Code, the Plan Agent will distribute any remaining amounts to the Equity Interest Holders of Debtor.  It is anticipated that any such distributions will be treated as redemptions for U.S. federal income tax purposes, with gain or loss resulting to each such Equity Interest Holder on the difference between the amount so distributed to such Equity Interest Holder and such Equity Interest Holder's U.S. federal income tax basis in their Debtor shares redeemed or deemed redeemed in connection with such distribution.  Such gain or loss will as a general matter likely constitute a capital gain or loss, and individual Equity Interest Holders of Debtor who have held their shares in Debtor to which such

distributions relate for in excess of one (1) year may be entitled to reduced long-term capital gain rates.

### 13.33.3        Tax Consequences to Creditors.

**In General**.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the Claimant receives consideration in more than one tax year, (c) whether the Claimant is a resident of the United States, (d) whether all the consideration by the Claimant is deemed to be received by that Claimant as part of an integrated transaction, (e) whether the Claimant utilizes the accrual or cash method of accounting for tax purposes, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

**Gain or Loss on Exchange**.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

The tax treatment of an Allowed Claim for accrued unpaid interest will depend on the Claimant's tax basis in such Claim, which primarily depends on whether the Claimant has previously recognized income for the accrual of such interest and/or recognized a loss with respect to same.  Any such holders should consult with their tax advisors regarding the tax treatment of any such accrued unpaid interest.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### 13.33.4        Information Reporting and Backup Withholding.

Under the backup withholding rules of the Internal Revenue Code, holders of Claims and Equity Interest Holders may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims and Equity Interests may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 13.33.5 Importance of Obtaining Professional Assistance.

THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. TO COMPLY WITH TREASURY DEPARTMENT CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT, THE PLAN OR ANY RELATED MATERIALS, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; AND (B) ANY SUCH DISCUSSIONS ARE BEING USED ONLY IN CONNECTION WITH SATISFYING THE REQUIREMENTS IMPOSED UNDER THE BANKRUPTCY CODE FOR DISCLOSURE STATEMENTS, AND (C) YOU SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR WITH RESPECT TO YOUR FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES BASED ON YOUR PARTICULAR CIRCUMSTANCES.

### ARTICLE 14
### CAUSES OF ACTION

### 14.1 Preferences.

Under the Bankruptcy Code, the Debtor may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of their bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtor been liquidated under Chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one-year preference period. There are certain defenses to such recoveries. Transfers made in the ordinary course of the Debtor's and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable. Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property. If a transfer is recovered by the Debtor, the transferee has an Unsecured Claim to the extent of the recovery. The Liquidating Trustee and the Post-Confirmation Committee reserve the right to bring preferential transfer claims against the Non-Released Parties, as well as the parties identified as receiving transfers within 90 days of the Petition Date on the attached **Schedule 2**.

### 14.2 Fraudulent Transfers.

Under the Bankruptcy Code and various state laws, the Debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered the Debtor insolvent. The Liquidating Trustee and the Post-Confirmation Committee reserve the right to bring fraudulent conveyance claims.

The Debtor has conducted a limited analysis of potential recoveries under Chapter 5 of the Bankruptcy Code and concluded that potential claims may exist.  A list of the known payments are set forth in the Debtor's statements of financial affairs, which are incorporated herein.  In addition, all secured creditors scheduled as "disputed" in the Debtor's Amended Schedule D (see Article 3.1.9 herein) are subject to claims for fraudulent transfer and/or preference on account of their asserted security interests.  Creditors and Interest Holders are advised that if they received a voidable transfer, they may be sued whether or not they vote to accept the Plan.  All avoidance actions and rights pursuant to §§ 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 and 724 of the Bankruptcy Code and all causes of action under state, federal or other applicable law shall be retained and may be prosecuted or settled by the Plan Agent/Post-Confirmation Committee in their sole discretion.  To the extent that material amounts are recovered, it will enhance the returns to the holders of Unsecured Claims.

**14.3     Other Causes of Action.**

As set forth herein, the Debtor believes that claims exist against certain of the Debtor's former officers, directors and professionals.  These claims will be evaluated, pursued and resolved by the Plan Agent/Post-Confirmation Committee in their sole discretion.

**ARTICLE 15**
**VOTING PROCEDURES AND REQUIREMENTS**

**15.1     Ballots and Voting Deadline.**

A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement.  A Creditor who is voting must (1) carefully review the ballot and instructions thereon, (2) complete and execute the ballot indicating the Creditor's vote to either accept or reject the Plan, and (3) return the executed ballot to the address indicated thereon by the deadline specified by the Bankruptcy Court.

**The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the Debtor no later than October 3, 2011 at 12:00 p.m. (Houston Time).**

If you hold an impaired Claim against the Debtor, return your ballot to:

> JOSHUA W. WOLFSHOHL
> PORTER HEDGES LLP
> 1000 MAIN STREET, 36TH FLOOR
> HOUSTON, TEXAS 77002
> PHONE: 713-226-6695
> FAX: 713-226-6295
> Email: jwolfshohl@porterhedges.com

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED**
**NO LATER THAN 12:00 P.M. (HOUSTON TIME) ON OCTOBER 3, 2011**

**15.2    Creditors Entitled to Vote.**

Any Creditor whose Claim is impaired under the Plan is entitled to vote, if either (i) the Debtor has scheduled its Claim on its Statement of Liabilities and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Creditor has filed a Proof of Claim on or before the last date set by the Bankruptcy Court for filing Proofs of Claim and no objection has been filed to such Claim.

Holders of Disputed Claims are not entitled to vote on the Plan.  Any Claim to which an objection has been filed and remains pending, is not entitled to vote unless the Bankruptcy Court, upon motion by the Creditor who holds a Disputed Claim, temporarily allows the Claim in an amount that it deems proper for accepting or rejecting the Plan.  Any such motion must be heard and determined by the Bankruptcy Court before the date established by the Bankruptcy Court as the final date to vote on the Plan.  In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Creditor was not solicited or obtained in good faith or according to the provisions of the Bankruptcy Code.

Classes of Claims that are not impaired are deemed to have accepted a plan of reorganization pursuant to § 1126(f) and, therefore, are not entitled to vote on a plan.  Pursuant to § 1126, only classes of claims or interests that are "impaired" are entitled to vote on a plan of reorganization.  Generally, a claim is impaired if the plan of reorganization alters the legal, equitable, or contractual rights to which the holder of such claim is otherwise entitled.

**15.3    Voting Procedures.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, and the Debtor's determination will be final and binding.   The Debtor also reserves the right to reject any Ballot not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful.  The Debtor further reserves the right to waive any defects or irregularities or conditions or delivery as to any particular Ballot.  The interpretation by the Debtor of the provisions of this Disclosure Statement and the Ballots will be final and binding on all parties in interest unless otherwise directed by the Bankruptcy Court.  Unless waived, any defects or irregularities concerning deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determine.  Neither the Debtor nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liability for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made and will be invalidated unless or until all defects and irregularities have been timely cured or waived.

**15.4    Vote Required for Class Acceptance.**

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Claims as the acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half in number of the allowed Claims of the class actually voting to accept or reject the proposed plan.

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Interests as the acceptance by holders of at least two-thirds (2/3) in amount of the allowed Interests in the class actually voting to accept or reject the proposed plan.

**15.5    Cramdown and Withdrawal of the Plan.**

If the Plan is not accepted by all classes of impaired Creditors, the Debtor reserves the right to withdraw the Plan.  If the Plan is accepted by one or more Classes of impaired Creditors of the Debtor, the Debtor reserves the right to request the Bankruptcy Court to approve the Plan under 11 U.S.C. § 1129(b).

**THE DEBTOR STRONGLY URGES ALL IMPAIRED CREDITORS TO VOTE TO ACCEPT THE PLAN**.

_____
*Remainder of Page is Intentionally Left Blank*

**Date: September 1, 2011.**

**DIABETES AMERICA, INC.**

By: /s/ Bonita Groesser
Name:  Bonita Groesser
Title:    Chief Operating Officer

# **SCHEDULE 1**

**UNITED STATES BANKRUPTCY COURT**

MOR-1

CASE NAME: Diabetes America, Inc.
CASE NUMBER: 10-41521
PROPOSED PLAN DATE:

PETITION DATE: 12/21/2010 0:00
DISTRICT OF TEXAS: Southern
DIVISION: Houston

## MONTHLY OPERATING REPORT SUMMARY FOR MONTH July    YEAR 2011

| MONTH | 31-Dec-10 | 31-Jan-11 | 28-Feb-11 | 31-Mar-11 | 30-Apr-11 | 31-May-11 | 30-Jun-11 | 31-Jul-11 |
|---|---|---|---|---|---|---|---|---|
| REVENUES (MOR-6) | 221,372.00 | 819,985.00 | 861,968.00 | 950,887.00 | 778,023.00 | 783,476.55 | 830,726.00 | 790,876.85 |
| INCOME BEFORE INT. DEPREC./TAX (MOR-6) | -40,088.00 | -55,237.00 | 80,865.00 | 80,822.00 | -2,711.00 | -56,013.72 | 10,690.00 | -85,254.59 |
| NET INCOME (LOSS) (MOR-6) | -98,825.00 | -220,364.00 | -26,096.00 | -57,658.00 | -260,356.00 | -224,642.88 | -161,784.00 | -223,620.59 |
| PAYMENTS TO INSIDERS (MOR-9) | 5,962.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 |
| PAYMENTS TO PROFESSIONALS (MOR-9) | 9,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 22,500.00 | 0.00 | 0.00 |
| TOTAL DISBURSEMENTS (MOR-8) | 258,424.00 | 838,859.00 | 752,137.00 | 744,248.00 | 727,740.00 | 628,343.00 | 871,732.00 | 926,743.92 |

***The original of this document must be filed with the United States Bankruptcy Court and a copy must be sent to the United States Trustee***

| REQUIRED INSURANCE MAINTAINED AS OF SIGNATURE DATE | | EXP. DATE |
|---|---|---|
| CASUALTY | YES (x) NO ( ) | 9/13/2011 |
| LIABILITY | YES (x) NO ( ) | 9/13/2011 |
| VEHICLE | YES ( ) NO (x) | --- |
| WORKERS | YES (x) NO ( ) | 2/25/2012 |
| OTHER | YES (x) NO ( ) | 8/31/2011 |

CIRCLE ONE

Are all accounts receivable being collected within terms?   [Yes]   No

Are all post-petition liabilities, including taxes, being paid within terms?   [Yes]   No

Have any pre-petition liabilities been paid?   [Yes]   No
If so, describe   Employee wages

Are all funds received being deposited into DIP bank accounts?   [Yes]   No

Were any assets disposed of outside the normal course of business?   Yes   [No]
If so, describe

Are all U.S. Trustee Quarterly Fee Payments current?   [Yes]   No

What is the status of your Plan of Reorganization?

I certify under penalty of perjury that the following complete
Monthly Operating Report (MOR), consisting of MOR-1 through
MOR-9 plus attachments, is true and correct.

SIGNED X _Bonita L. Gressler_   TITLE: COO
(ORIGINAL SIGNATURE)

_Bonita L. Gressler_   08/23/2011
(PRINT NAME OF SIGNATORY)   DATE   Revised 07/01/98

ATTORNEY NAME: Joshua W. Wolfshoul
FIRM NAME: Porter Hedges LLP
ADDRESS: 1000 Main Street
36th Floor
CITY, STATE, ZIP: Houston, Texas 77002
TELEPHONE/FAX: 713-226-6695

MOR-1

## COMPARATIVE BALANCE SHEETS

CASE NAME: Diabetes America, Inc.
CASE NUMBER: 10-41521

| ASSETS | FILING DATE* 12/21/2010 | MONTH 12/31/2010 | MONTH 1/31/2011 | MONTH 2/28/2011 | MONTH 3/31/2011 | MONTH 4/30/2011 | MONTH 5/31/2011 | MONTH 6/30/2011 | MONTH 7/31/2011 |
|---|---|---|---|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | | | | | |
| Cash | 93,891.00 | 14,495.00 | 45,174.00 | 12,836.00 | 23,440.00 | 21,563.00 | 30,261.00 | 40,186.00 | 3,151.00 |
| Accounts Receivable, Net | 1,734,688.00 | 1,733,643.00 | 1,684,090.00 | 1,826,260.00 | 1,889,603.00 | 1,832,941.00 | 1,872,034.00 | 1,821,104.00 | 1,818,449.00 |
| Inventory: Lower of Cost or Market | | | | | | | | | |
| Prepaid Expenses | | 46,061.00 | 40,557.00 | 35,052.00 | 38,059.00 | 76,250.00 | 31,068.00 | 35,761.00 | 35,014.00 |
| Investments | | | | | | | | | |
| Other | 307,560.00 | 325,103.00 | 337,074.00 | 335,529.00 | 345,507.00 | 345,507.00 | 356,600.00 | 368,571.00 | 334,992.0 |
| TOTAL CURRENT ASSETS | 2,136,139.00 | 2,119,302.00 | 2,106,895.00 | 2,209,677.00 | 2,296,609.00 | 2,276,261.00 | 2,289,963.00 | 2,265,622.00 | 2,191,606.7 |
| PROPERTY, PLANT & EQUIP. @ COST | 6,308,050.00 | 6,308,050.00 | 6,308,050.00 | 6,308,050.00 | 6,308,050.00 | 6,308,050.00 | 6,308,050.00 | 6,308,050.00 | 6,308,050.00 |
| Less Accumulated Depreciation | 2,544,188.00 | 2,544,188.00 | 2,580,243.00 | 2,616,298.00 | 2,684,776.00 | 2,753,254.00 | 2,821,732.00 | 2,890,210.00 | 2,958,688.00 |
| NET BOOK VALUE OF PP & E | 3,763,862.00 | 3,763,862.00 | 3,727,807.00 | 3,691,752.00 | 3,623,274.00 | 3,554,796.00 | 3,486,318.00 | 3,417,840.00 | 3,349,362.00 |
| **OTHER ASSETS** | | | | | | | | | |
| 1 Tax Deposits | | | | | | | | | |
| 2. Investments in Subsidiaries | | | | | | | | | |
| 3 Electric Deposit | 6,434.00 | 6,434.00 | 6,434.00 | 6,434.00 | 6,434.00 | 6,434.00 | 6,434.00 | 6,434.00 | 6,434.00 |
| 4 Note Receivable - DCOA - PA | 3,521,226.00 | 3,684,155.00 | 3,621,195.00 | 3,515,233.00 | 3,488,512.00 | 3,360,532.00 | 3,144,324.00 | 3,285,969.00 | 3,058,396.8 |
| TOTAL ASSETS | $9,427,661.00 | $9,573,753.00 | $9,462,331.00 | $9,423,096.00 | $9,414,829.00 | $9,198,023.00 | $8,927,039.00 | $8,989,484.00 | $8,619,418.5 |

* Per Schedules and Statement of Affairs

MOR-2

Revised 07/01/98

CASE NAME: Diabetes America, Inc.
CASE NUMBER: 10-41521

# COMPARATIVE BALANCE SHEETS

| LIABILITIES & OWNER'S EQUITY | FILING DATE* 12/21/2010 | MONTH 12/31/2010 | MONTH 1/31/2011 | MONTH 2/28/2011 | MONTH 3/31/2011 | MONTH 4/30/2011 | MONTH 5/31/2011 | MONTH 6/30/2011 | MONTH 7/31/2011 |
|---|---|---|---|---|---|---|---|---|---|
| **LIABILITIES** | | | | | | | | | |
| POST-PETITION LIABILITIES(MOR-4) | | 244,917.00 | 353,859.00 | 340,720.00 | 390,111.00 | 433,661.00 | 387,319.00 | 611,557.73 | 465,112.8 |
| PRE-PETITION LIABILITIES | | | | | | | | | |
| Notes Payable – Secured (see note) | 5,984,151.00 | 5,984,151.00 | 5,984,151.00 | 5,984,151.00 | 5,984,151.00 | 5,984,151.00 | 5,984,151.00 | 5,984,151.00 | 5,984,151.00 |
| Priority Debt | 14,155.00 | 14,155.00 | 14,155.00 | 14,155.00 | 14,155.00 | 14,155.00 | 14,155.00 | 14,155.00 | 14,155.00 |
| Federal Income Tax | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FICA/Withholding | 1,348,350.00 | 1,348,350.00 | 1,348,350.00 | 1,348,350.00 | 1,348,350.00 | 1,348,350.00 | 1,348,350.00 | 1,348,350.00 | 1,348,350.00 |
| Unsecured Debt | 3,316,075.00 | 3,316,075.00 | 3,316,075.00 | 3,316,075.00 | 3,316,075.00 | 3,316,075.00 | 3,316,075.00 | 3,316,075.00 | 3,316,075.00 |
| Other | | | | | | | | | |
| TOTAL PRE-PETITION LIABILITIES | 10,662,731.00 | 10,662,731.00 | 10,662,731.00 | 10,662,731.00 | 10,662,731.00 | 10,662,731.00 | 10,662,731.00 | 10,662,731.00 | 10,662,731.00 |
| **TOTAL LIABILITIES** | 10,662,731.00 | 10,907,648.00 | 11,016,590.00 | 11,003,451.00 | 11,052,842.00 | 11,096,392.00 | 11,050,050.00 | 11,274,288.73 | 11,127,843.8 |
| **OWNER'S EQUITY (DEFICIT)** | | | | | | | | | |
| PREFERRED STOCK | 22,970.00 | 22,970.00 | 22,970.00 | 22,970.00 | 22,970.00 | 22,970.00 | 22,970.00 | 22,970.00 | 22,970.00 |
| COMMON STOCK | 148,507.00 | 148,507.00 | 148,507.00 | 148,507.00 | 148,507.00 | 148,507.00 | 148,507.00 | 148,507.00 | 148,507.00 |
| ADDITIONAL PAID-IN CAPITAL | 30,194,520.00 | 30,194,520.00 | 30,194,520.00 | 30,194,520.00 | 30,194,520.00 | 30,194,520.00 | 30,194,520.00 | 30,194,520.00 | 30,194,520.00 |
| RETAINED EARNINGS Filing Date | -31,601,067.00 | -31,601,067.00 | -31,601,067.00 | -31,601,067.00 | -31,601,067.00 | -31,601,067.00 | -31,601,067.00 | -31,601,067.00 | -31,601,067.00 |
| RETAINED EARNINGS Post Filing Date | | -98,825.00 | -319,189.00 | -345,285.00 | -402,943.00 | -663,299.00 | -887,941.00 | -1,049,734.73 | -1,273,355.3 |
| TOTAL OWNERS EQUITY (NET WORTH) | -1,235,070.00 | -1,333,895.00 | -1,554,259.00 | -1,580,355.00 | -1,638,013.00 | -1,898,369.00 | -2,123,011.00 | -2,284,804.73 | -2,508,425.3 |
| **TOTAL LIABILITIES & OWNERS EQUITY** | $9,427,661.00 | $9,573,753.00 | $9,462,331.00 | $9,423,096.00 | $9,414,829.00 | $9,198,023.00 | $8,927,039.00 | $8,989,484.00 | $8,619,418.5 |

* Per Schedules and Statement of Affairs

Revised 07/01/98

MOR-3

NOTE: "Notes Payable – Secured" includes $4,219,593 owed Apelles Master Fund I, Ltd. which has been disputed by Debtor.

CASE NAME: Diabetes America, Inc.
CASE NUMBER: 10-41521

## SCHEDULE OF POST-PETITION LIABILITIES

| | MONTH 31-Dec-10 | MONTH 31-Jan-11 | MONTH 28-Feb-11 | MONTH 31-Mar-11 | MONTH 30-Apr-11 | MONTH 31-May-11 | MONTH 30-Jun-11 | MONTH 31-Jul-11 |
|---|---|---|---|---|---|---|---|---|
| *TRADE ACCOUNTS PAYABLE* | 128,047.00 | 110,324.00 | 54,481.00 | 82,525.00 | 113,729.00 | 96,213.00 | 115,670.00 | 112,967.00 |
| TAX PAYABLE | | | | | | | | |
| Federal Payroll Taxes | 58,133.00 | 60,846.00 | 0.00 | 6,097.00 | 5,066.00 | 3,892.00 | 51,719.00 | 88.27 |
| State Payroll Taxes | 0.00 | 12,723.00 | 15,041.00 | 20,939.00 | 3,355.00 | 1,081.00 | 5,675.00 | 816.02 |
| Ad Valorem Taxes | | | | | | | | |
| Other Taxes | | | | | | | | |
| TOTAL TAXES PAYABLE | 58,133.00 | 73,569.00 | 15,041.00 | 27,036.00 | 8,421.00 | 4,973.00 | 57,394.00 | 904.29 |
| SECURED DEBT POST-PETITION | | | | | | | | |
| ACCRUED INTEREST PAYABLE | | | | | | | | |
| ACCRUED PROFESSIONAL FEES* | 54,934.00 | 135,001.00 | 166,929.00 | 165,000.00 | 194,237.00 | 134,237.00 | 177,633.73 | 201,965.23 |
| OTHER ACCRUED LIABILITIES | | | | | | | | |
| 1. Other Accrued Expenses | 0.00 | 27,359.00 | 92,850.00 | 100,298.00 | 98,209.00 | 129,018.00 | 234,169.00 | 118,772.36 |
| 2. Accrued Interest | 3,803.00 | 7,606.00 | 11,419.00 | 15,252.00 | 19,065.00 | 22,878.00 | 26,691.00 | 30,504.00 |
| 3. | | | | | | | | |
| TOTAL POST-PETITION LIABILITIES (MOR-3) | $244,917.00 | $353,859.00 | $340,720.00 | $390,111.00 | $433,661.00 | $387,319.00 | $611,557.73 | $465,112.88 |

Revised 07-01-98

*Payment requires Court Approval

MOR-4

Accrued Professional Fees -

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Looper, Reed & McGraw | 54,934.00 | 135,001.00 | 166,929.00 | 165,000.00 | 194,237.00 | 134,237.00 | 134,237.00 | 134,237.00 |
| Porter and Hedges | | | | | | | 43,396.73 | 67,728.23 |
| Total | 54,934.00 | 135,001.00 | 166,929.00 | 165,000.00 | 194,237.00 | 134,237.00 | 177,633.73 | 201,965.23 |

NOTE: Looper Reed filed a fee application on June 20, 2011 asserting that it was owed unpaid fees and expenses in the amount of $242,374.78. The Debtor objects to Looper Reed's application on numerous grounds. Looper Reed has since withdrawn the application without prejudice to refiling at a later date. Consequently, this footnote also discloses an additional 'contingent liability' of $108,137.78 for legal fees to Looper Reed; representing the difference between Looper Reed's fee application of $242,374.78 and the total amount of $134,237.00 reported as "Accrued Professional Fees".

NOTE:

Other Accrued Expenses

| | 30-Jun-11 | 31-Jul-11 |
|---|---|---|
| Accrued Payroll (06/13/2011 to 06/26/2011 paid on 07/01/2011 PLUS 06/26/2011 to 06/30/2011 paid on 07/15/2011) | 160,067.98 | 39,733.05 |
| Accrued Payroll | | 16,773.72 |
| Accrued Property Taxes (Accrual for year 2011 property taxes that will be due 01/31/2012) | 12,580.29 | 9,250.00 |
| Accrued Building Leases | 9,250.00 | 53,015.59 |
| Accrued Insurance Premium | 52,270.29 | 118,772.36 |
| | 234,168.56 | |
| | 118,772.36 | |

CASE NAME:   Diabetes America, Inc.
CASE NUMBER: 10-41521

## AGING OF POST-PETITION LIABILITIES
### MONTH   7/31/2011

| DAYS | TOTAL | TRADE ACCOUNTS | FEDERAL TAXES | STATE TAXES | AD VALOREM, OTHER TAXES |
|---|---|---|---|---|---|
| 0-30 | 113,871.29 | 112,967.00 | 88.27 | 816.02 | |
| 31-60 | 0.00 | | | | |
| 61-90 | 0.00 | | | | |
| 91+ | 0.00 | | | | |
| TOTAL | $113,871.29 | $112,967.00 | $88.27 | $816.02 | $0.00 |

## AGING OF ACCOUNTS RECEIVABLE

| MONTH | 12/31/2010 | 1/31/2011 | 2/28/2011 | 3/31/2011 | 4/30/2011 | 5/31/2011 | 6/30/2011 | 7/31/2011 |
|---|---|---|---|---|---|---|---|---|
| 0-30 DAYS | 580,835.00 | 579,019.00 | 654,481.00 | 679,691.00 | 648,310.00 | 666,948.00 | 705,165.00 | 696,722.00 |
| 31-60 DAYS | 208,396.00 | 219,300.00 | 243,471.00 | 261,356.00 | 249,289.00 | 256,480.00 | 234,632.00 | 248,075.00 |
| 61-90 DAYS | 288,455.00 | 232,048.00 | 312,594.00 | 331,711.00 | 316,396.00 | 325,492.00 | 297,792.00 | 299,376.00 |
| 91+ DAYS | 655,957.00 | 653,723.00 | 615,714.00 | 616,845.00 | 618,946.00 | 623,115.00 | 583,515.00 | 574,276.00 |
| TOTAL | $1,733,643.00 | $1,684,090.00 | $1,826,260.00 | $1,889,603.00 | $1,832,941.00 | $1,872,035.00 | $1,821,104.00 | $1,818,449.00 |

MOR-5

Revised 07/01/98

CASE NAME: __Diabeles America, Inc.__

CASE NUMBER: __10-41521__

## STATEMENT OF INCOME (LOSS)

| | MONTH 31-Dec-10 | MONTH 31-Jan-11 | MONTH 28-Feb-11 | MONTH 31-Mar-11 | MONTH 30-Apr-11 | MONTH 31-May-11 | MONTH 30-Jun-11 | MONTH 31-Jul-11 | FILING TO DATE |
|---|---|---|---|---|---|---|---|---|---|
| REVENUES (MOR-1) | 221,372.00 | 819,985.00 | 861,968.00 | 950,887.00 | 778,023.00 | 783,476.55 | 830,726.00 | 790,876.85 | 6,037,314.40 |
| TOTAL COST OF REVENUES | | | | | | | | | 0.00 |
| GROSS PROFIT | 221,372.00 | 819,985.00 | 861,968.00 | 950,887.00 | 778,023.00 | 783,476.55 | 830,726.00 | 790,876.85 | 6,037,314.40 |
| OPERATING EXPENSES: | | | | | | | | | |
| Selling & Marketing | | | | | | | | | 0.00 |
| General & Administrative | 246,498.00 | 845,288.00 | 751,169.00 | 840,131.00 | 750,800.00 | 805,056.27 | 808,102.00 | 864,197.44 | 5,911,241.71 |
| Insiders Compensation | 5,962.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 89,500.00 |
| Professional Fees | 9,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 22,500.00 | 0.00 | 0.00 | 103,500.00 |
| Other | | | | | | | | | 0.00 |
| Other | | | | | | | | | 0.00 |
| TOTAL OPERATING EXPENSES | 261,460.00 | 875,222.00 | 781,103.00 | 870,065.00 | 780,734.00 | 839,490.27 | 820,036.00 | 876,131.44 | 6,104,241.71 |
| INCOME BEFORE INT, DEPR/TAX (MOR-1) | -40,088.00 | -55,237.00 | 80,865.00 | 80,822.00 | -2,711.00 | -56,013.72 | 10,690.00 | -85,254.59 | -66,927.31 |
| INTEREST EXPENSE | 3,803.00 | 3,803.00 | 3,813.00 | 3,813.00 | 3,813.00 | 3,813.00 | 3,813.00 | 3,813.00 | 30,484.00 |
| DEPRECIATION | | 36,055.00 | 36,055.00 | 68,478.00 | 68,478.00 | 68,478.00 | 66,478.00 | 66,478.00 | 410,500.00 |
| OTHER (INCOME) EXPENSE* | | 13,399.00 | 13,515.00 | 16,364.00 | 13,380.00 | 13,523.00 | 14,208.00 | 14,122.00 | 98,511.00 |
| OTHER ITEMS** | 54,934.00 | 111,870.00 | 53,578.00 | 49,825.00 | 171,974.00 | 82,815.16 | 87,985.00 | 53,953.00 | 666,934.16 |
| TOTAL INT, DEPR & OTHER ITEMS | 58,737.00 | 165,127.00 | 106,961.00 | 138,480.00 | 257,645.00 | 168,629.16 | 172,484.00 | 138,366.00 | 1,206,429.16 |
| NET INCOME BEFORE TAXES | -98,825.00 | -220,364.00 | -26,096.00 | -57,658.00 | -260,356.00 | -224,642.88 | -161,794.00 | -223,620.00 | -1,273,356.47 |
| FEDERAL INCOME TAXES | | | | | | | | | 0.00 |
| NET INCOME (LOSS) (MOR-1) | ($98,825.00) | ($220,364.00) | ($26,096.00) | ($57,658.00) | ($260,356.00) | ($224,642.88) | ($161,794.00) | ($223,620.59) | ($1,273,356.47) |

MOR-6

Accrual Accounting Required, Otherwise Footnote with Explanation:

\* Footnote Mandatory.

\*\* Unusual and/or infrequent item(s) outside the ordinary course of business requires footnote

| | 31-Dec-10 | 31-Jan-11 | 28-Feb-11 | 31-Mar-11 | 30-Apr-11 | 31-May-11 | 30-Jun-11 | 31-Jul-11 | FILING TO DATE |
|---|---|---|---|---|---|---|---|---|---|
| Unusual and/or infrequent item(s) : | | | | | | | | | |
| Discontinued Operations - shut-down Expenses | 0.00 | 53,475.00 | 2,225.00 | 0.00 | 0.00 | | | | |
| Vandalism - Electricity | 0.00 | 0.00 | 0.00 | 0.00 | 43,752.00 | | | | |
| Restructuring Expenses - Employees & Professionals | 54,934.00 | 58,395.00 | 51,353.00 | 49,825.00 | 128,222.00 | 82,815.16 | 87,985.00 | 53,953.00 | |
| Total Unusual and/or infrequent item(s) | 54,934.00 | 111,870.00 | 53,578.00 | 49,825.00 | 171,974.00 | 82,815.16 | 87,985.00 | 53,953.00 | |
| Other Items (Non-cash flow) : | | | | | | | | | |
| Bad Debt Provision | 13,399.00 | 13,399.00 | 13,515.00 | 16,364.00 | 13,380.00 | 13,523.00 | 14,208.00 | 14,122.00 | |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total Other Items | 13,399.00 | 13,399.00 | 13,515.00 | 16,364.00 | 13,380.00 | 13,523.00 | 14,208.00 | 14,122.00 | |

Revised 07/01/98

CASE NAME:  Diabetes America, Inc.
CASE NUMBER:  10-41521

| CASH RECEIPTS AND DISBURSEMENTS | MONTH 31-Dec-10 | MONTH 31-Jan-11 | MONTH 28-Feb-11 | MONTH 31-Mar-11 | MONTH 30-Apr-11 | MONTH 31-May-11 | MONTH 30-Jun-11 | MONTH 31-Jul-11 | FILING TO DATE |
|---|---|---|---|---|---|---|---|---|---|
| | $93,891.00 | $14,495.00 | $45,174.00 | $12,835.00 | $23,440.00 | $21,563.00 | $30,261.00 | $40,186.00 | $93,891.00 |
| 1 CASH-BEGINNING OF MONTH | 93,891.00 | 14,495.00 | 45,174.00 | 12,835.00 | 23,440.00 | 21,563.00 | 30,261.00 | 40,186.00 | 93,891.00 |
| RECEIPTS: | | | | | | | | | |
| 2 CASH SALES | | | | | | | | | 0.00 |
| 3 COLLECTION OF ACCOUNTS RECEIVABLE | 179,028.00 | 869,538.00 | 719,798.00 | 754,853.00 | 725,863.00 | 637,041.00 | 881,657.00 | 793,531.85 | 5,561,309.85 |
| 4 LOANS & ADVANCES (attach list) | | | | | | | | | 0.00 |
| 5 SALE OF ASSETS | | | | | | | | | 0.00 |
| 6 OTHER (attach list) | | | | | | 120,983.00 | 0.00 | 96,177.00 | 217,160.00 |
| TOTAL RECEIPTS** | 179,028.00 | 869,538.00 | 719,798.00 | 754,853.00 | 725,863.00 | 758,024.00 | 881,657.00 | 889,708.85 | 5,778,469.85 |
| Withdrawal) Contribution by Individual Debtor MFR-2* | | | | | | | | | 0.00 |
| DISBURSEMENTS: | | | | | | | | | |
| 7 NET PAYROLL | 173,942.00 | 338,924.00 | 314,104.00 | 307,455.00 | 308,202.00 | 326,574.00 | 329,304.00 | 476,152.05 | 2,574,657.05 |
| 8 PAYROLL TAXES PAID | | 118,996.00 | 101,871.00 | 105,565.00 | 92,783.00 | 100,357.00 | 101,807.00 | 104,919.55 | 726,298.55 |
| 9 SALES, USE & OTHER TAXES PAID | | | | | | | | | 0.00 |
| 10 SECURED/RENTAL/LEASES | | 138,644.00 | 124,391.00 | 145,083.00 | 156,960.00 | 168,979.00 | 159,601.00 | 197,799.89 | 1,091,457.89 |
| 11 UTILITIES & TELEPHONE | 9,688.00 | 78,559.00 | 81,956.00 | 66,927.00 | 61,171.00 | 7,593.00 | 18,105.00 | 17,331.37 | 341,330.37 |
| 12 INSURANCE | 59,996.00 | 120,470.00 | 87,988.00 | 97,369.00 | 83,517.00 | 18,728.00 | 11,455.00 | 34,637.46 | 514,160.46 |
| 13 INVENTORY PURCHASES | | | | | | | | | 0.00 |
| 14 VEHICLE EXPENSES | | | | | | | | | 0.00 |
| 15 TRAVEL & ENTERTAINMENT | | | | | | | | | 0.00 |
| 16 REPAIRS, MAINTENANCE & SUPPLIES | | | | | | 11,402.00 | | | 11,402.00 |
| 17 ADMINISTRATIVE & SELLING | 4,000.00 | 4,000.00 | | | | 5,997.00 | 6,778.00 | 7,467.80 | 28,242.80 |
| 18 OTHER (attach list) | 1,798.00 | 21,266.00 | 23,827.00 | 3,849.00 | 7,107.00 | 91,696.00 | 240,182.00 | 78,688.45 | 468,413.45 |
| TOTAL DISBURSEMENTS FROM OPERATIONS | 249,424.00 | 820,859.00 | 734,137.00 | 726,248.00 | 709,740.00 | 731,326.00 | 867,232.00 | 916,996.57 | 5,755,962.57 |
| 19 PROFESSIONAL FEES | 9,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 4,500.00 | | 103,500.00 |
| 20 U.S. TRUSTEE FEES | | | | | | | | 9,747.35 | 9,747.35 |
| 21 OTHER REORGANIZATION EXPENSES (attach list) | | | | | | | | | 0.00 |
| TOTAL DISBURSEMENTS** | 258,424.00 | 838,859.00 | 752,137.00 | 744,248.00 | 727,740.00 | 749,326.00 | 871,732.00 | 926,743.92 | 5,869,209.92 |
| 22 NET CASH FLOW | -79,396.00 | 30,679.00 | -32,339.00 | 10,605.00 | -1,877.00 | 8,698.00 | 9,925.00 | -37,035.07 | -90,740.07 |
| 23 CASH - END OF MONTH (MOR-2) | $14,495.00 | $45,174.00 | $12,835.00 | $23,440.00 | $21,563.00 | $30,261.00 | $40,186.00 | $3,150.93 | $3,150.93 |

* Applies to individual debtors only

*** Numbers for the current month should balance (match)
RECEIPTS and CHECKS/OTHER DISBURSEMENTS lines on MOR-8

Revised 07 01 98

## MOR-7

Receipts - other

| | 31-May-11 | 31-Jul-11 | FILING TO DATE |
|---|---|---|---|
| DCOA Physician Associates, P.A. | 120,983.00 | 96,177.00 | 217,160.00 |

Other Disbursements:

| | 31-Dec-10 | 31-Jan-11 | 28-Feb-11 | 31-Mar-11 | 30-Apr-11 | 31-May-11 | 30-Jun-11 | 31-Jul-11 |
|---|---|---|---|---|---|---|---|---|
| Clinic Research Patient Travel | | | | | 735.00 | | | 3,500.00 |
| Marketing | | | | 1,025.00 | 0.00 | 100.00 | | 879.75 |
| Bank and Credit Card Fees | | 1,800.00 | 1,200.00 | 2,824.00 | 6,372.00 | 866.00 | 909.00 | 16,680.00 |
| Relocating offices | | 1,000.00 | 0.00 | | | 23,076.00 | 20,050.00 | 16,875.00 |
| Related to theft of electrical | | | | | | 8,184.00 | | 12,500.00 |
| Contract with AHF Financial | | 10,760.00 | 8,870.00 | | | 11,600.00 | 17,750.00 | 4,207.11 |
| Contract labor | | 7,706.00 | 13,757.00 | | | 14,485.00 | 16,018.00 | 1,944.50 |
| IT costs | | | | | | 10,228.00 | 11,044.00 | 4,207.11 |
| Reinsurance employee expenses | | | | | | 838.00 | 4,018.00 | 1,944.50 |
| Employee benefits | | | | | | 2,322.00 | | 2,380.00 |
| Employees contribution to 401k | | | | | | 19,799.00 | 22,410.00 | 19,722.09 |
| DCOA Physician Associates, P.A. | | | | | | | 147,983.00 | |
| Total Other Expenses | 1,798.00 | 21,266.00 | 23,827.00 | 3,849.00 | 7,107.00 | 91,696.00 | 240,182.00 | 78,688.45 |

**CASE NAME:** Diabetes America, Inc.
**CASE NUMBER:** 10-41521

## CASH ACCOUNT RECONCILIATION
### MONTH OF _____
31-Jul-11

| BANK NAME | | | | | |
|---|---|---|---|---|---|
| ACCOUNT NUMBER | BofA #0931 | BofA #0944 | Metro #644 | Metro #700 | |
| ACCOUNT TYPE | OPERATING | PAYROLL | TAX | OTHER FUNDS | TOTAL |
| BANK BALANCE | 169,229.60 | | | | $169,229.60 |
| DEPOSITS IN TRANSIT | | | | | $0.00 |
| OUTSTANDING CHECKS | 166,078.67 | | | | $166,078.67 |
| ADJUSTED BANK BALANCE | $3,150.93 | $0.00 | $0.00 | $0.00 | $3,150.93 |
| BEGINNING CASH - PER BOOKS | 40,186.00 | | | | $40,186.00 |
| RECEIPTS* | 889,708.85 | | | | $889,708.85 |
| TRANSFERS BETWEEN ACCOUNTS | | | | | $0.00 |
| (WITHDRAWAL) OR CONTRIBUTION BY INDIVIDUAL DEBTOR MFR-2 | | | | | $0.00 |
| CHECKS/OTHER DISBURSEMENTS* | 926,743.92 | | | | $926,743.92 |
| ENDING CASH - PER BOOKS | $3,150.93 | $0.00 | $0.00 | $0.00 | $3,150.93 |

MOR-8

*Numbers should balance (match) TOTAL RECEIPTS and
TOTAL DISBURSEMENTS lines on MOR-7

Revised 07/01/98

**CASE NAME:** Diabetes America, Inc.
**CASE NUMBER:** 10-41521

# PAYMENTS TO INSIDERS AND PROFESSIONALS

Of the total disbursements shown for the month, list the amount paid to insiders (as defined in Section 101(31)(A)-(F) of the U.S. Bankruptcy Code) and the professionals.
Also, for insiders, identify the type of compensation paid (e.g., salary, commission, bonus, etc.) (Attach additional pages as necessary).

| INSIDERS: NAME/COMP. TYPE | MONTH 31-Dec-10 | MONTH 31-Jan-11 | MONTH 28-Feb-11 | MONTH 31-Mar-11 | MONTH 30-Apr-11 | MONTH 31-May-11 | MONTH 30-Jun-11 | MONTH 31-Jul-11 |
|---|---|---|---|---|---|---|---|---|
| 1. Bonita Groesser / Salary | 5,962.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 | 11,934.00 |
| 2. | | | | | | | | |
| 3. | | | | | | | | |
| 4. | | | | | | | | |
| 5. | | | | | | | | |
| 6. | | | | | | | | |
| TOTAL INSIDERS (MOR-1) | $5,962.00 | $11,934.00 | $11,934.00 | $11,934.00 | $11,934.00 | $11,934.00 | $11,934.00 | $11,934.00 |

| PROFESSIONALS | MONTH 31-Dec-10 | MONTH 31-Jan-11 | MONTH 28-Feb-11 | MONTH 31-Mar-11 | MONTH 30-Apr-11 | MONTH 31-May-11 | MONTH 30-Jun-11 | MONTH 31-Jul-11 |
|---|---|---|---|---|---|---|---|---|
| 1. HealthCare Markets Group | 9,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 22,500.00 | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |
| 4. | | | | | | | | |
| 5. | | | | | | | | |
| 6. | | | | | | | | |
| TOTAL PROFESSIONALS (MOR-1) | $9,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $22,500.00 | $0.00 | $0.00 |

*Revised 07 01 98*

**MOR-9**

# **SCHEDULE 2**

## Schedule 2 - Preference Payments

**3. Payments to creditors**

None
■    *Complete a. or b., as appropriate, and c.*

    a.    *Individual or joint debtor(s) with primarily consumer debts.*  List all payments on loans, installment purchases of goods or services, and other debts to any creditor made within **90 days** immediately preceding the commencement of this case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $600. Indicate with an (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

None
☐        b.    *Debtor whose debts are not primarily consumer debts:* List each payment or other transfer to any creditor made within **90 days** immediately preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $5,850*.  If the debtor is an individual, indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency.  (Married debtors filing under chapter 12 or chapter 13 must include payments and other transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|
| **Aetna Life Insurance Company**<br>**P. O. Box 981105**<br>**El Paso, TX 79998-1105** | | **$22,916.00** | **$0.00** |
| **AT&T - 5019** | | **$5,886.65** | **$0.00** |
| **AT&T 713 A43=0015 8911** | | **$17,306.09** | **$0.00** |
| **AT&T - Box 5001** | | **$12,160.19** | **$0.00** |
| **Bank of America**<br>**P. O. Box 851001**<br>**Dallas, TX 75285-1001** | | **$75,450.66** | **$0.00** |
| **BCBS of Texas - Co Health Insurance**<br>**Attn:  Cashier Health Care Service Corp.**<br>**P. O. Box 660049**<br>**Dallas, TX 75266-0049** | | **$95,463.56** | **$0.00** |
| **Clean USA**<br>**P. O. Box 16337**<br>**Houston, TX 77222** | | **$7,101.65** | **$0.00** |
| **Comptroller of Public Accounts** | | **$15,408.98** | **$0.00** |
| **David Brooks** | | **$36,807.29** | **$0.00** |
| **Dexcom**<br>**Attn:  Accounts Receivable**<br>**6340 Sequence Dr.**<br>**San Diego, CA 92121** | | **$6,677.56** | **$0.00** |
| **Dr. Aaron King** | | **$8,940.00** | **$0.00** |
| **EBK-DA, LLC** | | **$38,880.00** | **$0.00** |

* Amount subject to adjustment on 4/01/13, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

3

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|
| **EBKT-DA, LLC** <br> **Lee A. Ohliger** <br> **Carter Ledyard & Milburn** <br> **2 Wall Street** <br> **New York, NY 10005** | | **$9,720.00** | **$0.00** |
| **Elizabeth Bello** | | **$8,652.83** | **$0.00** |
| **Emdeon** <br> **12016 Collections Center Dr.** <br> **Chicago, IL 60693** | | **$16,380.85** | **$0.00** |
| **GE Healthcare IITS USA Corp.** <br> **P. O. Box 277475** <br> **Atlanta, GA 30384-7475** | | **$6,199.28** | **$0.00** |
| **Healthcare Markets Group, Ltd.** | | **$37,200.00** | **$0.00** |
| **Hudson Energy** <br> **P. O. Box 731137** <br> **Dallas, TX 75373-1137** | | **$19,740.08** | **$0.00** |
| **Identity Architects** <br> **8807 W. Sam Houston Parkway N.** <br> **Suite 111** <br> **Houston, TX 77040** | | **$10,000.00** | **$0.00** |
| **Insight** <br> **P. O. Box 731069** <br> **Dallas, TX 75373-1069** | | **$9,217.49** | **$0.00** |
| **Julie Demille** | | **$14,921.45** | **$0.00** |
| **K.B. Centre, Ltd.** <br> **8554 Katy Freeway** <br> **Suite 301** <br> **Houston, TX 77024** | | **$28,380.00** | **$0.00** |
| **Konica Minolta Premier Finance** <br> **P. O. Box 790448** <br> **Saint Louis, MO 63179-0448** | | **$12,178.25** | **$0.00** |
| **Matlock Park Place, LP** <br> **c/o Quine & Associates** <br> **P. O. Box 833009** <br> **Richardson, TX 75083-3009** | | **$20,803.12** | **$0.00** |
| **MetroBank** | | **$40,099.59** | **$0.00** |
| **OnTime Electric & Air** | | **$34,843.51** | **$0.00** |
| **P 2 F Payment Processing** | | **$10,043.53** | **$0.00** |
| **Pearland MOB, Ltd.** <br> **98 San Jacinto Blvd.** <br> **Suite 1810** <br> **Austin, TX 78701** | | **$13,296.70** | **$0.00** |
| **Physician Resources, Inc.** | | **$8,451.50** | **$0.00** |

4

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|
| **Premium Assignment Corporation**<br>**P. O. Box 3100**<br>**Tallahassee, FL 32315-3100** | | **$35,509.73** | **$0.00** |
| **PRU CB Limited Partnership**<br>**Wells Fargo Department 4282**<br>**P. O. Box 202220**<br>**Dallas, TX 75320-2220** | | **$7,730.50** | **$0.00** |
| **PSS - Arizona** | | **$12,226.24** | **$0.00** |
| **PSS - Dallas** | | **$61,685.19** | **$0.00** |
| **PSS - Houston** | | **$186,068.07** | **$0.00** |
| **PSS - San Antonio** | | **$38,536.52** | **$0.00** |
| **PV North, LLC** | | **$20,000.00** | **$0.00** |
| **Retasure Digital Healthcare, Inc.**<br>**343 South White Street**<br>**Wake Forest, NC 27587** | | **$31,591.28** | **$0.00** |
| **Texas Workforce Commission**<br>**Regulatory Enforcement Division**<br>**101 E 15th Street**<br>**Austin, TX 78778** | | **$14,828.23** | **$0.00** |
| **The Hartford** | | **$83,363.85** | **$0.00** |
| **The Lincoln National Life Insurance Co.**<br>**Group Insurance Service Office**<br>**P. O. Box 0821**<br>**Carol Stream, IL 60132-0821** | | **$22,004.23** | **$0.00** |
| **The Plazas at Callaghan Road, Ltd.**<br>**c/o Vista Management Company**<br>**1117 El Iridge Parkway**<br>**Houston, TX 77077** | | **$18,768.00** | **$0.00** |
| **Townsend Crossing, LP**<br>**Attn:  Mr. David Mulligan**<br>**1513 Highway 69, #42**<br>**Nederland, TX 77627** | | **$16,130.30** | **$0.00** |
| **TRAVELERS** | | **$12,592.06** | **$0.00** |
| **Tres Colegas Realty Partners, Ltd.**<br>**c/o Reata Property Management**<br>**7330 San Pedro, Suite 710**<br>**San Antonio, TX 78216** | | **$25,140.07** | **$0.00** |
| **Ventana Properties, Inc.**<br>**5353 Alpha Rd.**<br>**Suite 200**<br>**Dallas, TX 75240** | | **$22,368.00** | **$0.00** |

5

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|
| **Ventas Bayshore**<br>**c/o Grubb & Ellis Mgmt. Svcs.**<br>**500 W. Monroe St.**<br>**Suite 2800**<br>**Chicago, IL 60661** | | **$16,505.81** | **$0.00** |
| **Verizon Business**<br>**P. O. Box 371355**<br>**Pittsburgh, PA 15250-7355** | | **$35,334.02** | **$0.00** |
| **Weingarten Nostat, Inc.**<br>**Attn:  Accounts Receivable**<br>**P. O. Box 201692**<br>**Houston, TX 77216-1692** | | **$27,179.56** | **$0.00** |
| **YS & LS & LS Partnership, Ltd.**<br>**6017 St. Denis St.**<br>**Corpus Christi, TX 78414** | | **$19,603.26** | **$0.00** |

None
■    c.    *All debtors:* List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

**4.  Suits and administrative proceedings, executions, garnishments and attachments**

None
□    a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| **Unilev Management Corp. v. Diabetes America, Inc.;  Case No. 2010-76400 (filed 11/18/10)** | **Breach of Contract** | **215th Judicial District, Harris County, Texas** | **Pending** |
| **Ken Carnes v. Diabetes America, Inc.;  Case No. 2010-46303 (filed 7/27/10)** | **Breach of Contract** | **157th Judicial District, Harris County, Texas** | **Pending** |
| **Southwest Sign Group, Inc. v. Diabetes Centers of America, Inc., et al.; Case No. 2010 CI 16465 (filed 9/30/10)** | **Breach of Contract** | **57th Judicial District, Harris County, Texas** | **Pending** |

None
■    b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

# **<u>SCHEDULE 3</u>**

**DIABETES AMERICA, INC. DISTRIBUTION/LIQUIDATION ANALYSIS**

| | Estimated recovery under proposed Chapter 11 Plan | Hypothetical Percentage Recovery in Ch 7 Liquidation | Estimated Liquidation Value (Unaudited) | Note Reference |
|---|---|---|---|---|
| | [1] | [2] | [1] * [2] = [3] | |
| Cash Proceeds of Sale, plus Assumed Liabilities | 5,675,000 | 40% | 2,270,000 | 1 |
| **Total Assets Available for Distribution** | | | **2,270,000** | |
| | | | | |
| **Chapter 7 Costs Associated with Liquidation:** | | | | |
| Chapter 7 professional fees | | | (125,000) | 2 |
| Chapter 7 Trustee fee | | | (68,100) | 3 |
| **Costs Associated with Liquidation** | | | **(193,100)** | |
| | | | | |
| **WoodRock Fees Associated with Sale** | (504,000) | | | |
| | | | | |
| **Net Estimated** | **5,171,000** | | **2,076,900** | |
| **Proceeds Available for Distribution** | | | | |

| | Estimated Claims if Allowed | Estimated Recovery Value % | Estimated Recovery Value | Note Reference |
|---|---|---|---|---|
| **Total Assets Available for Distribution** | | | 2,076,900 | |
| | | | | |
| Less Secured Claims: | | | | |
| Metro Bank Secured Claim | 578,997 | 100% | 578,997 | |
| Other Secured Claims | 800,000 | 100% | 800,000 | 4 |
| | | | | |
| **Total Secured Claims** | **1,378,997** | **100%** | **1,378,997** | |
| | | | | |
| **Estimated Liquidation Proceeds Available After Payment on Secured Claims** | | | **697,903** | |
| | | | | |
| Less Chapter 11 Administrative and Priority Claims: | | | | |
| Allowed Administrative Expense Claim | 200,717 | 100% | 200,717 | 5 |
| Current Trade Payables | 925,000 | 100% | 925,000 | 6 |
| Priority tax claims | 1,388,826 | 100% | 1,388,826 | 7 |
| Chapter 11 professional fees | 500,000 | 100% | 500,000 | 8 |
| | | | | |
| **Total Administrative and Priority Claims** | **3,014,543** | **100%** | **3,014,543** | |
| | | | | |
| **Total Estimated Liquidation Proceeds Available to Unsecured Claims:** | 777,460 | | (2,316,640) | |
| | | | | |
| **Total Filed Unsecured Claims** | **2,888,136** | | **2,888,136** | 9 |
| | | | | |
| Potential Re-classified Unsecured Claims | 650000 | | 650000 | 10 |
| | | | | |
| **Total Unsecured Claims Without Apelles** | **3,538,136** | | **3,538,136** | 11 |
| | | | `2 | |
| **Estimated Distribution to Unsecureds** | **22%** | | **0%** | |

**Notes to Diabetes America, Inc. Distribution/Liquidation Analysis:**

The Liquidation Analysis reflects the Debtor's estimate of the proceeds that could be realized if the Debtor were to be liquidated in accordance with Chapter 7 of the Bankruptcy Code.  Underlying the liquidation analysis are a number of estimates and assumptions that, although developed and considered reasonable by management of the Debtor, are inherently subject to significant business, economic and competitive risks, uncertainties and contingencies beyond the control of the Debtor and its management and upon assumptions with respect to the liquidation decisions which could be subject to change.  **ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO ATTEMPT TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.**

The liquidation analysis assumes that the Debtor's case is converted to Chapter 7 and a chapter 7 trustee is appointed.  The Chapter 7 Trustee would be responsible for liquidating the Debtor's assets and disbursing the proceeds realized over an assumed period of 3 months.  It is assumed that proceeds resulting from the liquidation would be reduced by the expenses of the liquidation before any allowed secured claimant would receive proceeds from the sale of collateral securing that claim.  The notes below detail the significant assumptions reflected in the liquidation analysis.

1   The Debtor believes that the liquidation value of its assets is the approximate value of its current accounts receivable.  The Debtor estimates this to be approximately 40% of the sales price under the EDG Asset Purchase Agreement.  Also, the purchase price of $5,675,000 under the EDG Sale assumes that the Debtor's receivables will total $2.4 million at Closing.  There is some risk that the Debtor's qualifying accounts receivable will not total $2.4 million at Closing, in which case the purchase price under the EDG Asset Purchase Agreement will be reduced dollar for dollar for the amount below the $2.4 million threshold.

2   Chapter 7 professional fees:  Estimated legal, accounting, collection and consulting services incurred in a ch. 7 liquidation

3   The Chapter 7 Trustee fee is assumed to be 3% of the total liquidated assets available for distribution.

4   The Debtor estimates that Allowed Secured Claims will be approximately $800,000.  This includes all Secured Claims asserted by taxing authorities, as well as certain filed Secured Claims that the Debtor does not believe are disputed.

5   This includes the allowed administrative expense claims of (i) PSS World Medical, Inc. in the amount of $61,149.21; and (ii) EBK-DA, LLC and EBKT-DA, LLC in the amount of $139,567.50.

6   The Debtor estimates that its current post-petition trade payables are $925,000 and will be paid pursuant to the EDG Asset Purchase Agreement (or such alternative asset purchase agreement as is approved by the Court).

2486143_1.XLS

7   This consists of both filed and scheduled priority tax claims, including the IRS claim for pre-petition 941 taxes in the amount of $1,348,350.46.

8   This estimate consists of both the Debtor's and the Committee's professional fees and assumes the allowance of fees billed by Looper Reed, which are disputed by the Debtor.

9   This amount is based on the claims register in the case.

10  This amount consists of secured claims filed by (i) Afton Capital, Inc. ($150,000); (ii) Bonita Groesser ($50,000); (iii) Frank Basile ($150,000); (iv) Jon Locy ($25,000); (v) Longmont Capital ($250,000); and (vi) Mark and Jane Osman ($25,000) are allowed as general unsecured claims rather than secured claims.

11  The distribution estimated herein assumes that the Apelles claim in the amount of $4,557,464.44 is either subordinated, recharacterized or disallowed.  If the Apelles claim is allowed as an unsecured claim, distribution to unsecured creditors is estimated at 10% or less.